## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, <br><br>                  Plaintiff, <br><br>     v. <br><br> PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, d/b/a FEDLOAN SERVICING and AMERICAN EDUCATION SERVICES, <br><br>                  Defendant. | Case No. 19-cv-9155 <br><br> **COMPLAINT** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

PARTIES, JURISDICTION, AND VENUE ................................................................... 5

FACTUAL ALLEGATIONS ........................................................................................... 6

I.   PHEAA ................................................................................................................ 6

II.   Federal Student Loan Programs ....................................................................... 8

III.   The Public Service Loan Forgiveness Program ............................................ 10

IV.   PHEAA's Deceptive, Unfair, and Abusive Practices .................................... 12

   A.   FedLoan fails to accurately count borrowers' PSLF-qualifying payments ............... 12

     i.   FedLoan is responsible for determining borrowers' progress towards forgiveness and borrowers reasonably rely on its ability to do so, but FedLoan lacks incentives to carry out this obligation accurately ........................................... 12

     ii.   FedLoan makes errors in payment counts when loans are first transferred to its systems ................................................................................................. 14

     iii.   FedLoan fails to maintain accurate counts for payments made after it begins servicing loans ........................................................................................... 18

     iv.   FedLoan's failure to accurately count PSLF-qualifying payments harms borrowers in several ways ........................................................................... 19

   B.   FedLoan fails to timely provide explanations to borrowers for PSLF payment count determinations ....................................................................................................... 22

     i.   FedLoan fails to provide borrowers with explanations for payment determinations when providing initial payment counts ........................................................... 22

     ii.   FedLoan delays excessively in providing borrowers with explanations for its decisions ....................................................................................................... 23

     iii.   Sometimes, FedLoan provides no explanation for its payment counts at all ......... 26

     iv.   FedLoan's delays and denials significantly harm borrowers ............................... 27

C.      PHEAA fails to timely and accurately process income-driven repayment plan paperwork ......................................................................................................... 30

    i.    PHEAA's errors in determining payment amounts impose financial difficulties on distressed borrowers.................................................................................................. 31

    ii.   PHEAA's errors in calculating payment amounts or verifying recertification can force borrowers into costly forbearances ........................................................................ 33

    iii.  PHEAA's errors also deprive borrowers of the opportunity to progress towards loan forgiveness ..................................................................................................... 34

    iv.   PHEAA even removes borrowers from IDR plans in which they have successfully enrolled ................................................................................................................ 35

D.      PHEAA treats borrowers inconsistently, failing to provide some borrowers with relief addressing the consequences of its own errors and information necessary to correct problems with their eligibility............................................................................................ 39

    i.    Reclassifying payments made during forbearance as PSLF-qualifying.................... 41

    ii.   Retroactive reapplication of payments to eliminate "paid-ahead status" .............. 43

    iii.  Providing misinformation to PSLF borrowers about the option to appeal FedLoan determinations.................................................................................................... 48

E.      PHEAA steers borrowers to less favorable options rather than income-driven repayment plans ...................................................................................................... 50

    i.    Forbearance steering................................................................................... 50

    ii.   Consolidation steering ................................................................................ 53

F.      PHEAA wrongfully denies access to deferments for eligible borrowers with cancer 56

CAUSES OF ACTION ............................................................................................ 57

RELIEF REQUESTED............................................................................................ 66

The People of the State of New York, by their attorney, Letitia James, Attorney General of the State of New York, respectfully allege, upon information and belief:

## INTRODUCTION

1.      The People of the State of New York ("NYAG"), by and through their Attorney General Letitia James, bring this action pursuant to the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. § 5301, *et seq*., N.Y. Executive Law § 63(12), and N.Y. General Business Law ("GBL") § 349 against the Pennsylvania Higher Education Assistance Agency ("PHEAA").

2.      In 2007, Congress created the Public Service Loan Forgiveness ("PSLF") program, which encourages individuals to work in public service by offering federal student loan forgiveness to borrowers who complete a period of public service.  34 C.F.R. § 685.219.  PSLF enables graduates to take low-paying jobs in government and at nonprofits serving veterans, the elderly, low-income children, people with disabilities, victims of domestic violence, and other vulnerable groups.  Many teachers, nurses, social workers, firefighters, and members of the armed forces are eligible for PSLF.

3.      "Our society needs more teachers, more emergency management and law enforcement professionals, more public health doctors and nurses, more social workers, more librarians, more public interest lawyers, and more early childhood teachers," Senator Ted Kennedy, one of the sponsors of the program, explained.  "Under our bill, we will produce more of them because they—and all the groups I have just mentioned—will be eligible for loan forgiveness."[1]

---

[1] 153 Cong. Rec. 9597 (2007) (statement of Sen. Kennedy), https://www.congress.gov/crec/2007/07/19/CREC-2007-07-19-pt1-PgS9574-2.pdf

1

4.      The program was intended to ensure that graduates are not "overly burdened with student loan debt…so they can afford to pursue careers that not only benefit them but make the world a better place in which to live."[2]

5.      Further, as a "growing body of research show[s] that Black and Latinx college graduates bear a disproportionate burden of student loan debt when entering the workforce compared with white college graduates," programs such as PSLF may be particularly important for supporting Black and Latinx participation in public service, including teaching.[3]

6.      PHEAA's failures as the PSLF servicer, however, have undermined the goals of the PSLF program and created financial hardship for many of these dedicated public servants.

7.      PHEAA, operating under the name FedLoan Servicing ("FedLoan"), services loans held by the U.S. Department of Education originated under the federal Direct Loan program, including those of New Yorkers, and those Federal Family Education Loan Program ("FFEL") loans owned by the federal government.  PHEAA also services privately-owned FFEL loans and private student loans for tens of thousands of borrowers in New York and nationwide.[4]

8.      FedLoan also has an exclusive contract with the U.S. Department of Education to service the accounts of borrowers seeking PSLF.[5]

---

[2] 153 Cong. Rec. 9540 (2007) (statement of Sen. Harkin), https://www.congress.gov/crec/2007/07/19/CREC-2007-07-19-pt1-PgS9534.pdf.

[3] Bayliss Fiddiman et al., *Student Debt: An Overlooked Barrier to Increasing Teacher Diversity* 3, 9 (2019), https://www.americanprogress.org/issues/education-postsecondary/reports/2019/07/09/471850/student-debt-overlooked-barrier-increasing-teacher-diversity/.

[4] PHEAA conducts its student loan servicing business both as American Education Services ("AES") and FedLoan Servicing ("FedLoan") (collectively referred to as "PHEAA").  AES services private (non-federally guaranteed) loans and federally-guaranteed loans originated under the (now-discontinued) Federal Family Education Loan Program ("FFEL") that are owned by private companies.  FedLoan services Direct loans (loans made directly by the federal government under the current program) and FFEL loans that are owned by the federal government.  The majority of the NYAG's claims relate to PHEAA's conduct under the FedLoan name.  To the extent that this Complaint refers to conduct by the company under both names, it will refer to the company as PHEAA.

[5] This includes all borrowers who file a form indicating an intention to participate in PSLF and meet certain initial eligibility requirements, even if they later decide not to pursue PSLF.

9.     Because FedLoan is the exclusive servicer of PSLF, borrowers have no choice but to rely on FedLoan to administer PSLF fairly and correctly.

10.     FedLoan has, however, failed miserably in its administration of PSLF.

11.     FedLoan has proven itself unwilling or unable to perform its most fundamental task as exclusive PSLF servicer—accurately counting the qualifying payments borrowers make towards the 120 required for forgiveness.  FedLoan's failure to accurately count eligible payments drives up the cost of borrowers' loans, extends the time that they are in repayment, and leads to improper denials when borrowers apply for loan forgiveness.

12.     To add insult to injury, borrowers who attempt to question FedLoan's counts are left waiting for months to over a year for an explanation.

13.     Furthermore, FedLoan places the burden of identifying and correcting its multitude of errors on the borrowers themselves; fails to apply policies consistently; and fails to inform borrowers of options to seek appeals or "overrides" to fix FedLoan's mistakes or undo their consequences.

14.     FedLoan's failure to properly administer the program is a significant contributor to the shockingly high rate of rejection of PSLF forgiveness applications—more than 98% of all PSLF applications have been rejected as ineligible for forgiveness.  Fewer than 900 out of more than 90,000 applicants have had loan discharges processed as of June 2019.

15.     FedLoan promises borrowers that it has "one goal: to help you successfully repay your loans" and that "[w]e are here to help you with every step of the [PSLF] process."

16.     But, in fact, one of the biggest obstacles borrowers face in obtaining the forgiveness they have earned is FedLoan itself.

17.     PHEAA also fails to fairly and correctly administer income-driven repayment ("IDR") plans, which are intended to help struggling borrowers avoid delinquency and default by limiting monthly payments based on income and household size.  Among other issues, FedLoan fails to timely process IDR applications and fails to accurately calculate monthly payments.[6] These delays and mistakes harm struggling borrowers and drive up the cost of their loans.

18.     PHEAA's deceptive, unfair, and abusive practices (as both FedLoan and AES) also include steering borrowers to less beneficial repayment options such as forbearance or consolidation instead of IDR plans and making false statements to borrowers with cancer about their eligibility for a special deferment.

19.     PHEAA has consistently demonstrated that it is unwilling to devote the resources required to carry out its servicing obligations in a timely and competent way.

20.     Student loan borrowers have no choice of servicer.  PHEAA borrowers are thus trapped with a company that disregards its responsibilities and leaves them stuck with the consequences of its errors—often thousands of dollars' worth.

21.     Ultimately, PHEAA's cavalier approach to its responsibilities has meant it has deprived borrowers of benefits which they have earned and which Congress intended them to have.  Faced with PHEAA's incompetent and indifferent servicing, borrowers report simply giving up on their hopes of ever achieving loan forgiveness or other benefits.  One borrower struggling with PHEAA's errors echoed many other complaints when she lamented, "I feel that I have no recourse in dealing with this situation since [FedLoan] is the exclusive servicer for PSLF and that [FedLoan] can do whatever they want on whatever timetable they want."

---

[6] Both Direct and FFEL loan borrowers are eligible for some IDR plans, and both FedLoan and AES engage in these practices.

4

## PARTIES, JURISDICTION, AND VENUE

22.     Plaintiff is the People of the State of New York, by their attorney, Letitia James, the New York Attorney General ("NYAG").

23.     The NYAG is authorized to initiate civil actions in federal district court to enforce provisions of the CFPA, which prohibits deceptive, unfair, and abusive practices.  12 U.S.C. § 5552(a)(1).

24.     The NYAG is also authorized to take action to enjoin repeated and persistent fraudulent and illegal conduct under N.Y. Executive Law § 63(12) and deceptive business practices under N.Y. GBL § 349.

25.     Defendant PHEAA is a national student loan servicer incorporated in Pennsylvania and headquartered at 1200 N. Seventh Street, Harrisburg, Pennsylvania 17102.

26.     The NYAG has provided PHEAA with a pre-litigation notice as specified in N.Y. GBL § 349.

27.     This Court has subject-matter jurisdiction over this action because the action presents a federal question and is brought under federal consumer financial law.  28 U.S.C. § 1331; 12 U.S.C. § 5565(a)(1).

28.     This Court has supplemental jurisdiction over NYAG's state-law claims because the state-law claims are so related to the federal claims that they form part of the same case or controversy.  28 U.S.C. § 1367(a).

29.     This Court has personal jurisdiction over PHEAA because the causes of action arise from PHEAA's conduct of business in this district and PHEAA contracts to provide goods or services in this state and has committed tortious acts within the state and without the state causing injury to persons or property within the state.  12 U.S.C. § 5564(f); N.Y. C.P.L.R. 302(a).

30.     Venue is proper in this district because a substantial amount of the transactions, acts, practices, and courses of conduct at issue occurred within this district and PHEAA conducted business in this district.  28 U.S.C. § 1391(b)(2); 12 U.S.C. § 5564(f).

31.     The NYAG demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## FACTUAL ALLEGATIONS

**I.     PHEAA**

32.     PHEAA is engaged in nationwide student-loan servicing activities, including servicing student loans held by tens of thousands of New York residents.

33.     PHEAA was created by the Pennsylvania General Assembly in 1963.  At its inception, PHEAA's mission was to improve higher education opportunities for Pennsylvania residents by funding student loans and grants to Pennsylvania residents.

34.     However, in 2009, pursuant to a contract with the federal Department of Education, PHEAA began servicing federal student loans nationally, and today, most of PHEAA's operations and revenues are associated with its national student loan servicing business, rather than its work funding student loans and grants for Pennsylvania residents.

35.     PHEAA services more than $454 billion in student loans, which is around 20 percent of the nation's student debt.

36.     PHEAA receives no operating funds from the Commonwealth of Pennsylvania, is responsible for its own debts, exercises control over its revenues, makes its own policy decisions, sets its own budget, and generates a majority of its revenues through its out-of-state activities.

As a result of these factors, multiple courts have found that PHEAA is not an arm of or an "alter ego" of the Commonwealth of Pennsylvania.[7]

37.     As noted above, PHEAA conducts its student loan servicing nationally as AES and FedLoan.

38.     PHEAA's servicing activities include, among others, creating and maintaining all borrower records, sending billing statements, collecting and processing borrowers' payments, processing applications for repayment plans, providing telephone assistance, and providing services related to administration of the PSLF and TEACH Grant programs.

39.     PHEAA reaps substantial rewards from its contracts with the federal government.

40.     In the fiscal year ending June 2019, its revenues from servicing student loans held by the federal government (primarily Direct loans) were a little over $201 million, making up around a third of its overall operating revenues.

41.     While the federal government is supposed to allocate accounts to the various loan servicers based in part on performance, FedLoan, as the sole servicer for borrowers progressing towards PSLF, is effectively guaranteed a steady flow of borrowers through the program for as long as its contract lasts.

42.     There is no financial penalty to FedLoan if an eligible borrower fails to progress towards PSLF forgiveness.

---

[7] *See U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 804 F.3d 646, 676-77 (4th Cir. 2015) (PHEAA not immune from suit under federal False Claims Act), *cert. denied*, 137 S. Ct. 617 (2017); *Pele v. Pennsylvania Higher Educ. Assistance Agency*, 13 F. Supp. 3d 518, 527-38 (E.D.Va. 2014), aff'd, 628 F. App'x 870, 872 (4th Cir. 2015) (PHEAA not immune from suit under federal Fair Credit Act), cert. denied, 137 S. Ct. 617 (2017); *Lang v. Pennsylvania Higher Educ. Assistance Agency*, 201 F. Supp. 3d 613, 628-29 (M.D. Pa. 2016) (PHEAA not immune from suit under federal Fair Labor Standards Act).  *See also* 24 Pa. Stat. § 5104(3) ("[PHEAA's funds] may be utilized at the discretion of the board of directors for carrying out any of the corporate purposes of the agency," and "… no obligation of the agency shall be a debt of the [Commonwealth of Pennsylvania].").

43.     PHEAA is the subject of thousands of consumer complaints.  From September 2016 to August 2017, the most recent period for which the Consumer Financial Protection Bureau ("CFPB") made a formal report, the CFPB received about 1500 complaints concerning PHEAA's servicing of federal student loans, the second most of any servicer.  From March 2018 to February 2019, the CFPB received approximately 2750 complaints concerning PHEAA's servicing of federal student loans.

44.     PHEAA also fares poorly in the Department of Education's quarterly surveys to measure borrower satisfaction with servicers.

45.     In 11 out of 12 surveys in the past three years of available data, FedLoan has ranked as one of the bottom two or three servicers.

46.     FedLoan fares even worse in the semi-annual survey of Department of Education personnel concerning loan servicer performance that it conducts at the same time: in 4 out of 6 surveys in that period, it received the worst score.

## II.    Federal Student Loan Programs

47.     Beginning in 1958, the federal government has established various federal student lending programs in order to help students afford to attend college.

48.     These programs have evolved over the years, changing from a model in which private lenders largely made and held the loans, ultimately backed by a federal guarantee ("FFEL loans"), to one in which the government is the exclusive originator and holder of all new federal loans ("Direct loans").[8]

---

[8] While FFEL loans are no longer made, there remain a substantial number still outstanding.  Some were purchased by the federal government in response to the 2007 financial crisis, meaning that some are serviced by FedLoan along with its Direct portfolio, while some of the others still held by private investors (which hire their own servicers) are serviced under the name AES.

49.     These programs have been widely used.  As of the first quarter of 2019, there are roughly $1.46 trillion in outstanding federal student loans.

50.     Under either model, the holder of the loan usually does not administer the loan directly, but rather retains a company to act as a servicer, creating and managing borrower records, billing and collecting monthly payments, and helping borrowers who have questions.

51.     Over the years, a borrower's loans may be serviced by multiple servicers.  A borrower generally does not have any control over which servicer handles the borrower's loans.

52.     Since the financial crisis of 2007, a large and increasing share of borrowers are struggling under the weight of their student loan debt.  As a result, beginning in 2009, the U.S. Department of Education introduced new repayment options for both Direct and, in a more limited way, FFEL loans.

53.     These repayment plans (collectively called "income-driven repayment" or IDR plans) base monthly payment amounts on a borrower's income and family size.

54.     There are now several such plans, each with its own eligibility requirements and benefits.

55.     To participate in one of these repayment plans, a borrower must apply to the borrower's servicer, documenting income and family size.

56.     The servicer is then supposed to calculate the borrower's monthly payment under the plan.

57.     Once enrolled, the borrower must also recertify income and household size annually, or risk being removed from the repayment plan.

58.     After a certain period of repayment (usually 20 to 25 years), the remaining balance of the loan is to be forgiven.

59.     Despite these plans, many borrowers still struggle with repaying their student debt.

60.     As of December 2018, at least $11.7 billion of federal student loan debt owed by about half a million borrowers was actually in default.[9]  Tens of billions of dollars more was delinquent (that is, more than 30 days late).

61.     This crisis appears to be growing.  A recent Brookings Institute report predicted that nearly 40 percent of all borrowers may default on their student loans by 2023.

**III.    The Public Service Loan Forgiveness Program**

62.     In 2007 Congress created the PSLF program as part of the College Cost Reduction and Access Act of 2007.  See 34 C.F.R. § 685.219.

63.     Under the PSLF program, Direct student loan borrowers who make 120 monthly payments according to its terms while working full-time for a qualifying public-service employer are eligible to have the remainder of their student loan balance forgiven.

64.     PHEAA, doing business as FedLoan, became the exclusive servicer for the PSLF program in 2012.

65.     Borrowers whose loans are serviced by PHEAA often seek guidance from PHEAA on navigating PSLF's complex and often confusing regulatory eligibility requirements.

66.      To qualify for PSLF, borrowers generally must be employed at a government agency or at certain types of nonprofit organizations for ten years; have Direct (rather than FFEL) loans; be enrolled in an eligible repayment plan; and make 120 qualifying payments.

67.     In order for a payment to be a PSLF-qualifying payment under the program, the payment must meet a number of requirements.

---

[9] This figure excludes privately-held FFEL loans, so is likely a substantial understatement.  "Default" is defined as nine months or more delinquent, at which point the borrower begins to face serious negative consequences.

68.     For example, the payment must be made on time (within 15 days of the due date) and for the full amount due, and the payment must be made while the borrower is enrolled in an eligible loan repayment plan and employed full-time by a qualified employer.

69.     Borrowers who are interested in participating in the PSLF program can confirm whether they are working for a qualifying employer by submitting an Employment Certification Form ("ECF") to the Department of Education.  FedLoan reviews the ECF on the Department's behalf.

70.     Once a borrower submits an ECF and is found to meet certain eligibility criteria, including having an eligible employer and at least some eligible loans, the borrower's loans (and records) will be transferred from the borrower's prior servicer to FedLoan, which is responsible for determining the borrower's progress towards forgiveness.  FedLoan will then inform the borrower how many qualifying payments towards the required 120 the borrower has made to date.

71.     The Department of Education encourages borrowers to continue to file an ECF annually, at which time FedLoan is supposed to update information about the number of PSLF-qualifying payments they have made to date.  However, borrowers are not required to file an ECF annually in order to remain on track for PSLF.

72.     After the borrower makes 120 PSLF-qualifying payments, the borrower must complete and submit to FedLoan a PSLF Application for Forgiveness to have the balance of the borrower's loans forgiven.  At that time, FedLoan is supposed to make a determination that the borrower has made the minimum number of PSLF-qualifying payments.

73.     Because the PSLF program first went into effect in 2007, fall 2017 was the earliest that any borrower could have made 120 PSLF-qualifying payments.

74.     As of June 2019, there have been over 2.3 million approved ECFs from more than

1.13 million borrowers, representing nearly $102 billion in loans, with an average loan balance

for borrowers with approved ECFs of over $90,000.

75.     Also as of June 2019, more than 90,000 borrowers have applied for forgiveness.

Less than a thousand borrowers have received discharges of their loans—barely 1 percent.

FedLoan's deceptive, unfair, and abusive conduct detailed below is a significant contributor to

this abysmally low approval rate.

## IV.     PHEAA's Deceptive, Unfair, and Abusive Practices

### A.     FedLoan fails to accurately count borrowers' PSLF-qualifying payments

#### i.     *FedLoan is responsible for determining borrowers' progress towards forgiveness and borrowers reasonably rely on its ability to do so, but FedLoan lacks incentives to carry out this obligation accurately*

76.     FedLoan is responsible for determining whether a borrower's payment counts

towards the 120 needed for PSLF forgiveness.

77.     As the Department of Education states on its website for borrowers,

"FedLoan…determine[s] the number of qualifying payments that you have made during the

period of qualifying employment."

78.     When a borrower's initial ECF is approved, FedLoan promises the borrower (in

this or similar language) that "[o]nce your servicer transfers your loans to us, we will calculate

and provide you with notification of: * The number of qualifying payments you have made

during the [relevant period], * The total number of qualifying payments you have made during

all periods of qualifying employment approved to date, * The estimated number of payments that

are still required, and * The date you are expected to be eligible to apply for forgiveness."

79.     Upon completing review of an ECF after FedLoan begins servicing the loan,

FedLoan tells the borrower (in this or similar language), "[t]he number of qualifying payments

you have made during the qualifying employment period listed below, the total number of

qualifying payments you have made during all periods of qualifying employment approved as of

the date of this letter, the number of payments that are still required before you can apply for the

forgiveness program, and the date you are expected to be eligible to apply for forgiveness are

[included in] this letter."

80.     FedLoan also promised on its website as of June 2019, "[e]ach time we approve

an ECF, we will update the count of qualifying payments that you have made to include

payments made during the [period covered]."

81.     Borrowers are often not in a good position to determine themselves whether a

payment is a PSLF-qualifying payment, especially as those payments may go back years.

82.     Borrowers may lack access to the necessary payment records created by their

servicers, which are now supposed to be held by FedLoan.

83.     In addition, borrowers may not know whether they were enrolled in a PSLF-

qualifying loan repayment plan when they made prior payments.  There are multiple repayment

plans available to borrowers, and only some of these are PSLF-qualifying.  Borrowers may not

know which plan they were enrolled in while making payments, especially when those payments

go back years.  Furthermore, borrowers may not know which repayment plans are PSLF-

qualifying.

84.     Therefore, borrowers naturally rely on the servicer specifically hired by the

Department of Education to count the number of PSLF-qualifying payments they have made.

85.     The Department of Education pays FedLoan a small additional fee to process the

form a borrower initially submits to indicate interest in PSLF (the ECF).  However, FedLoan

receives no additional payments for assisting borrowers with their ongoing participation in the program.

86.     Because FedLoan receives only the small flat fee to evaluate a borrower's initial eligibility and determine the number of PSLF-qualifying payments at that time, its incentive is to perform that task as quickly and cheaply as possible, regardless of quality of service.

87.     Further, since FedLoan is paid only for the *initial* eligibility determination and payment count, when a borrower submits a subsequent ECF, as borrowers are encouraged to do annually by the Department of Education, it receives no additional compensation for updating the borrower's payment count or for assisting borrowers with their ongoing participation in the program.

88.     FedLoan thus has an incentive to minimize the effort it expends updating payment counts every time a borrower files a new ECF.

89.     Despite its responsibility for tracking borrowers' progress towards PSLF and its claims that it will provide borrowers with the relevant information on their individual progress, FedLoan often fails to accurately count borrowers' PSLF-qualifying payments.

90.     FedLoan's failure to accurately count PSLF-qualifying payments has been identified repeatedly in a Department of Education review team ("FSA")'s reports since at least October 2016.  FSA's review of even a limited sample of borrower files has shown multiple instances of qualifying payments being miscounted.

> ii.     *FedLoan makes errors in payment counts when loans are first transferred to its systems*

91.     In some cases, FedLoan's inaccurate payment counts arise from incompatibilities between FedLoan's record-keeping systems, including the one known as Compass, and the

14

record-keeping systems of the other servicers that service borrowers' loans before their transfer to FedLoan.

92.     It appears that FedLoan currently has an automated process for determining PSLF-qualifying payments made prior to transfer (sometimes called "pre-conversion payments"), but that the system sometimes fails to do so correctly, meaning that a manual review would be required to make a correct payment count.

93.     FedLoan is aware that it "does not receive consistent and reliable information from other servicers" and admits that it is "challenging to determine whether borrowers are on qualifying repayment plans or making qualifying payments."[10]

94.     But FedLoan continues to use its automated process—and make representations to borrowers concerning the number of their PSLF-qualifying payments—despite these established and acknowledged problems.

95.     It is not clear what—if any—quality assurance measures FedLoan undertakes to ensure that its initial counts of PSLF-qualifying pre-conversion payments, whether automated or manual, are accurate.  Any quality assurance measures in place are not sufficient.

96.     In October 2016, a Department of Education review of FedLoan's servicing practices concluded that "**there is no measure in place to ensure that qualifying payments counted by HERA/COMPASS are correct**, or that info transferred into HERA/COMPASS is accurate via the supplemental file; this is true even when FedLoan Servicing staff is conducting a manual review of an account to manually calculate qualifying payments. This represents a potential risk and a missed opportunity, as incorrect data loaded into FedLoan Servicing's loan-servicing platform can cause HERA/COMPASS and automated account scripting to inaccurately

---

[10] U.S. Gov't Accountability Office, *Public Service Loan Forgiveness: Education Needs to Provide Better Information for the Loan Servicer and Borrowers* 21 (2018).

count qualifying payments." (emphasis added)  FedLoan admitted that it lacked ongoing quality

assurance measures, conceding that it only "historically performed quality assessments with the

implementation of any change to established automation, or if we were alerted to a concern

through an existing channel."

97.    In fact, FedLoan's initial counts are often wrong, and it is often up to borrowers to

identify the mistake and even to locate records of payments that should have been reflected in

FedLoan's systems.

98.    For example, one borrower was initially told by FedLoan that she had made 39

pre-conversion payments.  After the borrower called in to complain that some payments were

missing, FedLoan eventually discovered that it had somehow failed to count five pre-conversion

payments.  If the borrower had not complained, the borrower would have lost five months' worth

of forgiveness.

99.    In November 2016, another borrower called FedLoan to question the payment

count he had received.  FedLoan's records state that "[t]he esc[a]lated rep that handled the call

advised that the payment counter included all payments made from 1/2014 through 11/2016, but

*appears there may have been payments made in 2013 that could have counted, but FLS did not*

*receive any informat[i]on in the account transfer from Direct Loans for these payments*."

100.    Although records were missing for a significant period after the borrower began

repayment, FedLoan's initial review failed to identify this or to flag it for follow-up.  Because a

servicer would ordinarily have the repayment start date for all loans, FedLoan should have

identified that records from a prior servicer for the borrower were missing.  Ultimately, the

borrower was forced (apparently, at a FedLoan employee's request) to locate three-year-old bank

records to document the payments he had made. As of May 2017 (six months after the problem

was identified), FedLoan was still "reviewing [the borrower's] eligibility for additional qualifying payments during months currently not counted." Ultimately, the borrower reports that it took over a year to get all his PSLF-qualifying payments recognized by FedLoan.

101.    Another borrower who had the same prior servicer reported similar issues. When his loans were transferred to FedLoan in December 2017, he discovered that FedLoan had not credited him for any PSLF-qualifying payments made to this servicer, and did not seem to be aware that it was missing data. FedLoan finally told him he should try to find evidence of these payments himself. Then FedLoan updated his payment count, inexplicably *reducing* his PSLF-qualifying payments by anywhere from 42 to 53 payments (varying by loan). *Fifteen months after his first call*, and after a complaint to a government regulator, FedLoan finally updated his payment count to account for these missing payments.

102.    Yet another borrower reports that a representative told him he simply might not get credit for PSLF-qualifying payments because FedLoan had not obtained his payment records from a prior servicer. He was forced to spend about forty hours of his own time obtaining these records from the servicer so he could provide them to FedLoan, doing the company's job for it.

103.    Repeatedly, FedLoan made no effort to locate missing records from a prior servicer, or even to identify, much less notify, borrowers who are missing such records—even though it should have had reason to know that those records were missing and that those records might well reflect PSLF-qualifying payments. Moreover, it represented to borrowers in responding to completed ECFs that it had accurately accounted for the borrowers' PSLF-qualifying payments, without any indication that its calculation may have been inaccurate.

104.    FedLoan also admitted in response to an FSA review in October 2017 that where a FedLoan processor incorrectly notes that a borrower has only had one prior servicer (as

17

opposed to two or more, which can be common among long-standing borrowers), the payment histories from any servicers before the one immediately prior to FedLoan are simply not evaluated.[11]

105.     Astonishingly, FedLoan officials have admitted that FedLoan's payment counts are unreliable and that FedLoan "rel[ies] on borrowers to catch any payment counting errors resulting from issues with information provided by other loan servicers."[12]

106.     However, as FSA noted in its October 2016 review of FedLoan, "Relying primarily on borrowers to raise issues is not an effective accounting control, and often borrowers are not knowledgeable to discern these types of qualifying payment counting errors."

107.     In other words, FedLoan takes a mess up first, fix the problem afterwards—*if* someone else catches it—approach to fulfilling its responsibility for generating the official payment counts which can seriously affect borrowers' lives.

### iii.     FedLoan fails to maintain accurate counts for payments made after it begins servicing loans

108.     In addition to inaccurately counting payments made prior to transfer to FedLoan, FedLoan frequently fails to accurately count borrowers' PSLF-qualifying payments made after the transfer to FedLoan (or after initial disbursement of the loan, if PHEAA is the original servicer).

109.     FedLoan's systems appear to be intended to be able to track such payments automatically.

110.     However, flaws in FedLoan's systems, as well as mistakes by its employees, result in numerous errors.

---

[11] FedLoan claimed at the time to have corrected this problem as a result of FSA's review.  It is unknown whether its attempt to correct the problem was successful.
[12] *Public Service Loan Forgiveness* at 23.

111.    FedLoan fails to undertake adequate quality assurance measures (if any at all) to confirm the accuracy of the automatically-generated payment counts.

112.    As a result, Fed Loan repeatedly misrepresents borrowers' PSLF-qualifying payments.  For example:

- In March 2018, a borrower complained to a consumer protection agency that FedLoan had recently told him that he had made only five PSLF-qualifying payments over the past twelve months of certified employment, even though he had been paying throughout and working for the same employer.  FedLoan had not been able to explain why.  Nearly seven months later and after the agency made inquiries into the matter, FedLoan discovered that it had somehow overlooked five months of PSLF-qualifying payments in that year.  The letter it sent the borrower updating the payment count did not acknowledge that it had made an error.[13]

- In March 2017, another borrower contacted FedLoan to ask why her payment count had suddenly decreased by nine (as a payment count should only stay the same or increase as time passes). The representative could not tell her.  It appears from FedLoan records that, as of August 2017, this problem had not yet been resolved.

- Another borrower complained that she had received a letter in July 2016 informing her that she had made ten PSLF-qualifying payments, whereas in August 2015, she had been told that she had made nineteen such payments, meaning that nine payments had been deducted from her total without explanation.  FedLoan does not appear to have been able to provide her with a corrected count until December 2016.

### iv.    *FedLoan's failure to accurately count PSLF-qualifying payments harms borrowers in several ways*

113.    FedLoan's failure to accurately count PSLF-qualifying payments significantly harms borrowers.  Because undercounting unjustifiably delays forgiveness, undercounting PSLF-qualifying payments unfairly prolongs the time that borrowers are in repayment and adds to the cost of the loan.

114.    At least one borrower reported having to hire a private consultant to try to determine correct payment counts and then explain to FedLoan what FedLoan had gotten wrong.

---

[13] FedLoan also failed to timely process this borrower's timely IDR recertification application, as discussed in Section IV(C) below, resulting in his monthly payment amount's being inappropriately increased.

In other words, she resorted to hiring someone at her own expense to do FedLoan's job for it—a cost for which she will not be reimbursed.

115.    FedLoan's failure to recognize PSLF-qualifying payments and its failure to provide explanations of its errors discourages borrowers from participating in PSLF.  Borrowers who believe that it is futile to challenge FedLoan's errors and thus that PSLF is effectively out of reach may give up on the program altogether.

116.    FedLoan's inaccurate counts of PSLF-qualifying payments also leads to improper denials of PSLF loan forgiveness applications.

117.    In June 2019, the Department of Education reported that more than 98% of borrowers who submitted PSLF loan forgiveness applications were rejected.  Fewer than 900 applicants out of more than 90,000 loan forgiveness applicants have received discharges.

118.    While many applicants may have been categorically ineligible, over fifty percent were deemed to qualify for the program based on employment, repayment plan, and loan type, but were denied based on FedLoan's finding that the applicant had not made 120 PSLF-qualifying payments.

119.    Many of these applicants may have been wrongfully denied loan forgiveness as a result of FedLoan's failure to accurately count PSLF payments.

120.    FedLoan's internal processing handbook is one factor that contributes to FedLoan's failure to accurately count PSLF payments.  The Department of Education has reviewed FedLoan's internal processing handbook and noted that in some cases it "does not accurately reflect PSLF requirements and could result in borrowers' certification requests being improperly approved or denied."[14]

---

[14] While the handbook has reportedly been updated, there has been no comprehensive review of the updated handbook for accuracy.

121.    Similarly, a recent Government Accountability Office report raised concerns that FedLoan's "inconsistent interpretations" of the rules related to qualifying payments has resulted in "borrowers being improperly denied loan forgiveness since Education does not currently review loan forgiveness applications that are denied by" FedLoan.[15]

122.    The *Wall Street Journal* recently reported on a librarian who thought she had completed her 120 PSLF-qualifying payments, only to learn after applying for forgiveness that, due to involuntary forbearances (discussed more below), she was three payments short.[16] She made the three additional payments, applied again—and was rejected again.  Two experts consulted by the *Journal* could not explain why she had been denied forgiveness.  Neither could a FedLoan customer service representative she spoke to, who agreed to appeal the decision.  At the time of the article, the appeal was still pending; it appears that, after its publication drew attention to her case, the borrower was granted forgiveness.

123.    In a recently-filed lawsuit, another borrower alleges having received at least a *dozen* different (and incorrect) payment counts from FedLoan in the process of challenging the denial of her PSLF (and TEPSLF, a related program) forgiveness applications.[17]

124.    Such errors are particularly harmful to borrowers who, having completed their payment obligations, choose the option of suspending payments while awaiting the results of the review.  For those borrowers, a rejection means that all outstanding interest that has accumulated over the ten or more years will capitalize, potentially increasing the loan principal by thousands of dollars.

---

[15] *Public Service Loan Forgiveness* at 18.
[16] Michelle Hackman, "Program to Relieve Student Debt Proves Unforgiving," *Wall Street Journal* (May 7, 2019).
[17] *See* Complaint, *Weingarten v. DeVos*, 19-cv-2056 (D.D.C.), at 4.

125.    FedLoan's incorrect payment counts, as well as its claims that it will provide accurate counts, are material and deceptive.

126.    FedLoan's repeated failure to count payments accurately, essentially abdicating responsibility for its work to individual borrowers, is an unfair practice that has caused or is likely to cause substantial injury which is not reasonably avoidable.

127.    FedLoan's repeated failure to count payments accurately, essentially abdicating responsibility for its work to individual borrowers, is an abusive practice which takes advantage of borrowers' lack of understanding of the requirements of the PSLF program; takes advantage of borrowers' inability to choose a servicer which might provide them with accurate payment counts; and takes advantage of borrowers' reasonable reliance on their federal government-chosen servicer to provide them with accurate payment counts.

**B.      FedLoan fails to timely provide explanations to borrowers for PSLF payment count determinations**

128.    FedLoan compounds the harm to borrowers that results from its failure to accurately determine PSLF payment counts by failing to provide explanations to borrowers of the basis for its determinations in any reasonable time frame.  These explanations can take many months to over one year, and the delays in making these explanations cause a wide range of consumer harm.

*i.      FedLoan fails to provide borrowers with explanations for payment determinations when providing initial payment counts*

129.    After a borrower is transferred to FedLoan, FedLoan sends the borrower a notification of the number of PSLF-qualifying payments it believes the borrower has made to date.  FedLoan provides no explicit details about which payments were considered or why any given payment was deemed ineligible.

130.    As the GAO notes, despite FedLoan's open reliance on borrowers to catch its errors, borrowers are not given "the details needed to verify the servicer's payment counts or identify payments that the servicer may have missed," but only the number of qualifying payments per loan.[18]

131.    The initial payment counts provided to borrowers are usually automated counts generated by Compass.

132.    These automated counts do not rely on any review of supporting data concerning the basis for the payment counts, even when evaluating records from other servicers which FedLoan acknowledges may be missing, incomplete, or inaccurately imported into its system.

133.    Borrowers who suspect that FedLoan has made a mistake, or simply want to better understand FedLoan's determination, are not told how they may challenge that initial determination.

134.    Nonetheless, some borrowers try to obtain this information from FedLoan.

### ii.    *FedLoan delays excessively in providing borrowers with explanations for its decisions*

135.    FedLoan can create a form called a "detailed payment tracker" or "detailed payment count" that explains its decision with respect to each monthly payment.

136.    Borrowers have no other means of determining FedLoan's basis for its payment count.

137.    The only way to get a detailed payment tracker is to contact FedLoan to request one.

138.    However, when borrowers request a detailed payment tracker, FedLoan does not provide it in a timely manner.

---

[18] *Public Service Loan Forgiveness* at 23.

139.    To produce a detailed payment tracker, FedLoan must undertake a manual review of pre-conversion payments that includes review of any supporting data.

140.    FedLoan fails to maintain any records of the bases for many of its initial payment count determinations.  As a result, a detailed payment tracker requires a *de novo* manual review and correction of errors and missing data that should have been addressed before generating the initial payment count on which the borrower is expected to rely.

141.    FedLoan takes many months, or, in some cases, over a year, to manually identify and review supporting data that it relies on in providing detailed payment trackers.

142.    A FedLoan internal document from 2016 acknowledges that requests for detailed payment trackers are sometimes "placed on hold…due to missing conversion files."  This suggests that FedLoan not only fails to import essential files from a prior servicer, but, remarkably, that FedLoan does not notice that files are missing until a borrower requests a detailed payment tracker.

143.    Even when FedLoan conducts a manual review, there is no assurance that the payment count is accurate.

144.    If a borrower contacts FedLoan to ask for an explanation as to why a particular payment did not count, FedLoan procedures direct the representative to walk through multiple screens of data, attempting to infer why the payment may not have counted.

145.    However, FedLoan's guide for customer service representatives anticipates that a representative simply "may not be able to determine if a payment is or is not approved."

146.    Borrowers who request an explanation for FedLoan's payment count determinations routinely wait several months, and in many cases, more than a year, just to receive an explanation of why FedLoan deemed certain payments not PSLF-qualifying.

147.    The Department of Education has recently admitted that "the time it takes for borrower accounts to be reviewed [by FedLoan] is a problem."

148.    A FedLoan guide for customer service representatives specifically instructs, "**Do not** offer the option of expediting the review process to borrowers.  Explain that the current processing time is approximately 70-90 days for the initial payment tracking review to be completed."

149.    In fact, FedLoan is now refusing to give borrowers *any estimate at all* of when it might provide a detailed payment tracker.  According to a *New York Times* article, one borrower has been told at various times, "Three months, six more weeks expedited, up to one year and, today, 'a long time; nobody should have given you a time frame.'"[19]

150.    Another reported being told not to bother following up at all for now because FedLoan was prioritizing other tasks.

151.    PHEAA's own records and complaints to regulators confirm this longstanding problem.  For example:

- One borrower, believing the borrower's payment count to be inaccurate, requested a detailed payment tracker in September 2017.  She reported being told that providing the detailed payment tracker "can sometimes take a great deal of time" and that it could take "70-90 days" to receive it.  After 90 days passed, the borrower followed up with FedLoan and was told again that it would take 70-90 days to complete the review.  The borrower pointed out that the borrower had *already waited* the 90 days.  FedLoan would not give the borrower any further information on when the borrower could expect the detailed payment tracker, only repeating that it would "take a great deal of time."  Two months later, in April 2018, the borrower, having still not received a detailed payment tracker, complained to a regulator.  Only then did she receive the tracker.

- Another borrower requested a detailed payment tracker in April 2016.  Apparently having received no response, the borrower contacted FedLoan again in December 2016.  The review was not completed until the end of January 2017 (that is, about eight months after the first request).  However, even then, FedLoan's records state

---

[19] Ron Lieber, "Your Student Loan Servicer Will Call You Back in a Year.  Sorry." *N.Y. Times* (Apr. 19, 2019), https://www.nytimes.com/2019/04/12/your-money/public-service-loan-forgiveness.html.

that "[n]o letter or callback was done for borrower with results."  It is unclear whether the borrower ever received a detailed payment tracker.  She requested another in April 2019 and has yet to receive one.[20]

- Yet another borrower, concerned that the payment counts on his loans did not seem to be consistent or accurate, requested a detailed payment tracker in October 2016.  FedLoan's records state, "As of 07/05/17 the review task is still open with [no] notation indicating reason for delay."  In other words, this borrower waited *at least* ten months.  After being unable to obtain sufficient information to determine whether FedLoan's counts were correct or not and exhausted by other issues with the servicer, including having to spend up to two hours at a time on phone calls, this borrower gave up on trying to participate in PSLF.

152.    While FedLoan is currently blaming the delay on the need starting in October 2017 to review final applications for forgiveness—an unacceptable reason in itself—a review of its complaint records indicates that delays in providing detailed payment trackers go back years.

153.    For example, in 2013, one borrower was told to expect to wait "180+ days" to receive a detailed payment tracker.

154.    This borrower was also told that "in order for the payment count letter to be done, we must obtain all info needed for counting and tracking qualifying payments."

155.    But, of course, FedLoan should have identified that it was missing "info[rmation] needed for counting and tracking qualifying payments" *at the time of the original payment count*. The borrower is expected to rely on that count.

###    iii.    *Sometimes, FedLoan provides no explanation for its payment counts at all*

156.    FedLoan does not appear to have made any response at all to some requests for detailed payment trackers.  In a number of these cases, FedLoan appears to have seized any excuse not to do the work, abandoning borrower inquiries simply because a FedLoan

---

[20] This borrower was another of those forced to locate her own bank records to prove that she had made payments to a prior servicer, as FedLoan was unable to locate her records from that servicer; although she provided those records to FedLoan in April 2019, she reports that, as of October 2019, she has still not been credited with the correct number of PSLF-qualifying payments.

representative did not follow some procedure in making the request for a detailed payment

tracker, a matter over which the borrower had no control.  For example:

- In June 2017, a borrower called in after receiving a letter adding a year to the borrower's projected forgiveness date and "request[ed] review."  A week later, FedLoan records show "payment count request closed as invalid due to proper procedure not followed by requesting rep, no letter sent."  There are no further notations to the record.

- Another borrower requested a review of her payments in November 2016.  FedLoan records note, "The review request was closed as invalid on March 8, 2017 after it was determined by the processor that the request lacked sufficient detail. A callback was requested to clarify…When the borrower called back on March 10, 2017 in response to the voicemail she was left, a PSLF payment count letter was requested. This request was closed as invalid on March 28, 2017 due to no borrower request. She did not actually request the letter in writing."  (There is no regulatory or statutory requirement that such a request be submitted in writing.  Furthermore, the borrower does not appear to have been notified that an oral request for a payment count letter was insufficient.)

- Another borrower requested a detailed payment tracker in April 2017.  In June 2017, FedLoan's records state, "the request was closed as invalid after it was determined by the processor that the borrower did not request it. *This closure is invalid, because the borrower did request the tracker*."  (emphasis added). There is no indication of whether FedLoan ever responded to the borrower's request.

### iv.    *FedLoan's delays and denials significantly harm borrowers*

157.    Lengthy delays in providing detailed payment trackers harm borrowers for a

number of reasons.

158.    For instance, at times, borrowers may inaccurately think they are making PSLF-

qualifying payments, and thus fail to take steps necessary to correct any disqualifying conditions.

159.    Borrowers who are aware that payments are not PSLF-qualifying may be able to

take steps to address disqualifying conditions.

160.    For example, a borrower who has FFEL loans, which are not PSLF-eligible, can

consolidate their loans into the Direct program for free in order to make PSLF-qualifying

payments going forward.

27

161.    Other borrowers may not realize that their payments are not PSLF-qualifying because the borrower was unknowingly placed into "paid ahead" status.  "Paid ahead" status occurs when a borrower makes an overpayment.  "Paid ahead" status can render future payments ineligible.  FedLoan can permanently remove a borrower from "paid ahead" status and prevent the problem from recurring in the future, but the borrower must request this.  A borrower who does not know of the problem will not make the request.

162.    For example, one borrower reports repeatedly being inaccurately told that she was not in paid-ahead status, only to finally be informed by a manager that she was.  She requested a detailed payment count in May or June of 2018 to try to understand what had happened and only received it in April 2019, after filing complaints with multiple consumer protection agencies.[21]

163.    Yet other borrowers may unknowingly be on a PSLF-ineligible repayment plan.

164.    This may not be the fault of the borrower.  Early on in the program, at least one servicer systematically misinformed borrowers that a particular payment plan allowed for PSLF-qualifying payments when, in fact, it did not.

165.    Eligible borrowers can move into a payment plan that allows for PSLF-qualifying payments, but they must apply to do so.  A borrower who does not know of the problem will not apply.

166.    None of these problems can ordinarily be resolved retroactively to grant credit towards forgiveness to borrowers for payments made while the problems persisted.  Therefore, it is urgent that borrowers resolve them as quickly as possible, to "lose credit" for as few of their payments as possible.

---

[21] This borrower was ultimately able to get paid-ahead status removed.

167.    Without a timely explanation of why payments are not deemed PSLF-qualifying, borrowers who for some reason are currently making payments that are not qualifying lack the information they need to make changes to rectify the problem going forward.

168.    As a result, borrowers lose the chance to make payments, delaying their ability to obtain loan forgiveness and significantly adding to the cost of their loans.

169.    As the likelihood of PSLF forgiveness affects—as it was intended to—borrowers' employment choices, inaccurate payment counts with delayed explanations may prompt borrowers to abandon public service.

170.    Other borrowers may simply give up and accept inaccurate payment counts, meaning that they do not receive the forgiveness they are entitled to on time or at all.

171.    Indeed, one borrower who reports being told it could take up to a year for FedLoan to provide a detailed payment tracker comments, "I believe FedLoan has no intention in reviewing my account with the expectation that I will give up."[22]

172.    FedLoan's lengthy delays in providing detailed payment trackers may result from FedLoan's failure to devote adequate staff and resources to these tasks.

173.    FedLoan's failure to review and provide information to borrowers concerning payment counts in a timely manner is an unfair practice that has caused or is likely to cause substantial injury which is not reasonably avoidable.

174.    FedLoan's repeated failure to review and provide information to borrowers concerning payment counts in a timely manner is an abusive practice that takes advantage of

---

[22] This borrower received a revised payment count after approximately six months (and filing a complaint with a consumer protection agency). Although she believes that this count is also inaccurate, she has still never received a detailed payment tracker. This borrower also reports having had other problems with FedLoan: she was dropped from her valid IDR plan upon transfer to FedLoan and had to reapply (see Section IV(C)(iv) below), which took "several months," and was later forced to go into forbearance—during which payments ordinarily do not qualify for PSLF—because FedLoan failed to process her timely IDR application in the necessary time frame, leaving her facing a monthly bill too high for her to pay (see Section IV(C)(iii) below).

borrowers' lack of understanding of the requirements of the PSLF program; takes advantage of borrowers' inability to choose a servicer which might provide them with timely reviews and adequately-documented payment counts; and takes advantage of borrowers' reasonable reliance on their federal government-chosen servicer to provide them with timely and adequately-documented payment counts.

### C.   PHEAA fails to timely and accurately process income-driven repayment plan paperwork

175.   PHEAA fails to timely and accurately process applications and recertification paperwork for income-driven repayment (IDR) plans, harming borrowers in multiple ways.[23]

176.   As a loan servicer, PHEAA is responsible for processing borrowers' IDR applications and determining whether they qualify and what monthly payment they must make.

177.   PHEAA is also responsible for "recertifying" borrowers already on an IDR plan yearly, verifying that they continue to have need for the plan and updating the monthly payment amount, if necessary.  This recertification is mandatory, and borrowers who fail to complete it on time face negative consequences, including being dropped from their plan.

178.    As borrowers applying for or already on an IDR plan are usually already having difficulty making their monthly payments, it is critical for PHEAA to perform these tasks competently.

179.   While borrowers may be able to obtain preliminary estimates of monthly payments under these plans using online calculators, they cannot get definitive calculations except from their servicer, in this case, PHEAA.

180.   However, PHEAA provides borrowers with inaccurate payment amounts.

---

[23] PHEAA handles IDR applications as both FedLoan (for Direct loans and federally-owned FFEL loans) and AES (for privately-owned FFEL loans).

181.    PHEAA also delays so long in recertifying applications that borrowers are dropped from their plan, even though they applied for recertification on time.

182.    PHEAA even removes borrowers without justification from plans they have successfully enrolled in.

### i.    *PHEAA's errors in determining payment amounts impose financial difficulties on distressed borrowers*

183.    PHEAA may miscalculate a borrower's payment amount by hundreds of dollars a month.

184.    PHEAA's inaccurate calculations of payment amounts place special burdens on borrowers who are, by definition, financially strapped and struggling to repay their loans.  These borrowers are faced with unnecessarily high payments for months while PHEAA flounders about, trying to correct its errors.

185.    PHEAA's mistakes delay or prevent eligible borrowers from obtaining lower monthly payments that would enable them to avoid delinquency or default.

186.    One borrower's story is illustrative.  She reported:

> I was proactive this year and submitted my application early [in July 2016]. …In September I contacted the agency to inquire about my new repayment terms as I have received no information. On my original application I indicated that my income had not changed and I also submitted my IRS information electronically. I received an email confirmation indicating there was nothing else needed from my part. Therefore when I called in September I did not understand why I was being told that my application was incomplete and why I had been notified otherwise. I resubmitted my application and income tax information. In October I had not he[a]rd back regarding my application so I called FedLoan approximately six times in attempts to have my issue resolved. I was told to wait. In November I called FedLoan again because my payments had been recalculated to be over $900 when I had been making payments of about $350. There is no human way I can pay that amount and still survive…I spoke to an agent and was told about the REPAYE [another IDR plan] repayment plan that I was never explained about before. That said I decided to resubmit my application for REPAYE because I could not make the payments under IBR with the way my payments were being calculated. Again my payments

were calculated in the $900. I did not understand what was happening as my income had not significantly changed. In the meantime [my household composition changed] and [I] had to resubmit my income information to FedLoan. I submitted three recent pay-stubs and a print out of my entire salary history. Again my payments were recalculated. This time I was told my payments would be $525. A fee I still cannot afford. I called FedLoan yet again to inquire about the formula used to recalculate payments because nothing made sense to me. After that conversation I realized that my income was being incorrectly calculated to about $90K or so. I did not make anywhere near this amount. I also realized that I was being recalculated as being paid 26 times a year or every two weeks when in fact I only get paid twice a month. I submitted all of this information and my payments were miscalculated still.

187.    This borrower escalated at FedLoan, to no avail:

> At that point I contacted the Office of Consumer Advocacy …[which] has attempted to have my payments recalculated correctly with no avail. I have called [them] approximately 2 to 3 times a week since then and nothing has been resolved. At this point [late January 2017] I have not been able to make any payments to my account since July. I have made it clear that I would like my payments calculated correctly so that I can again resume my loan repayment. …Nothing has been recalculated or resolved.

188.    As she correctly notes, "Prolonging my payments does not benefit me in anyway as I am also applying for the Public Service Loan Forgiveness. The longer I have without making payments the more it affects me negatively."

189.    Another borrower reports that after a small increase in family income, her payment under her repayment plan quadrupled. She complains that in trying to figure out what happened, "every time I call, the representative gives me a different payment amount ranging from $38 to $251, and each of them swears it is the lowest possible payment available and can not see how the previous representative came to the payment amount they did."

190.    Yet another borrower reports that, when she recertified, her monthly payment jumped more than $250, even though she did not have a significant increase in income. When she complained, she was told that her payment would be about a hundred dollars less than her

prior amount instead.  She then received another bill for the higher amount.  After having to correct FedLoan's excessively high calculation of her IDR payment for several years, including being placed into forbearances she did not request, and being unable to understand why her qualifying payment count is lower than she expected, she has given up on trying to obtain PSLF forgiveness, even though she continues to work for a qualifying employer.

### ii. *PHEAA's errors in calculating payment amounts or verifying recertification can force borrowers into costly forbearances*

191.    PHEAA's slow and error-ridden processing of IDR applications has consequences that extend beyond the financial stress it imposes on borrowers suddenly confronted with a jump in their monthly payment amounts.

192.    It can also force borrowers facing unmanageably high bills to choose between trying to make a payment that can be hundreds of dollars higher than the payment they are actually eligible for, loan delinquency, or a request for a forbearance (that is, a period in which no payments are due) of unknown length while PHEAA resolves its own mistakes.

193.    Forbearance imposes costs on borrowers.  While a borrower is on forbearance and not making payments, unpaid interest typically accrues.

194.    Some borrowers have reported that, after their forbearances, PHEAA has capitalized that accrued interest—that is, added it to the principal of their loans—even though the forbearance was a result of PHEAA's mistakes or delays.

195.    This adds to the cost of borrowers' loans, sometimes by hundreds or thousands of dollars.

196.    Borrowers have no control over whether interest is capitalized, are unlikely to understand the complex regulatory requirements governing capitalization, and may not even understand that capitalization has occurred.

33

197.    Borrowers who complain and request corrections often have trouble getting PHEAA to reverse the interest capitalization that resulted from PHEAA's own errors.

198.    Similarly, servicers are required by regulation to capitalize some or all of a borrower's outstanding interest if the borrower chooses to stop participating in an IDR plan.

199.    Therefore, if a servicer incorrectly concludes that the borrower has not filed a timely annual recertification of income and family size to remain on an IDR plan, the servicer will inappropriately capitalize some or all of the borrower's outstanding interest, costing the borrower hundreds or thousands of dollars over the life of the loan.

200.    If PHEAA does not process a timely application for recertification on time, it will conclude that the borrower has chosen not to file a recertification, remove them from their IDR plan (causing their payment amounts to skyrocket), and capitalize any interest accrued over the course of the loan.

### iii.    *PHEAA's errors also deprive borrowers of the opportunity to progress towards loan forgiveness*

201.    PHEAA's mistakes in calculating payment amounts can also end up depriving borrowers of payments that would otherwise count toward IDR[24] or PSLF forgiveness.

202.    Payments made during forbearance are not by default PSLF-qualifying payments, nor do they count towards IDR forgiveness.[25]  Therefore, borrowers who cannot afford to pay inflated bills and must go into forbearance while waiting for PHEAA to fix its mistakes can make no progress towards forgiveness until PHEAA's errors are corrected.

203.    Borrowers report that clerical errors and delays by PHEAA in processing IDR paperwork have resulted in loss of months or even years of payments toward PSLF.  For

---

[24] Borrowers who make payments on an IDR plan for twenty or twenty-five years, depending on the program, are eligible to have their remaining balance forgiven.
[25] But see Section IV(D)(i) below.

example, one borrower reports two- to three-month delays on three different occasions when the borrower timely applied for or recertified for an IDR plan, meaning a loss of at least seven PSLF-qualifying payments over the life of the loan.[26]

204.    Another borrower reports that FedLoan has been unable to provide him with a correct payment amount since approximately November 2018; he remains in forbearance as of late July 2019 waiting for FedLoan to correct its error, meaning he has lost the opportunity to make at least eight PSLF-qualifying payments.

205.    PHEAA also provides borrowers with misleading information about IDR plans and other options that may negatively affect PSLF-qualifying payment counts.  FSA observed in an October 2017 review of PHEAA's servicing that, in dealing with "common servicing scenarios experienced by PSLF such as forbearances being applied…while processing Income Driven Repayment requests…it is clear that PSLF processors are not cognizant of the fact that the timing and application of these program options may negatively affect PSLF borrowers."  FSA concluded that FedLoan provided  advice that would lead to a borrower "los[ing] PSLF credit potentially for 2-3 months."

### iv.    PHEAA even removes borrowers from IDR plans in which they have successfully enrolled

206.    Ordinarily, the income certification of a borrower on an IDR plan is good for one year.  A servicer transfer should not cancel that certification or remove a borrower from an IDR plan before the year is up.  Yet FedLoan also puts some borrowers who have already successfully enrolled in a repayment plan with their prior servicer into the wrong plan or makes

---

[26] Each time, this borrower was forced to go into forbearance, causing the outstanding interest on his loan to capitalize and therefore increasing the cost of his loan.

other processing errors when the borrowers transfer to FedLoan, which can lead to inappropriate capitalizations.

207.    For example, in 2016, when a borrower's servicing was transferred from the servicer Nelnet to FedLoan, FedLoan first sent her a letter demanding that she recertify within 10 days, even though she had recertified with Nelnet less than a year previously.  She did recertify in December 2016 (within about ten months of her prior recertification, and therefore not only timely, but early), but FedLoan still dropped her (without justification) from the repayment plan she had already been enrolled in.  It placed her in the standard repayment plan instead, thus significantly increasing her monthly payments.

208.    It also incorrectly capitalized the interest that had been accruing while she was in the prior repayment plan, thus increasing the total she owed.

209.    When the borrower contacted FedLoan, she was told that she would have to recertify again (that is, in March 2017, even though she had *already* and redundantly recertified with FedLoan about three months earlier) or else remain on the standard repayment plan, with its significantly higher monthly payment amount.

210.    These errors were corrected only when the borrower complained, both to FedLoan and to a consumer protection agency.

211.    Another borrower had been approved for an IDR plan with her prior servicer in March 2016, about a month before her servicing was transferred to FedLoan.  For no apparent reason, FedLoan initially calculated her payments as though she were on an extended repayment plan (more than 120 months), which would make her payment amount incorrect and her payments not PSLF-qualifying.  Shortly thereafter, it recalculated her payments as though she were on the standard repayment plan, which would have made her payments too high.  The

36

borrower contacted FedLoan to complain.  She was told to send proof of her IDR application and approval letter, which ought to have been tracked by FedLoan.  In June 2016, FedLoan finally placed her on the correct IDR plan.  Two months after that, FedLoan finally granted an override to count the borrower's payments during the time period when FedLoan had miscalculated her payments.[27]

212.    Yet another borrower had recertified his payment plan with his prior servicer, Navient, well before the deadline Navient had given him and about six weeks prior to his servicing transfer to FedLoan.  FedLoan then sent him two (inaccurate) reminders about two weeks after the transfer that he "needed" to recertify, and he apparently did recertify again.

213.    FedLoan then miscalculated his payment, increasing it, and he requested a review.

214.    Eventually, FedLoan determined the correct payment.  However, the borrower had been given a forbearance during the review process, which caused the outstanding interest to capitalize, thereby increasing the principal the borrower owed.

215.    Even though the capitalization was due to FedLoan's first unnecessarily requesting a recertification, and then getting the payment calculations wrong, FedLoan did not reverse the capitalization after identifying its own error.  After the borrower complained about the capitalization, its records note: "At this point, there are no open requests to reverse the interest cap, which is the main source of the FSA Complaint. This is probably because it was a valid resu[l]t of changing the current IDR plan, *even though the IDR review requested … was a result of the borrower receiving an IDR recert reminder that they should not have been sent* (the

---

[27] Part of the reason for the override was that FedLoan used a "delinquency forbearance" to cover May 2016, even though the borrower was not actually yet delinquent, and "the representative that spoke with the borrower…did not offer to have the forbearance removed so that [a May 2016] payment could be" PSLF-qualifying, even though it could have been done.  This is an example of the inconsistent treatment of borrowers discussed in more detail at Section IV(D) below.

borrower had already been approved for an IDR recert prior to their loans transferring to FLS)."
(emphasis added)

216.     Whether FedLoan ultimately reversed the capitalization is unknown.

217.     Another borrower's story is a catalog of typical mistakes by FedLoan left to her to
fight to correct. Like the others just discussed, she reports that FedLoan dropped her from the
IDR plan she was enrolled in upon transfer.  When she complained, FedLoan attempted to put
her back on the plan—but miscalculated her payment amount.  While waiting for it to fix the
problem, she was put on two months' forbearance, which, she was told, meant she could not
make PSLF-qualifying payments.[28] After she was restored to the correct IDR plan, she
discovered that her payment count seemed wrong.  It took some time and several calls before
FedLoan told her that her payments were not PSLF-qualifying because she was in paid-ahead
status.  She was ultimately told that this would be corrected (which may or may not be the case;
see Section IV(D)(ii) below).  However, six months, and still more calls, later, she was still
waiting to learn if FedLoan's errors would be addressed.

218.     Another borrower reports that her interest was capitalized upon her transfer to
FedLoan simply because it put her in an (unrequested) administrative forbearance, which is not
consistent with PSLF regulations.  This problem was not corrected until she complained to a
consumer-protection agency.

219.     PHEAA's failure to accurately and timely process borrowers' IDR applications or
to maintain borrowers in the plan which they were already on, as well as their inappropriate

---

[28] As discussed below at Section IV(D)(i), at times, if a borrower is persistent enough in complaining, FedLoan
appears to obtain an "override" and allow borrowers' payments made during forbearances resulting from FedLoan's
errors to count as PSLF-qualifying payments.  However, a borrower faced with an incorrect bill too high to pay and
told that the borrower may postpone payment while the problem is resolved—and *not* that, if the borrower continues
to make the correct payment and continues to pursue the issue, it may later be determined to be PSLF-qualifying—
will likely not make that payment, missing the opportunity and thus increasing the cost of the loan.

capitalizations of interest when borrowers' servicing is transferred, is an unfair practice that has caused or is likely to cause substantial injury which is not reasonably avoidable.

220.     PHEAA's failure to accurately and timely process borrowers' IDR applications or to maintain borrowers in the plan which they were already on, as well as their inappropriate capitalizations of interest when their servicing is transferred, is an abusive practice which takes advantage of borrowers' inability to understand the regulations governing calculation of IDR monthly payments, when recertification is required, and capitalization of interest.  It also  takes advantage of borrowers' inability to choose a servicer which calculates their IDR monthly payments accurately, does not drop them from their IDR plans despite timely recertification (or no recertification at all's being required at the time), and does not inaccurately capitalize accrued interest.  It further takes advantage of borrowers' reasonable reliance on the servicer chosen by the federal government to track their participation in IDR plans and calculate their monthly payments.

221.     PHEAA's false statements to borrowers about the amount due under their repayment plans are also material and deceptive.

**D.     PHEAA treats borrowers inconsistently, failing to provide some borrowers with relief addressing the consequences of its own errors and information necessary to correct problems with their eligibility**

222.     PHEAA lacks clear policies and procedures for addressing the consequences of its own errors and assisting borrowers who are having difficulties with eligibility.

223.     As a result, even though regulations leave it little discretion with respect to determining PSLF-qualifying payments, FedLoan does not consistently provide borrowers with relief for the consequences of its own errors.  Rather than implementing policies to address the predictable effects of its routine errors and delays, it relies on borrowers both to identify its mistakes and then to request special consideration to obtain redress for the problems FedLoan

itself has caused.  When borrowers' own mistakes may have contributed to a problem, FedLoan does not consistently explain options available to borrowers to remedy the problem.

224.    This approach is particularly harmful because, as FedLoan officials have admitted, "[FedLoan] staff [is] sometimes unaware of relevant guidance and instructions…provided by Education."  The GAO has pointed out that FedLoan representatives' lack of authoritative sources of knowledge "creates a risk of differing interpretations and inconsistent implementation."[29]

225.    As discussed above, even FedLoan's own processing handbook sometimes "does not accurately reflect PSLF requirements and could result in borrowers' certification requests being improperly approved or denied."[30]

226.    When FSA observed FedLoan representatives interacting with borrowers in July 2017, it noted "in terms of PSLF call center operations, phone representatives should utilize standard scripting or reference material to ensure their responses are correct and comprehensive. The phone representative observed was new and FSA did not observe the representative reviewing notes or training materials to respond to the calls taken. One call observed involved an unemployed borrower, and the phone representative never considered whether they qualified for an unemployment deferment; this was a missed opportunity and could be avoided with appropriate information material."  (FedLoan blamed any problems on "isolated human error.")

227.    There is thus no assurance that any given representative interacting with a borrower will even have a correct understanding of the policy in question.

228.    This means that borrowers who do not have the time or sophistication required to challenge errors and demand relief often receive worse treatment than those who are

---

[29] *Public Service Loan Forgiveness* at 17.
[30] *Id.*

knowledgeable enough and have the resources to pursue FedLoan's errors aggressively, even if they are similarly situated and although the same regulations apply to all borrowers.

### i.    *Reclassifying payments made during forbearance as PSLF-qualifying*

229.    One example is PHEAA's treatment of borrowers placed in forbearance for extended periods due to PHEAA's own paperwork processing delays or error (*e.g.*, when recertifying income for an IDR plan).  PHEAA's internal policies do not provide that such borrowers will have otherwise-qualifying payments during the forbearance period routinely reclassified as PSLF-qualifying.  PHEAA's internal instructions to employees explain that there is no "rule" for employees to follow in cases where a PSLF borrower's IDR paperwork processing "takes longer than expected."  Rather, in such cases, the PHEAA employee is instructed to email a supervisor who will review each request "case by case."

230.    In May 2017, a borrower complained that FedLoan's delay in processing his application to change repayment plans meant that he could not make a PSLF-qualifying payment that month (presumably because he was in forbearance[31]).  The borrower received an override so that his May payment could indeed be treated as PSLF-qualifying.

231.    There is no indication that, if the borrower had not complained, he would have received an override, which has to be specially requested.

232.    In another example, a borrower filed her annual recertification of her income and household size to remain on her IDR plan before the deadline.  FedLoan, however, did not process her paperwork on time and simply dropped her from her plan, leading to an increase in

---

[31] Some borrowers may prefer to remain in forbearance while changing repayment plans.  However, it is obvious that borrowers making full payments during this process are not choosing to take a break from repayment, but rather are attempting to make 120 PSLF-qualifying payments as quickly as possible, and many borrowers may prefer that option.  FedLoan does not appear to make any attempt to identify these borrowers or offer an "override" to make those payments count, even after extensive application processing delays.

monthly payments.  She contacted FedLoan and reports being told that FedLoan would correct the error by adjusting her payment amount retroactively, but it did not.  Even though she had already made FedLoan aware of its own failure to process paperwork on time, the next month, it added *nearly $14,000 in interest* to her principal balance.

233.    Only when the borrower made a formal complaint to a government agency did FedLoan admit that "a processing error led to a failure to properly process her recertification request," reverse the capitalization, and establish the correct amount due.  After her complaint, FedLoan also "obtained approval from the U.S. Department of Education" to count her payments during the period of delay as PSLF-qualifying.

234.    There is no evidence of a policy or practice for FedLoan to seek overrides—or to alert borrowers that such an override is even possible—absent borrower prodding.

235.    For example, when FedLoan failed to process one borrower's timely IDR recertification application—and thus sent her a new monthly bill far higher than the one she was entitled to pay—it put her into forbearance after she called to complain.  FedLoan never informed her that she could continue to make her prior monthly payment during forbearance and then seek an override to have those payments counted towards the 120.

236.    Another borrower, forced to go into forbearance three separate times because FedLoan did not timely process timely applications, was never given this information or offered the chance to request an override.

237.    Another borrower forced into forbearance after first being removed from her valid IDR plan upon transfer and then given an inaccurate payment amount reports specifically being told that payments made during forbearance simply could not qualify.

42

238.    Thus, other borrowers in these sorts of situations who do not complain, or who do not speak to a customer service representative who is willing to help, or who do not file formal complaints with consumer-protection authorities, might not receive an override, even though they might otherwise be able to obtain one.

239.    PHEAA's misrepresentations to borrowers concerning whether payments made during forbearance may potentially be deemed PSLF-qualifying are material and deceptive.

240.    PHEAA's failure to inform some borrowers of the potential to have payments made during forbearance treated as PSLF-qualifying, while giving other borrowers the opportunity to seek this relief, is an unfair practice that has caused or is likely to cause substantial injury which is not reasonably avoidable.

241.    PHEAA's failure to inform borrowers of the potential to have payments made during forbearance treated as PSLF-qualifying is an abusive practice that takes advantage of borrowers' inability to understand the complex terms of the PSLF program; takes advantage of borrowers' inability to choose a servicer which provides them with the correct information; and takes advantage of borrowers' reasonable reliance on the servicer chosen by the federal government to administer the PSLF program.

### ii.    Retroactive reapplication of payments to eliminate "paid-ahead status"

242.    Another example of PHEAA's inconsistent application of policies is PHEAA's treatment of PSLF borrowers who enter "paid-ahead status."

243.    As noted above, in order to qualify for PSLF, borrowers must meet certain requirements related to loan type and repayment plan.

244.     In addition, for a payment to count toward the 120 required payments required for loan forgiveness, a payment must be made within 15 days of the scheduled due date and must be made in the monthly installment amount or more.[32]

245.     If a borrower makes a single payment that is equal to multiple monthly installments, the payment counts as only one PSLF payment.

246.     When a federal student loan borrower pays more than the required monthly payment amount and provides no instructions for how the payment should be applied, the servicer applies the overpayment to future payment obligations and places the borrower in "paid-ahead" status.

247.     When a borrower is in paid-ahead status, the borrower is not billed or is billed for less than the monthly installment amount during the period that the borrower remains in paid ahead status.  For example, if a borrower's monthly installment amount is $10, and a borrower pays $15 dollars in one month, the borrower will be placed in paid ahead status and will be billed $5 in the subsequent month.  However, the borrower's $5 payment would not be PSLF-qualifying, because it is less than the monthly installment amount.

248.     Some borrowers enter paid-ahead status after making a large overpayment, while others enter paid-ahead status after an accidental overpayment of just a few cents.  One borrower reports being put into paid-ahead status because, during her transfer to FedLoan, FedLoan put her in an administrative forbearance, but also withdrew an auto-debit payment.  In other words, she did not even attempt to make an overpayment; FedLoan put her in a status where a payment was not due, but took one anyway.[33]

---

[32] See 34 C.F.R. § 219(c)(iii) ("The borrower must make the monthly payments within 15 days of the scheduled due date for the full scheduled installment amount.")
[33] It appears that there may be other circumstances in which FedLoan's own system errors led to payments being classified as partial, non-qualifying payments when in fact they were full payments.

249.     Borrowers may be unaware that payments made while in paid-ahead status that are less than the monthly installment amount are not PSLF-qualifying payments.

250.     When borrowers discover that payments made in paid-ahead status were not PSLF-qualifying, they frequently contact FedLoan to find out if anything can be done to retroactively reclassify the payments as PSLF-qualifying.

251.     In some cases, FedLoan responds to such requests by referring the requests to the Department of Education for an "override."   If one is granted, FedLoan "reallocates" the payments so that they will count as PSLF-qualifying payments.

252.     However, in other cases, FedLoan representatives falsely inform borrowers that there is nothing FedLoan can do to retroactively reclassify such payments.  In these cases, they do not inform the borrowers of even the possibility of requesting an "override."

253.     For example one FedLoan borrower was placed into paid-ahead status because he overpaid a monthly installment by 7 cents.  The next month, the borrower was billed, and paid, 7 cents less than the full monthly installment amount.  As a result, FedLoan deemed the payment not PSLF-qualifying.  The borrower contacted FedLoan to complain that the payment was deemed not PSLF-qualifying.  The borrower requested a review of FedLoan's decision to deem the payment ineligible for PSLF.  It took PHEAA three months to respond to the borrower's request.  Finally, FedLoan told the borrower that the borrower's paid-ahead status was "valid" and accordingly, the classification of the payment as PSLF ineligible "cannot be overridden."

254.     In another example, a borrower made several 12 cent overpayments, leading FedLoan to put her in paid-ahead status and bill her 60 cents less than her installment amount.  She paid the amount billed.  The payment was deemed not PSLF-qualifying.  When she called

FedLoan to request reconsideration, her request was denied.  She was told that due to "strict PSLF guidelines" her payment could not be deemed PSLF-qualifying.

255.    In contrast, FedLoan sometimes told borrowers in the same circumstances that it was possible for the borrower to obtain an "override" of such determinations.  In those cases, FedLoan "reapplied" payments made while in pre-paid status in order to have such payments deemed eligible PSLF payments.

256.    One borrower complained that her payment count was too low "due to a paid-ahead issue."  FedLoan "reapplied all of the borrower's payments to ensure the maximum number of qualifying payments were counted towards PSLF, and maintained contact via phone throughout the payment reapplication process."

257.    Another borrower appears to have been in paid-ahead status for a year.  When she complained, "[p]aid ahead status [was] removed and the borrower's payments were reapplied to satisfy current bills."

258.    FedLoan's website does not clearly explain whether borrowers can request overrides of payment determinations in this circumstances.  The only information provided on the website currently[34] states that: "[p]aying ahead while seeking PSLF can adversely affect your qualifying payment count.  If you pay extra and enter a paid ahead status while seeking PSLF, any future bills that you satisfy may not *immediately count* as qualifying payments.  If you want to pay more than your required monthly payment, please contact us and request to have paid ahead status permanently removed."  (emphasis added).

259.    The website's warning that payments made in paid-ahead status may not "immediately count" as PSLF-qualifying payments suggests that such payments may eventually

---

[34] It is not yet known when the "immediately count" language was added to the website; it may have been a relatively recent addition.

count as PSLF-qualifying payments.  However, the website does not inform borrowers how a non-qualifying payment would eventually be transformed into a qualifying payment.

260.    FedLoan does not consistently inform borrowers, even borrowers who complain, of the opportunity to request an appeal or "override."

261.    Thus, it is usually only the most persistent borrowers, or those who are able to enlist outside assistance, who even have the opportunity to seek an override.

262.    FedLoan's failure to provide borrowers with clear and consistent information with respect to paid-ahead status may have been in part a result of FedLoan's failure from 2016 to 2018 to obtain guidance from the Department of Education concerning how to handle prepayments.  As shown above, however, the fact that FedLoan lacked this guidance did not prevent it from making definitive declarations to borrowers—with potentially dramatic effect on their lives—as to whether a payment was PSLF-qualifying.  It is unknown whether FedLoan ever revisited prior determinations after receiving more definitive guidance from the Department of Education.  (In fact, it is not possible to glean from publically-available information what the current policy concerning payments made during paid-ahead status is.)

263.    While FedLoan is not responsible for the Department of Education's policies, it *is* responsible for ensuring that all borrowers are given the same opportunities to appeal or challenge adverse determinations and that borrowers affected by later policy corrections and clarifications actually benefit from them.

264.    FedLoan's misrepresentations to some borrowers that there is no way to override determinations harm these borrowers by depriving them of the opportunity to request and obtain an override concerning paid-ahead status, depriving them of PSLF-qualifying payments.  This unfairly extends both the duration and cost of such borrowers' loans.

47

265.     PHEAA's misrepresentations to borrowers concerning whether payments made during "paid-ahead status" may potentially be deemed PSLF-qualifying are material and deceptive.

266.     PHEAA's failure to inform borrowers of the potential to have payments made during "paid-ahead status" treated as PSLF-qualifying, while giving others the opportunity to seek this relief, is an unfair practice that has caused or is likely to cause substantial injury which is not reasonably avoidable.

267.     PHEAA's failure to inform borrowers of the potential to have payments made during "paid-ahead status" treated as PSLF-qualifying is an abusive practice that takes advantage of borrowers' inability to understand the complex terms of the PSLF program; takes advantage of borrowers' inability to choose a servicer which provides them with the correct information; and takes advantage of borrowers' reasonable reliance on the servicer chosen by the federal government to administer the PSLF program.

### iii.     *Providing misinformation to PSLF borrowers about the option to appeal FedLoan determinations*

268.     Many FedLoan borrowers discover after months or even years of payments that FedLoan has deemed their prior payments not PSLF-qualifying because the borrower failed to meet certain requirements related to loan type, repayment plan, or payment amount.

269.     Although some borrowers manage to appeal FedLoan's determinations concerning the PSLF eligibility of prior payments to the Department of Education and get those payments counted towards PSLF, FedLoan does not consistently inform borrowers that they can appeal determinations.

270.     For example, when FedLoan deemed one borrower's eight years of prior payments not PSLF-qualifying because the borrower was not enrolled in a PSLF-eligible

repayment plan, a FedLoan representative told the borrower that she could appeal to the Department of Education. When the borrower appealed, the Department found that the borrower had been misinformed about repayment plan eligibility by a prior servicer. The Department ruled that her prior payments would be deemed PSLF-qualifying if she paid the difference between the amount she had already paid and the amount due under an eligible plan.

271. However, FedLoan representatives inform other borrowers that there is no way to appeal FedLoan determinations regarding the PSLF eligibility of prior payments.

272. Because FedLoan provides incorrect (and inconsistent) information to borrowers regarding the option to appeal FedLoan determinations regarding the PSLF qualification of payments, some borrowers are denied the opportunity to seek review of such determinations.

273. In addition, in some cases, FedLoan provides incorrect (and inconsistent) information to individual borrowers about appeal options. For example, one borrower, a veteran who was deployed in Iraq, wrote to FedLoan that "I have received conflicting information from FedLoan Servicing representatives and supervisors regarding the proper appeal process [for PSLF payment eligibility determinations]. The answers I have received for this question range from '*there is none*' to '*send a letter to us*' to '*write to the Department of Education*'." (emphasis in original).

274. PHEAA's misrepresentations to borrowers concerning whether payment counts may be appealed are material and deceptive.

275. PHEAA's failure to inform borrowers of the potential to appeal payment counts, while giving others the opportunity to seek this relief, is an unfair practice that has caused or is likely to cause substantial injury which is not reasonably avoidable.

276.     PHEAA's failure to inform borrowers of the potential to appeal payment counts is

an abusive practice that takes advantage of borrowers' inability to understand the complex terms

of the PSLF program; takes advantage of borrowers' inability to choose a servicer which

provides them with the correct information; and takes advantage of borrowers' reasonable

reliance on the servicer chosen by the federal government to administer the PSLF program.

**E.     PHEAA steers borrowers to less favorable options rather than income-driven repayment plans**

*i.     Forbearance steering*

277.     Federal student loan borrowers can choose "income-driven repayment" ("IDR")

plans that allow borrowers to make payments based on their income and family size, with the

remaining balance forgiven after 20 or 25 years.  Enrolling in IDR can result in payments as low

as $0 per month.  These plans ensure that monthly payments are manageable and enable

struggling borrowers to avoid defaulting on their loans.

278.     Borrowers who are in IDR plans are significantly less likely to enter into default.

One report by the Government Accountability Office found that from 2010–2014, less than 1

percent of IDR participants defaulted on their loan, compared to 14 percent in a standard

repayment plan.[35]

279.     A 2015 Government Accountability Office report estimated that 51% of federal

Direct Loan borrowers would benefit from an IDR plan.[36]  However, as of March 2018, only

around 29% of borrowers of federal Direct Loans in repayment were enrolled in an IDR plan.

280.     Borrowers who are having difficulty meeting their loan repayment obligations

also have the option of entering forbearance.  While in forbearance, borrowers are not obligated

---

[35] U.S. Government Accountability Office, *Federal Student Loans: Education could do more to help ensure borrowers are aware of repayment and forgiveness options* 20 (2015).
[36] *Id.* at [i].

to make payments on their loan.  However, the interest on the loan continues to accrue during most types of forbearance and is capitalized (added to the principal amount due) at the end of the forbearance period.  This adds to the total cost of the loan and thus usually increases the amount a borrower must pay each month.  In addition, a borrower on forbearance is unable to make payments that count for PSLF or IDR loan forgiveness.

281.    While forbearance may be appropriate during short-term financial difficulties and for borrowers who anticipate being unable to make payments for a short, defined period of time, forbearance is not appropriate for borrowers whose income is simply not adequate to make their monthly student loan payments. Such borrowers would instead benefit from enrollment in an IDR plan.

282.    Borrowers are often unaware of the repayment plan options that are available to them.  PHEAA's borrowers are thus dependent on PHEAA to provide accurate information concerning the repayment options available to them.

283.    Enrolling in IDR takes time.  PHEAA must explain the program, assist the borrower in filling out the application, and then process the application.  The borrower must then complete an application along with income documentation.  The process of enrolling in an IDR plan can require multiple telephone conversations with PHEAA customer service representatives.  Additionally, borrowers in IDR must re-certify their income and family size each year, requiring regular follow-up from PHEAA.

284.    By comparison, servicers can put borrowers into forbearance in the course of a single short phone call.  For some forms of forbearance, there are no income or family-size requirements to verify.

285.    PHEAA holds itself out as a source of reliable information and assistance for borrowers who are struggling to repay their loans.  PHEAA's website states:  "We are your student loan servicer and we have one goal:  to help you successfully repay your loans."   On its page for borrowers having trouble making payments, it promises, "We are here to help ease that [financial] stress and find a solution that works for you and your budget."

286.    Borrowers believe that PHEAA is a reliable source of information and that PHEAA's "one goal" is to provide borrowers with help in repaying their loans.  Borrowers rely on PHEAA to provide information about repayment.

287.    However, PHEAA misrepresents the options available to struggling borrowers by often failing to mention the option to enter IDR and instead steering borrowers into forbearance.

288.    A February 2019 report from the U.S. Department of Education's Office of Inspector General ("OIG Report") describes a Department of Education audit of telephone calls with borrowers of all nine servicers that contract with the Department to service federal loans.[37]

289.    The OIG Report states that the Department's April 2017 audit found that in more than 10% of PHEAA's calls with borrowers, PHEAA representatives failed to meet the Department's established standards for calls with borrowers.

290.    According to the OIG Report, PHEAA's call failure rate was by far the worst of the nine servicers—in fact, PHEAA's failure rate was more than double the average call failure rate for the servicers.

291.    Furthermore, the OIG Report states that in 25 of the 106 failed calls, the call failed because PHEAA failed to provide adequate information to the borrower about repayment options.

---

[37] U.S. Dep't of Education Office of Inspector General, *Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally Held Student Loans* 11 (2019).

292.    PHEAA's rate of failing to provide adequate information on repayment options was more than four times higher than the average among all servicers that contract with the Department.

293.    Borrowers who are told only of the option to enter forbearance and not about the option to enter IDR may not be aware of IDR and therefore are unable to enroll (or even consider enrolling) in IDR.

294.    PHEAA's misrepresentations of the repayment options available to borrowers lead borrowers to spending extended periods in forbearance, instead of IDR.

295.    PHEAA's misrepresentations concerning IDR harm borrowers who could have entered the program if they had known of its existence.  The misrepresentations harm borrowers in several ways, including delaying or preventing borrowers from obtaining lower monthly payments.

### ii.    Consolidation steering

296.    PHEAA receives a relatively high payment for completing a consolidation (that is, combining two or more loans into one) for the federally-owned loans it services—in fact, it is the highest-paid single task for a servicer with respect to a single borrower.

297.    A borrower who consolidates all loans held at other servicers with PHEAA cannot generally switch servicers through consolidation again, securing the business relating to that borrower for FedLoan.

298.    Additionally, when a borrower chooses at the time of consolidation, as is the borrower's option, to extend the term of the loan, that effectively extends the length of PHEAA's contract to service that loan.

299.    PHEAA therefore has incentive to push consolidation on borrowers, even in cases where it is not appropriate or helpful.

300.   Unsurprisingly, PHEAA's website vigorously promotes consolidation of loans, promising on its page for struggling borrowers that "when you combine all your loans into one, it will give you a fixed interest rate, a lower monthly payment, and more."

301.   A borrower who follows the links to the consolidation page (or who contacts PHEAA for information and is directed to the page) is shown a "pros and cons" list for consolidation.  However, PHEAA's characterization of the "pros" and "cons" of consolidation is likely to mislead consumers.

302.   Under the "pros" are listed both "[p]otential for lower monthly payments by extending the time you have to repay your loan" *and* "[c]onsolidation may make loans eligible for the following…forgiveness programs: … *PSLF."

303.   Although a borrower's monthly payments can be reduced by the optional extension of the term of the borrower's loan through a consolidation, a borrower who reduces their monthly payments by consolidating and extending the term of the borrower's loan *will no longer be able to make PSLF-qualifying payments*, as the borrower on a so-called "extended plan" will be paying too little to qualify, and extended repayment plans are explicitly deemed ineligible for PSLF.[38]

304.   This issue is not mentioned on the "cons" side.

305.   In its Consolidation FAQ, FedLoan answers the question "How does consolidating impact my repayment options?" with this response: "When you consolidate, you may be eligible for a longer repayment term, up to 30 years…A longer repayment term may result in a lower monthly payment…Additionally, if you are consolidating [FFEL] loans to a

---

[38] Consolidation from FFEL loans to Direct loans *without* entering an extended repayment plan is necessary for the loans to be eligible for PSLF.  PHEAA ignores this important distinction.

Direct Consolidation Loan, you may be eligible to apply for… * Public Service Loan
Forgiveness (PSLF)."

306.    There is no countervailing warning that a borrower who takes advantage of a
longer repayment term will in fact be *ineligible* to make PSLF-qualifying payments.

307.    A borrower who takes the "Consolidation Quiz," states that she has only Direct
Loans, and indicates that she is interested both in lowering her monthly payments and in Public
Service Loan Forgiveness is told "Consolidation could be right for you! …Enjoy the following
features: **Lower Monthly Payment**.  Consolidating will lower your monthly payment…you
could lower your monthly payment by as much as 50%...**Public Service Loan Forgiveness.**
Only Direct Loans are eligible for PSLF.  By consolidating your loans that are ineligible, they
would then qualify."

308.    By listing "lower monthly payments" and "Public Service Loan Forgiveness" as
both benefits of consolidation, when, in fact, these benefits are incompatible, FedLoan creates
the misleading impression that a borrower can choose to lower monthly payments through
consolidation and still qualify for PSLF forgiveness.

309.    Further, some FedLoan guides for customer service representatives warn the
representatives to "caution borrowers" about several potential drawbacks of consolidation, but
never tell them to mention that consolidating into an extended (or graduated) plan to lower their
monthly payments will mean that fewer or none of their payments will be PSLF-qualifying.

310.    Borrowers who switch to an extended plan based on this information are harmed
because, even if they would otherwise be eligible, they lose the opportunity to make payments
towards PSLF forgiveness.

311.     PHEAA's forbearance steering practices harm borrowers who would benefit financially from lower monthly payments and eventual forgiveness in an IDR program.

312.     PHEAA's consolidation steering practices harm borrowers who wish to take advantage of PSLF but are misled into thinking that they can do so while extending their loan term through consolidation.

313.     PHEAA's false statements to borrowers concerning forbearance and consolidation are material and deceptive.

314.     PHEAA's practices of forbearance and consolidation steering are unfair practices that have caused or is likely to cause substantial injury which is not reasonably avoidable.

315.     PHEAA's practices of forbearance and consolidation steering are abusive practices that take advantage of borrowers' lack of understanding of the consequences of choose forbearance and consolidation; take advantage of borrowers' inability to choose a servicer who will not steer them into forbearance or consolidation when it is not beneficial to them; and take advantage of borrowers' reasonable reliance on the servicer hired by the federal government to advise them on their loan options are unfair.

### F.     PHEAA wrongfully denies access to deferments for eligible borrowers with cancer

316.     As of September 2018, borrowers with cancer are statutorily entitled to suspend student loan repayments through a special deferment program.  *See* 20 U.S.C. 1087e(f)(3).

317.     When borrowers have contacted PHEAA about the deferment program, PHEAA representatives have falsely represented that the law had not yet gone into effect.

318.     PHEAA representatives have also falsely represented to borrowers that the borrowers did not qualify for the deferment.

319. As of late May 2019, the availability of the cancer deferment was not even mentioned on the FedLoan borrower website.

320. As a result, borrowers who qualified for the deferment were unable to defer payments and struggled to repay their loans while seeking treatment for cancer.

321. While it appears that the Department of Education did not produce an application for this deferment for some time, that does not entitle PHEAA to misrepresent the availability of or a borrower's eligibility for it.

322. PHEAA's false statements concerning the availability of the cancer deferment to borrowers are material and deceptive.

323. PHEAA's preventing borrowers from obtaining a deferment to which they are entitled is an unfair practice that has caused or is likely to cause substantial injury which is not reasonably avoidable.

324. PHEAA's preventing borrowers from obtaining a deferment to which they are entitled is an abusive practice that takes advantage of borrowers' inability to understand which benefits they are entitled to; takes advantage of borrowers' inability to select a servicer which will provide them an opportunity to take the deferment to which they are entitled; and takes advantage of borrowers' reliance on the servicer hired by the federal government to advise them on the terms of their loans.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### U.S.C. § 5531 (Dodd-Frank) (Deceptive Practices)

325. The NYAG repeats and realleges the allegations set forth in paragraphs 31 to 324 above.

326.     12 U.S.C. § 5531(a) *et seq.* ("the Dodd-Frank Act") prohibits covered persons or service providers from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.

327.     PHEAA is a "covered person or service provider" for the purposes of 12 U.S.C. § 5531.

328.     Student loan borrowers are "consumers" for the purposes of the Dodd-Frank Act.

329.     Student loans are a "consumer financial product or service" for the purposes of the Dodd-Frank Act.

330.     As set forth in paragraphs 31 to 324 above, PHEAA has engaged in materially deceptive acts and practices in violation of the Dodd-Frank Act through its federal loan servicing practices related to PSLF and IDR.  These materially deceptive acts and practices include but are not limited to:

   a.  Providing borrowers with false PSLF-qualifying loan counts;

   b.  Providing borrowers with incorrect monthly loan payment amounts;

   c.  Misrepresenting repayment options available to struggling borrowers;

   d.  Misrepresenting the benefits of loan consolidation;

   e.  Misinforming borrowers as to their opportunities to seek exceptions to certain PHEAA policies and to seek reversals of certain PHEAA determinations;

   f.  Misrepresenting that the law providing for cancer deferments has not yet gone into effect;

   g.  Misrepresenting that eligible borrowers do not qualify for a cancer deferment; and

    h.  Falsely holding itself out as a reliable source of information and assistance to

        borrowers.

331.    PHEAA's representations, omissions, acts, and practices have misled or are likely

to mislead reasonable borrowers under the circumstances.

**SECOND CAUSE OF ACTION**
**12  U.S.C. § 5531 (Dodd-Frank) (Unfair Practices)**

332.    The NYAG repeats and realleges the allegations set forth in paragraphs 31 to 324

above.

333.    12 U.S.C. § 5531(a) *et seq.* ("the Dodd-Frank Act") prohibits covered persons or

service providers from committing or engaging in a deceptive, unfair, or abusive act or practice

under federal law in connection with any transaction with a consumer for a consumer financial

product or service, or the offering of a consumer financial product or service.

334.    PHEAA is a "covered person or service provider" for the purposes of 12 U.S.C. §

5531.

335.    Student loan borrowers are "consumers" for the purposes of the Dodd-Frank Act.

336.    Student loans are a "consumer financial product or service" for the purposes of

the Dodd-Frank Act.

337.    As set forth in paragraphs 31 to 324 above, PHEAA has engaged in unfair acts

and practices in violation of the Dodd-Frank Act through its federal loan servicing practices

related to PSLF and IDR.  These practices include but are not limited to:

    a.  Providing borrowers with inaccurate PSLF-qualifying loan counts;

    b.  Failing to keep accurate records, leading to errors in PSLF payment counts;

    c.  Failing to use adequate quality assurance measures to ensure that PSLF

        payment counts are accurate;

59

d.  Failing to provide timely explanations to borrowers for PSLF payment count determinations;

e.  Providing no explanation at all of PSLF payment count determinations to certain borrowers;

f.  Failing to timely and accurately process IDR paperwork;

g.  Erroneously removing eligible borrowers from IDR plans in which they have successfully enrolled;

h.  Providing borrowers with incorrect monthly loan payment amounts;

i.  Steering borrowers into less-favorable repayment options such as forbearance and consolidation;

j.  Applying policies inconsistently to borrowers and failing to inform some borrowers of the opportunity to challenge findings that payments are not PSLF-qualifying; and

k.  Denying certain deferments to eligible borrowers.

338.  PHEAA's practices have caused substantial injury to borrowers.

339.  The injury PHEAA's practices have caused is not reasonably avoidable by borrowers.

340.  The injury PHEAA's practices have caused is not outweighed by countervailing benefits to borrowers or to competition.


**THIRD CAUSE OF ACTION**
**12 U.S.C. § 5531 (Dodd-Frank) (Abusive Practices)**

341.  The NYAG repeats and realleges the allegations set forth in paragraphs 31 to 324 above.

342.    12 U.S.C. § 5531(a) ("the Dodd-Frank Act") prohibits covered persons or service providers from committing or engaging in an deceptive, unfair, or abusive act or practice under federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.

343.    PHEAA is a "covered person or service provider" for the purposes of 12 U.S.C. § 5531.

344.    Student loan borrowers are "consumers" for the purposes of the Dodd-Frank Act.

345.    Student loans are a "consumer financial product or service" for the purposes of the Dodd-Frank Act.

346.    As set forth in paragraphs 31 to 324 above, PHEAA has committed or engaged in abusive practices in violation of the Dodd-Frank Act by materially interfering with borrowers' ability to understand terms and conditions of their loans; taking unreasonable advantage of borrowers' lack of understanding of terms and conditions of their loans; and taking unreasonable advantage of borrowers' reasonable reliance on PHEAA to act in the interests of the borrower through its federal loan servicing practices related to PSLF and IDR.  These abusive practices include but are not limited to:

    a.  Providing borrowers with inaccurate PSLF-qualifying loan counts;

    b.  Failing to provide timely explanations to borrowers for PSLF payment count determinations;

    c.  Providing no explanation at all of PSLF payment count determinations to certain borrowers;

    d.  Failing to timely and accurately process IDR paperwork;

e.   Erroneously removing eligible borrowers from IDR plans in which they have successfully enrolled;

f.   Providing borrowers with incorrect monthly loan payment amounts;

g.   Steering borrowers into less-favorable repayment options such as forbearance and consolidation;

h.   Applying policies inconsistently to borrowers and failing to inform some borrowers of the opportunity to challenge findings that payments are not PSLF-qualifying; and

i.   Denying certain deferments to eligible borrowers.

## FOURTH CAUSE OF ACTION
## EXECUTIVE LAW § 63(12) (FRAUD)

347.   The NYAG repeats and realleges the allegations set forth in paragraphs 31 to 324 above.

348.   Executive Law § 63(12) authorizes the NYAG to take action for injunctive and other equitable relief when any individual or business engages in repeated and persistent fraud in the carrying on, conducting, or transaction of business in the state of New York.

349.   Executive Law § 63(12) defines fraud as "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

350.   As set forth in paragraphs 31 to 324 above, PHEAA has repeatedly engaged in repeated fraudulent acts and practices in violation of Executive Law § 63(12) against borrowers resident in New York through its federal loan servicing practices related to PSLF, IDR, and deferments.  These repeated fraudulent acts and practices include but are not limited to:

a.   Providing borrowers with false PSLF-qualifying loan counts;

b.   Providing borrowers with incorrect monthly loan payment amounts;

c.   Misrepresenting repayment options available to struggling borrowers and steering borrowers into less-favorable repayment options such as forbearance;

d.   Misrepresenting the benefits of loan consolidation and steering borrowers to consolidate;

e.   Misinforming borrowers as to their opportunities to seek exceptions to certain PHEAA policies and to seek reversals of certain PHEAA determinations;

f.   Misrepresenting that the law providing for cancer deferments has not yet gone into effect;

g.   Misrepresenting that eligible borrowers do not qualify for a cancer deferment; and

h.   Falsely holding itself out as a reliable source of information and assistance to borrowers.

351.   By reason of the foregoing, PHEAA has engaged in repeated and persistent fraudulent conduct in violation of Executive Law § 63(12).

### FIFTH CAUSE OF ACTION
### EXECUTIVE LAW § 63(12) (N.Y. GBL § 349)

352.   The NYAG repeats and realleges the allegations set forth in paragraphs 31 to 324 above.

353.   Executive Law § 63(12) authorizes the NYAG to take legal action for injunctive and other equitable relief when any individual or business engages in repeated and persistent illegal conduct in the carrying on, conducting, or transaction of business in the state of New York.

63

354.    N.Y. GBL, Article 22-A, § 349 prohibits deceptive acts and practices in the conduct of any business, trade, or commerce in the state of New York.

355.    As set forth in paragraphs 31 to 324 above, PHEAA has repeatedly and persistently engaged in deceptive acts and practices in violation of N.Y. GBL, Article 22-A, § 349 against borrowers resident in New York through its federal loan servicing practices related to PSLF, IDR, and deferments.  These deceptive acts and practices include but are not limited to:

   a.  Providing borrowers with false PSLF-qualifying loan counts;

   b.  Providing borrowers with incorrect monthly loan payment amounts;

   c.  Misrepresenting repayment options available to struggling borrowers and steering borrowers into less-favorable repayment options such as forbearance;

   d.  Misrepresenting the benefits of loan consolidation and steering borrowers to consolidate;

   e.  Misinforming borrowers as to their opportunities to seek exceptions to certain PHEAA policies and to seek reversals of certain PHEAA determinations;

   f.  Misrepresenting that the law providing for cancer deferments has not yet gone into effect;

   g.  Misrepresenting that eligible borrowers do not qualify for a cancer deferment; and

   h.  Falsely holding itself out as a reliable source of information and assistance to borrowers.

356.    By reason of the foregoing, PHEAA has engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## SIXTH CAUSE OF ACTION
## GBL § 349

357.     The NYAG repeats and realleges the allegations set forth in paragraphs 31 to 324 above.

358.     N.Y. GBL, Article 22-A, § 349 prohibits deceptive acts and practices in the conduct of any business, trade, or commerce in the state of New York.

359.     As set forth in paragraphs 31 to 324 above, PHEAA has engaged in deceptive acts and practices through its federal loan servicing practices related to PSLF, IDR, and deferments. These deceptive acts and practices include but are not limited to:

  a.   Providing borrowers with false PSLF-qualifying loan counts;

  b.   Providing borrowers with incorrect monthly loan payment amounts;

  c.   Misrepresenting repayment options available to struggling borrowers and steering borrowers into less-favorable repayment options such as forbearance;

  d.   Misrepresenting the benefits of loan consolidation and steering borrowers to consolidate;

  e.   Misinforming borrowers as to their opportunities to seek exceptions to certain PHEAA policies and to seek reversals of certain PHEAA determinations;

  f.   Misrepresenting that the law providing for cancer deferments has not yet gone into effect;

  g.   Misrepresenting that eligible borrowers do not qualify for a cancer deferment; and

  h.   Falsely holding itself out as a reliable source of information and assistance to borrowers.

## RELIEF REQUESTED

**WHEREFORE**, the NYAG respectfully requests that a judgment and order be issued:

1)      Enjoining PHEAA from engaging in the deceptive, unfair, and abusive practices identified in this Complaint;

2)      Directing PHEAA to pay restitution and damages to all New York residents injured by PHEAA's conduct, pursuant to 12 U.S.C. 5565(a)(2), Exec. Law 63(12) and GBL § 349;

3)      Directing PHEAA to pay a civil penalty of $5,000 to the State of New York for each violation of GBL § 349, pursuant to GBL § 350-d;

4)      Directing PHEAA to pay a civil penalty of $1,000,000 per day in which PHEAA engaged in conduct that violated 12 U.S.C. § 5301 *et seq.*, pursuant to 12 U.S.C. § 5565(c)(2);

5)      Directing PHEAA to pay the costs of the NYAG in connection with the prosecution of this action, pursuant to 12 U.S.C. § 5565(b); and

6)      Granting such other and further relief as the Court deems just and proper.


LETITIA JAMES
Attorney General of the State of New York
28 Liberty St.

New York, NY 10005

New York, New York
October 3, 2019

By:    _/s Sarah E. Trombley_____
Carolyn Fast
Special Counsel
Sarah E. Trombley
Assistant Attorney General
Bureau of Consumer Frauds & Protection
28 Liberty St.
New York, NY 10025
(212) 416-6250 (Fast)
(212) 416-8294 (Trombley)


JANE M. AZIA
Bureau Chief

LAURA J. LEVINE
Deputy Bureau Chief


*of Counsel*