UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PEOPLE OF THE STATE OF NEW YORK,
by LETITIA JAMES,
Attorney General of the State of New York,

Plaintiff,

v.

PENNSYLVANIA HIGHER EDUCATION
ASSISTANCE AGENCY, d/b/a
FEDLOAN SERVICING and AMERICAN
EDUCATION SERVICES,

Defendant.

Civil Action No. 19-cv-9155

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS COMPLAINT

BALLARD SPAHR LLP

1675 Broadway, 19th Floor
New York, NY 10019-5820
Telephone: 212.223.0200

and

1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: 215.665.8500

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1
FACTUAL BACKGROUND.................................................................................................... 3
I.      The HEA, the Direct Loan Program, and the PSLF Program................................... 3
II.     The Department's Oversight of PHEAA ................................................................... 5
III.    NYAG's Complaint ................................................................................................. 10
LEGAL STANDARD............................................................................................................ 11
I.      Motion to Dismiss for Lack of Subject Matter Jurisdiction ................................... 11
II.     Motion to Dismiss for Failure to State a Claim ..................................................... 11
III.    Motion to Dismiss for Failure to Join a Necessary Party ...................................... 12
ARGUMENT ........................................................................................................................ 12
I.      The Court lacks subject-matter jurisdiction. .......................................................... 12
        A.      PHEAA is entitled to derivative sovereign immunity under *Yearsley*. ................ 12
                1.      Applicable Law................................................................................. 12
                2.      The Department validly conferred authority to PHEAA to
                        administer federal student loans.................................................... 15
                3.      PHEAA has serviced New York borrowers' federal loans in
                        accordance with federal directives.................................................. 15
        B.      NYAG's state-law claims are barred by intergovernmental immunity. ............. 17
        C.      Alternatively, PHEAA requests that the Court allow for jurisdictional
                discovery to determine whether PHEAA is entitled to immunity. ...................... 20
        D.      The Court lacks subject-matter jurisdiction because NYAG's claims
                relating to borrowers who have not yet reached 120 payments under PSLF
                are not ripe. ........................................................................................................ 20
                1.      Applicable Law................................................................................. 21
                2.      NYAG's claims are not constitutionally ripe because the alleged
                        harm is not actual or imminent. ..................................................... 22
                3.      NYAG's claims are not prudentially ripe. ................................... 24
II.     The Court should dismiss NYAG's state-law claims as preempted by the HEA............ 26
        A.      The HEA expressly preempts NYAG's state-law claims. .................................. 28
                1.      The HEA preempts NYAG's omission-based claims............................... 29
                2.      The HEA preempts NYAG's claims based on alleged affirmative
                        misrepresentations by PHEAA. ..................................................... 30
        B.      NYAG's state-law claims should also be dismissed based on conflict
                preemption. ......................................................................................................... 31
        C.      The Department's position on preemption under the HEA supports
                PHEAA's motion and is entitled to substantial deference.................................. 33
III.    The Court should dismiss the Complaint for failure to join the U.S. Department of
        Education. ............................................................................................................... 34
        A.      Applicable Law.................................................................................................. 35
        B.      The Department of Education is a necessary party.............................................. 36
        C.      The Department of Education is indispensable. ................................................. 38
IV.     NYAG is not permitted to pursue civil penalties under the CFPA................................... 40
CONCLUSION...................................................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967)................................................................21, 24

*Ackerson v. Bean Dredging LLC*,
   589 F.3d 196 (5th Cir. 2009) ..........................................................16

*Am. Trucking Ass'n, Inc. v. N.Y. State Thruway Auth.*,
   795 F.3d 351 (2d Cir. 2015).............................................................12

*AMSAT Cable Ltd. v. Cablevision of Conn.*,
   6 F. 3d 867 (2d Cir. 1993)...............................................................21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................11, 12

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)...............................................................11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 554 (2007)........................................................................12

*Bell v. Blue Cross & Blue Shield*,
   823 F.3d 1198 (8th Cir. 2016) .........................................................27

*Black Hills Power & Light Co. v. Weinberger*,
   808 F.2d 665 (8th Cir. 1987) ...........................................................18

*Blackburn v. United States*,
   100 F.3d 1426 (9th Cir. 1996) ....................................................18, 19

*Boeing Co. v. Movassaghi*,
   768 F.3d 832 (9th Cir. 2014) ......................................................18, 19

*Boyle v. United Technologies Corp.*,
   487 U.S. 500 (1998)..................................................................14, 37

*Butters v. Vance Int'l, Inc.*,
   225 F.3d 462 (4th Cir. 2000) ...........................................................12

*Campbell-Ewald Co. v. Gomez*,
   136 S. Ct. 663 (2016).......................................................12, 13, 14, 20

*Chae v. SLM Corp.*,
   593 F.3d 936 (9th Cir. 2010) .................................................................................3, 28, 30, 32

*Chesney v. TVA*,
   782 F. Supp. 2d 570 (E.D. Tenn. 2011) ...............................................................................13

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .........................................................................................................22, 23

*Cohen v. Facebook*,
   252 F. Supp. 3d 140 (E.D.N.Y. 2017) .................................................................................23

*Cortlandt St. Recovery Corp. v. Hellas Telecomms.*,
   790 F.3d 411 (2d Cir. 2015) .................................................................................................11

*Coventry Health Care of Mo., Inc. v. Nevils*,
   137 S. Ct. 1190 (2017) ..........................................................................................................27

*Crosby v. Nat. Foreign Trade Council*,
   530 U.S. 363 (2000) ..............................................................................................................31

*Cunningham v. Gen. Dynamics Info. Tech.*,
   888 F.3d 640 (4th Cir. 2018) .............................................................................13, 14, 15, 20

*Davis v. Navient Corp.*,
   No. 17-cv-00992, 2018 U.S. Dist. LEXIS 41365 (W.D.N.Y. Mar. 12, 2018) .................31, 32

*Dawavendewa v. Salt River Projects Agr. Imp. & Power Dist.*,
   276 F.3d 1150 (9th Cir. 2002) ..............................................................................................39

*Dep't of Army v. Blue Fox, Inc.*,
   525 U.S. 255 (1999) ..............................................................................................................14

*Edrei v. Maguire*,
   892 F.3d 525 (2d Cir. 2018) .................................................................................................20

*Envirotech Corp. v. Bethlehem Steel Corp.*,
   729 F.2d 70 (2d Cir. 1984) ...................................................................................................36

*FDIC v. Meyer*,
   510 U.S. 471 (1994) ..............................................................................................................14

*Felder v. Casey*,
   487 U.S. 131 (1988) ..............................................................................................................26

*Fluent v. Salamanca Indian Lease Auth.*,
   928 F.2d 542 (2d Cir. 1991) .................................................................................................38

*Freightliner Corp. v. Myrick*,
    514 U.S. 280 (1995) ........................................................................................31

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
    505 U.S. 88 (1992) ..........................................................................................31

*Genna v. Sallie Mae, Inc.*,
    No. 11-cv-7371, 2012 U.S. Dist. LEXIS 54044 (S.D.N.Y. Apr. 17, 2012) ...................31, 32

*Goodyear Atomic Corp. v. Miller*,
    486 U.S. 174 (1988) ........................................................................................18

*Helfrich v. Blue Cross & Blue Shield Ass'n*,
    804 F.3d 1090 (10th Cir. 2015) .........................................................................27

*Holland v. Fahnestock & Co.*,
    210 F.R.D. 487 (S.D.N.Y. 2002) .......................................................................12

*Hunter v. Bryant*,
    502 U.S. 224 (1991) ........................................................................................20

*Hyland v. Navient Corp.*,
    No. 18-cv-9031, 2019 U.S. Dist. LEXIS 113038 (S.D.N.Y. July 8, 2019) ...................31, 32

*In re KBR, Inc., Burn Pit. Litg.*,
    744 F.3d 326 (4th Cir. 2014) .......................................................................14, 17

*Ins. Co. of the West v. Emp't Dev. Dep't*,
    No. 16-cv-248, 2016 U.S. Dist. LEXIS 73212 (C.D. Cal. May 24, 2016) ...........................35

*Isaccs v. Bowen*,
    865 F.2d 468 (2d Cir. 1989) ..............................................................................24

*Johnson v. DeVos*,
    775 F. App'x 86 (4th Cir. 2019) ........................................................................15

*Kokkonen v. Guardian Life Ins. Co.*,
    511 U.S. 375 (1994) ....................................................................................11, 14

*Kunica v. St. Jean Fin.*,
    No. 97-cv-3804, 1998 U.S. Dist. LEXIS 11867 (S.D.N.Y. July 29, 1998) ...........................40

*Lane v. Pena*,
    518 U.S. 187 (1996) ........................................................................................15

*Lawson-Ross v. Great Lakes Higher Educ. Corp.*,
    No. 17-cv-0253, 2018 U.S. Dist. LEXIS 199048 (N.D. Fla. Sept. 20, 2018) .............28, 30, 32

*Linsley v. FMS Inv. Corp.*,
   No. 11-cv-961, 2012 U.S. Dist. LEXIS 53735 (D. Conn. Apr. 17, 2012)...............................28

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..........................................................................................................21

*M'Culloch v. Maryland*,
   17 U.S. 316 (1819)............................................................................................................18

*Makarova v. United States*,
   201 F.3d 110 (2d Cir. 2000)..............................................................................................11

*Marchi v. Bd. of Coop. Educ. Servs.*,
   173 F.3d 469 (2d Cir. 1999)..............................................................................................24

*United States ex rel. Matheny v. Medco Health Sols., Inc.*,
   671 F.3d 1217 (11th Cir. 2012) .........................................................................................17

*McCue v. City of New York (In re World Trade Ctr. Disaster Site, Litig.)*,
   521 F.3d 169 (2d Cir. 2008)..............................................................................13, 14, 16

*McCulloch v. PNC Bank Inc.*,
   298 F.3d 1217 (11th Cir. 2002) .........................................................................................28

*McKenna v. Udall*,
   418 F.2d 1171 (D.C. Cir. 1969).........................................................................................35

*Milmark Services, Inc. v. United States*,
   2 Cl. Ct. 116 (Cl. Ct. 1983)...............................................................................................17

*Mitchell v. Forsyth*,
   472 U.S. 511 (1985)..........................................................................................................20

*Monticello Heights, Inc. v. Morgan Drive Away, Inc.*,
   No. 73-cv-3806, 1974 U.S. Dist. LEXIS 6522 (S.D.N.Y. Sep. 30, 1974).............................40

*Morales v. New York*,
   22 F. Supp. 3d 256 (2014) ................................................................................................20

*Morrison v. Nat'l Austl. Bank Ltd.*,
   547 F.3d 167 (2d Cir. 2008)..............................................................................................11

*N.Y. SMSA Ltd. P'Ship v. Town of Clarkstown*,
   612 F.3d 97 (2d Cir. 2010).................................................................................................27

*Nat'l Jewish Democratic Council v. Adelson*,
   No. 18-cv-8787, 2019 U.S. Dist. LEXIS 168675 (S.D.N.Y. Sept. 30, 2019) .........................18

*Nat'l Org. for Marriage, Inc. v. Walsh*,
  714 F.3d 682 (2d Cir. 2013)........................................................................21, 22

*Navajo Tribe of Indians v. New Mexico*,
  809 F.2d 1455 (10th Cir. 1987) ............................................................................35

*In re Oil Spill*,
  MDL No. 2179, 2016 U.S. Dist. LEXIS 18248 (E.D. La. Feb. 16, 2016) ............................16

*Ryan v. Volpone Stamp Co. Inc.*,
  107 F. Supp. 2d 369 (S.D.N.Y. 2000)....................................................................36

*Salazar v. King*,
  822 F.3d 61 (2d Cir. 2016)....................................................................................4

*Scott v. J.P. Morgan Chase & Co.*,
  296 F. Supp. 3d 98 (D.D.C. 2017) ..................................................................14, 20

*Simmonds v. INS*,
  326 F.3d 351 (2d Cir. 2003)........................................................21, 24, 25, 26

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944)........................................................................................33

*Susan B. Anthony List v. Driehaus*,
  134 S. Ct. 2334 (2014)....................................................................................23

*Taylor v. Bernanke*,
  No. 13-cv-1013, 2013 U.S. Dist. LEXIS 128533 (E.D.N.Y. Sept. 9, 2013) ...........................23

*Texas v. United States*,
  523 U.S. 296 (1998)........................................................................................21

*Thomas v. Union Carbide Aric. Prods. Co.*,
  473 U.S. 568 (1985)........................................................................................21

*Two Shields v. Wilkinson*,
  790 F.3d 791 (8th Cir. 2015) ............................................................................35

*United States v. Locke*,
  529 U.S. 89 (2000)........................................................................................27

*United States v. Mitchell*,
  445 U.S. 535 (1980)........................................................................................14

*United States v. Virginia*,
  139 F.3d 984 (4th Cir. 1998) ............................................................................18

*Vango Media v. City of New York*,
  34 F.3d 68 (2d Cir. 1994)........................................................................26

*Viacom Int'l, Inc. v. Kearney*,
  212 F.3d 721 (2d Cir. 2000)...............................................................12, 35

*Vullo v. Office of the Comptroller of the Currency*,
  No. 17-cv-3574, 2017 U.S. Dist. LEXIS 205259 (S.D.N.Y. Dec. 12, 2017) .........................25

*Winebarger v. PHEAA*,
  __ F. Supp. 3d ___, No. 19-cv-1503, 2019 U.S. Dist. LEXIS 196821 (C.D.
  Cal. Aug. 21, 2019).............................................................24, 25, 26, 28, 30, 32

*Wyeth v. Levine*,
  555 U.S. 555 (2009)...............................................................................33

*Yashenko v. Harrah's NC Casino Co., LLC*,
  446 F3d 541 (4th Cir. 2006) ....................................................................36

*Yearsley v. W.A. Ross Construction Co.*,
  309 U.S. 18 (1940)...........................................................................1, 13, 15, 16

## Federal Statutes

12 U.S.C. § 5031 *et seq.*................................................................................40

12 U.S.C. § 5565.............................................................................................40

20 U.S.C. §§ 1070–1099c..........................................................................4, 15

20 U.S.C. § 1082.......................................................................................4, 5

20 U.S.C. § 1083...........................................................................................29

20 U.S.C. § 1087a.................................................................................4, 5, 20

20 U.S.C. § 1087e...............................................................................4, 5, 32

20 U.S.C. § 1087f...................................................................................5, 15

20 U.S.C. § 1098g....................................................................................3, 28

Consolidated Appropriations Act,
  Pub. L. No. 115-141, § 315, 132 Stat. 348 (2018)..........................................9, 24

## State Statutes

24 Pa. Stat. § 5101 ........................................................................................6

24 Pa. Stat. § 5102 ....................................................................................................6

24 Pa. Stat. § 5104 ....................................................................................................6

24 Pa. Stat. § 5105.6 .................................................................................................6

**Rules**

Fed. R. Civ. P. 19 ...............................................................................................35, 38

**Regulations**

34 C.F.R. § 682.209 ..................................................................................................6

34 C.F.R. §§ 682.210–211 ........................................................................................6

34 C.F.R. § 682.215 ..................................................................................................6

34 C.F.R. § 682.700(a) ..............................................................................................8

34 C.F.R. §§ 685.204–205 ........................................................................................6

34 C.F.R. § 685.208 ...............................................................................................4, 6

34 C.F.R. § 685.209 ..................................................................................................4

34 C.F.R. § 685.219 .............................................................................................5, 20

34 C.F.R. § 685.220 ..................................................................................................6

**Other Authorities**

Statement of Interest, *Chae v. SLM Corp.*, No. 08-56154 (9th Cir. Feb. 26, 2009)
 (Dkt. No. 22) ......................................................................................................33

Consumer Financial Protection Bureau, *Staying On Track While Giving Back*,
 June 2017, *available at*
 https://files.consumerfinance.gov/f/documents/201706_cfpb_PSLF-midyear-
 report.pdf ..............................................................................................................9

Federal Student Aid, *Federal Student Aid Posts New Report to FSA Data Center*,
 (Sept. 19, 2018), *available at*
 https://ifap.ed.gov/eannouncements/091918FSAPostsNewReportstoFSAData
 Center.html (last visited Jan. 30, 2020) ...............................................................5

*Notice of Federal Preemption and State Regulation of the Department of
 Education's Federal Student Loan Programs and Federal Student Loan
 Servicers*, 83 Fed. Reg. 10619 (Mar. 12, 2018) ..............................5, 6, 7, 8, 33, 37

Statement of Interest, *Massachusetts Attorney General v. PHEAA*, No. 1784-cv-02685 (Ma. Super. Ct. Jan. 8, 2018) ....................................................................6, 7, 8, 33, 37

Statement of Interest, *Sanchez v. ASA College, Inc.*, No. 14-cv-5006 (S.D.N.Y. Jan. 23, 2015) (Dkt. No. 64) ........................................................................................33

Statement of Interest, *Student Loan Servicing Alliance v. Taylor*, No. 18-640 (D.D.C. Aug. 24, 2018) (Dkt. No. 20) ...............................................................................8, 37

U.S. Gov't Accountability Office, GAO-18-547, *Public Service Loan Forgiveness: Education Needs to Provide Better Information for the Loan Servicer and Borrowers* (2018), *available at* https://www.gao.gov/assets/700/694304.pdf .............................................8, 9, 39, 40

U.S. Gov't Accountability Office, GAO-19-347, *Federal Student Loans: Education Needs to Verify Borrowers' Information for Income-Driven Repayment Plans* (2019), *available at* https://www.gao.gov/assets/700/699968.pdf .............................................................9

U.S. Gov't Accountability Office, GAO-19-595, *Public Service Loan Forgiveness: Improving the Temporary Expanded Process Could Help Reduce Borrower Confusion* (2019), *available at* https://www.gao.gov/assets/710/701157.pdf .............................................................9

## PRELIMINARY STATEMENT

The premise of this lawsuit by the New York Attorney General (NYAG) is that absent its intervention, student borrowers in New York whose loans are serviced by the Pennsylvania Higher Education Assistance Agency (PHEAA) may be harmed because no other effective means exists to ensure the appropriate servicing of these student borrowers' loans.  Contrary to NYAG's premise, though, PHEAA is already well-monitored: the U.S. Department of Education (the Department) serves as both PHEAA's primary regulator and its contractual counterparty, exercising comprehensive oversight of PHEAA's loan-servicing operations to ensure that the Department's regulatory and contractual obligations to its borrowers are fulfilled.  In fact, the Complaint itself identifies several instances in which PHEAA, upon receipt of a substantiated borrower complaint, has remediated the issue pursuant to the Department's guidance.  NYAG, a state actor, now wrongly seeks to intervene in this federal paradigm by suing PHEAA for alleged harm to the Department's borrowers on the Department's watch.  NYAG should not be permitted to do so for several reasons.

*First*, PHEAA, as a federal contractor, is immune from suit as a matter of both derivative sovereign immunity and intergovernmental immunity.  Derivative sovereign immunity, which was first articulated in *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), immunizes a federal contractor acting within an authorized grant of contractual authority.  Here, the Higher Education Act (HEA), 20 U.S.C. §§ 1070–1099c, authorizes the Department to contract with PHEAA to service federal student loans, upon which this Complaint overwhelmingly is based.  The terms of PHEAA's performance, including its remediation of any servicing errors that may occur, are specifically and entirely dictated by its Servicing Contract with the Department, applicable statutes and regulations, and the Department's day-to-day directives.  Because PHEAA has acted at all times within the scope of its duly authorized federal contract, and because the

federal government itself would be immune from suit, NYAG's claims should be dismissed for lack of subject-matter jurisdiction.

PHEAA also is immune from suit as a matter of intergovernmental immunity, which prohibits state efforts to directly regulate the federal government.  That principle, which arises from the Supremacy Clause, applies with equal force where a state lawsuit would interfere with an ongoing federal contractual relationship.  NYAG's suit represents a direct attempt by the State of New York to regulate the servicing of federal student loans, even though the terms of such servicing are set and monitored in all respects by the federal government.  Because the Supremacy Clause bars NYAG's effort, NYAG's claims should be dismissed for lack of subject-matter jurisdiction.

*Second*, many of NYAG's claims are not ripe because the alleged harms are contingent on future events.  NYAG alleges that PHEAA has miscounted borrowers' qualifying payments under the Public Service Loan Forgiveness (PSLF) program, provided untimely explanations of PSLF-related determinations, and inconsistently resolved PSLF-related errors, thereby extending borrowers' repayment terms by pushing out the date on which they can achieve PSLF forgiveness. (Doc. No. 1, Compl. ¶¶ 11, 113, 168, 264.)  Even drawing all inferences in these borrowers' favor—and setting aside instances in which these so-called errors are due to the actions of prior servicers or changing regulatory guidance—they have not yet made the requisite 120 qualifying payments while working for a qualified employer and enrolled in a qualifying repayment plan. For these borrowers, uncertainty exists as to whether they will perform the service and make the payments—if they do not, any alleged delay in the soonest date on which they can achieve PSLF forgiveness will be irrelevant.  NYAG's claims that such borrowers have been harmed are not yet ripe and should be dismissed.

*Third*, the HEA bars NYAG's state law claims as a matter of express preemption and conflict preemption.  The HEA expressly preempts "*any* disclosure requirements of any State law" that might otherwise apply to federal borrower loans.  20 U.S.C. § 1098g (emphasis added).  NYAG's state-law claims, however, are grounded in what PHEAA allegedly disclosed or should have disclosed to borrowers, and those claims are therefore expressly preempted.  Separately, entertaining NYAG's state-law claims would open the door to piecemeal regulation of federal loan servicing under a patchwork of disparate state law, and thereby undercut Congress's command that the HEA "[e]stablish[ed] a set of rules that will apply across the board."  *Chae v. SLM Corp.*, 593 F.3d 936, 945 (9th Cir. 2010) (affirming dismissal of disclosure claims based on preemption).  NYAG's claims therefore are also subject to dismissal based on conflict preemption.

*Fourth*, NYAG has failed to join an indispensable party, the Department, which owns the federal loans at issue, is a party to the contract that is the subject of this litigation, and, as discussed above, directly regulates PHEAA as a matter of statute, regulation, and contract.  The Department must approve PHEAA's interactions with borrowers and any changes PHEAA makes to servicing policies and procedures.  Because PHEAA has no authority to act unilaterally with respect to its federal loan servicing, any injunctive relief NYAG seeks requires permission from the Department, and any order relating to such relief would be ineffective absent the Department's joinder.  The Department, however, is immune from monetary or injunctive relief in this context.  Given the Department's interest in this case and the likelihood that any order would be ineffective absent joinder, the Court should dismiss the Complaint.

## FACTUAL BACKGROUND

I.    **The HEA, the Direct Loan Program, and the PSLF Program**

The HEA, subsequent amendments, and implementing regulations have created an intricate regulatory regime concerning federal student loans.  *See* 20 U.S.C. §§ 1071–1099c.  Federal

student loans fall into two categories: those issued under the Federal Family Education Loans (FFEL) program, *id.* § 1071 *et seq.*, and those issued under the William D. Ford Federal Direct Loans (Direct Loan) program, *id.* § 1087a *et seq.* Under the FFEL program, which began in 1966, "private lenders issue subsidized student loans, which are then insured by guaranty agencies (a state or private non-profit organization), which, in turn, are insured by" the Department. *Salazar v. King*, 822 F.3d 61, 65 (2d Cir. 2016). Under the Direct Loan program, which began in 1994, "the government lends money to students directly." *Id.* Since 2010, all federal student loans have been issued as Direct Loans, *id.* at 65 n.2, which are documented in standardized Master Promissory Notes constituting contracts between the federal government and the borrower, *see* 20 U.S.C. §§ 1082(m)(1)(D), 1087e(i). Loan servicers are not parties to the underlying notes for loans issued under either program.

Federal regulations authorize several different "repayment plans," which dictate the schedule of a borrower's loan repayment, including the overall number and dollar amount of each payment. Depending on various eligibility factors, such as income and family size, a borrower with Direct Loans can choose among more than ten repayment options, including a "standard" plan, graduated and extended plans, and income-driven plans. *See* 34 C.F.R. §§ 685.208, 685.209. Income-driven repayment (IDR) plans require student borrowers to submit annual recertifications of their income and family size, which allows their servicer to confirm the borrower's continuing eligibility for IDR and recalculate their monthly payment amount. (Compl. ¶¶ 55–57, 177.)

In 2007, Congress authorized the Department to implement a number of loan forgiveness programs, including the PSLF program. *See* 20 U.S.C. § 1087e(m). The PSLF program provides an opportunity for student borrowers with Direct Loans to seek forgiveness of their loan balance after satisfaction of several conditions. *See id.*; 34 C.F.R. § 685.219; (Compl. ¶ 2.) To be eligible

for forgiveness, the borrower must: (1) make 120 separate on-time monthly qualifying payments on a Direct Loan; (2) while enrolled in a qualifying repayment plan, such as an IDR plan; (3) while working full-time for a qualifying public-service employer.  34 C.F.R. § 685.219(c); (Compl. ¶¶ 63, 66–68.)  Borrowers may, but need not, submit interim Employment Certification Forms (ECFs) to receive confirmation that their employer qualifies, and that they are on track for loan forgiveness.  (Compl. ¶ 69.)  Because it takes at least ten years to become eligible for PSLF, the earliest any borrower could have had his or her loans forgiven was October 2017.  *See* Federal Student Aid, *Federal Student Aid Posts New Report to FSA Data Center*, (Sept. 19, 2018) *available at*  https://ifap.ed.gov/eannouncements/091918FSAPostsNewReportstoFSADataCenter.html  (last visited Jan. 30, 2020).

## II.     The Department's Oversight of PHEAA

Every aspect of servicing federal loans is highly regulated by the Department, which has been directed by Congress to implement the federal student loan regime.  *See* 20 U.S.C. §§ 1082(a)(1), 1087a, 1087e.  The Department has express authority to "enter into contracts" for loan "servicing" and "such other aspects of the [Direct Loan Program] as the Secretary determines are necessary."  *Id.* § 1087f(b)(2), (4).  The Department selects its servicers and drafts its servicing contracts to ensure compliance with federal requirements.  *Notice of Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers*, 83 Fed. Reg. 10619, 10620–22 (Mar. 12, 2018) (the Preemption Notice).

In 2009, the Department selected PHEAA as one of several national Direct Loan servicers. (Compl. ¶ 34; *see also* Exhibit 1, relevant excerpts of Servicing Contract (the Servicing

Contract).)[1]  In 2012, by way of a contract modification, PHEAA was selected to administer the PSLF program and service the loans of all borrowers who have indicated an interest in PSLF by submitting an ECF.  (Compl. ¶¶ 41, 64.)

PHEAA receives instruction from the Department in three ways: regulation, contract, and day-to-day oversight.  First, federal regulations govern every aspect of federal loan servicing, including administration of loan repayment, 34 C.F.R. §§ 682.209, 685.208, IDR plans, *id.* §§ 682.215, 685.209, deferments and forbearances, *id.* §§ 682.210–211, 685.204–205, Direct Loan consolidation, *id.* § 685.220, and "a carefully crafted disclosure regime specifying what information must be provided."  Preemption Notice, 83 Fed. Reg. at 10621.  PHEAA's Servicing Contract requires that PHEAA understand and comply with "all federal and state laws and regulations and FSA requirements."  (Ex. 1, Servicing Contract, at C.1.4.3.)

Second, the Servicing Contract also "specifies in detail [PHEAA's] responsibilities and obligations" for servicing Direct Loans, including with respect to various repayment plans and programs such as PSLF.  Preemption Notice, 83 Fed. Reg. at 10620.  The Servicing Contract is "voluminous" and "includ[es] provisions governing [PHEAA's] financial controls, internal monitoring, communications with borrowers, and many other topics."  *Id.*; Statement of Interest at 5, *Massachusetts Attorney General v. PHEAA*, No. 1784-cv-02685 (Ma. Super. Ct. Jan. 8, 2018) (MA Statement of Interest) (attached hereto as Exhibit 2).  Since the Servicing Contract's

---

[1]    PHEAA was created in 1963 by the Commonwealth of Pennsylvania as "a body corporate and politic constituting a public corporation and government instrumentality."  24 Pa. Stat. § 5101.  PHEAA's founding mission is to improve higher education opportunities for Pennsylvania residents by funding student loans and grants.  24 Pa. Stat. §§ 5102, 5105.6.  Over time, PHEAA came not only to fund but also service student loans and grants.  *Id.* § 5104(1.1)(iii).

inception, the Department has implemented more than 450 "change requests" (modifications to the Servicing Contract).  Ex. 2, MA Statement of Interest, at 5.

Third, the Department, through its dedicated contract officers and other staff, provides additional directives to PHEAA and addresses borrower-specific issues during the course of its "daily" communications with PHEAA.  *Id.* at 6.  "These communications have the intent and effect of filling any remaining gaps for servicer discretion."  *Id.*

Overall, the Department's oversight of PHEAA's performance is robust and multi-faceted. As the Department has explained in the Federal Register:

> [T]he Department monitors servicer compliance with the Department's contracts, which include requirements related to customer service. These oversight efforts include, but are not limited to, call monitoring, process monitoring, and servicer auditing, conducted both remotely and on-site by the Department's office of Federal Student Aid (FSA). FSA has dedicated staff with the responsibility to ensure that servicers are adhering to regulatory and contractual requirements for servicing loans. For example, FSA reviews interactions between servicers and borrowers and compares the servicers' performance against a detailed Department checklist. FSA provides its performance evaluations to servicers through written reports and meetings and requires servicers to alter their practices when needed to correct deficiencies. FSA also maintains direct access to servicer systems and therefore can review individual borrower accounts to evaluate the servicers' treatment of those accounts against regulatory and contractual requirements.
>
> …
>
> FSA [also] maintains a Feedback System, which includes a formal process for borrowers to report issues or file complaints about their loan experiences, including problems with servicing. Borrowers may also elevate complaints to the FSA Ombudsman Group—a neutral and confidential resource available to borrowers to resolve disputes related to their loans.

Preemption Notice, 83 Fed. Reg. at 10622.  PHEAA, in turn, is "responsible for resolving all deficiencies identified during audits and participating in corrective action plans as needed."  (Ex. 1, Servicing Contract, Attachment A-1 at 7.)  Borrowers have alternative recourse in the event that they disagree with PHEAA's servicing of their account, including "filing an official complaint with [the Department of] Education's Federal Student Aid Ombudsman Group or through the

Federal Student Aid Feedback System."  U.S. Gov't Accountability Office, GAO-18-547, *Public Service Loan Forgiveness: Education Needs to Provide Better Information for the Loan Servicer and Borrowers*, at 23 (2018), *available at* https://www.gao.gov/assets/700/694304.pdf (GAO-18-547).

The Department's enforcement mechanisms in the event of servicer noncompliance are also substantial.  The Department has plenary authority to limit, suspend, or terminate the activities of a federal student loan servicer that violates its legal obligations or breaches its contract with the Department.   34 C.F.R. § 682.700(a); Preemption Notice, 83 Fed. Reg. at 10620–22.   The Department may opt to withhold payment in the event that PHEAA fails to comply with contract provisions or statutory and legislative requirements.  (Ex. 1, Servicing Contract at B.13.C.)  Even the Department's allocation of loans among servicers is driven by servicer performance—the Department "allocat[es] more loans to servicers that meet performance metrics such as high levels of customer satisfaction and . . . pay[s] servicers higher rates for loans that are in a non-delinquent status."  Preemption Notice, 83 Fed. Reg. at 10622.

The Department has repeatedly stressed the importance of maintaining cost-effective and streamlined federal regulation of servicers, and avoiding the imposition of patchwork state-by-state regulations.  *See id.*; Ex. 2, MA Statement of Interest at 1, 21; Statement of Interest at 1–2, *Student Loan Servicing Alliance v. Taylor*, No. 18-640 (D.D.C. Aug. 24, 2018) (Dkt. No. 20 at 1) (SLSA Statement of Interest) (attached hereto as Exhibit 3).   Indeed, the Department's management of the $1.4 trillion in student loans underwritten by the federal government constitutes a "uniquely federal interest."  Ex. 3, SLSA Statement of Interest at 3, 9 n.13; (*see also* Compl. ¶ 49 (alleging $1.46 trillion in outstanding federal student loans).)

The attention of other federal agencies, too, signals the federal government's overriding interest in the management of the federal student loan portfolio.  For example, in 2018, the U.S. Government Accountability Office (GAO) attributed a low initial approval rate of PSLF applications to, among other things, the fact that over half of all borrowers requesting forgiveness did not meet the basic eligibility requirements or had not yet made any qualifying loan payments. *See* GAO-18-547 at 11.  Congress, in response, enacted the Temporary Expanded Public Service Loan Forgiveness (TEPSLF) Program to provide loan forgiveness to borrowers who would have been eligible for the PSLF Program, but were ineligible due to enrollment in a non-qualifying repayment plan.  Consolidated Appropriations Act, 2018 Pub. L. No. 115-141, § 315, 132 Stat. 348 (2018).  The GAO later reviewed and commented on challenges to the success of that program as well.  *See* U.S. Gov't Accountability Office, GAO-19-595, *Public Service Loan Forgiveness: Improving the Temporary Expanded Process Could Help Reduce Borrower Confusion* 1 (2019), *available at https://www.gao.gov/assets/710/701157.pdf* (GAO-19-595).   The Department has agreed with the recommendations in both GAO reports and committed to implementation of those recommendations.  GAO-18-547 at 27–28; GAO-19-595 at 24–26.  Other federal agencies, too, have submitted assessments of various federal loan programs, such as IDR and PSLF, and made recommendations to policymakers.  *See* Consumer Financial Protection Bureau, *Staying On Track While Giving Back*, June 2017, *available at* https://files.consumerfinance.gov/f/documents/201706_cfpb_PSLF-midyear-report.pdf;      U.S. Gov't Accountability Office, GAO-19-347, *Federal Student Loans: Education Needs to Verify Borrowers' Information for Income-Driven Repayment Plans* 1 (2019), *available at* https://www.gao.gov/assets/700/699968.pdf.

### III.    NYAG's Complaint

NYAG alleges that PHEAA has engaged in deceptive, unfair, and abusive practices in connection with its loan servicing for New York borrowers, including by miscounting PSLF-qualifying payments; failing to timely provide PSLF payment counts to borrowers; failing to timely and accurately process IDR-related paperwork; treating borrowers inconsistently; steering borrowers to less favorable repayment options; and misadvising borrowers with cancer concerning deferment eligibility.

For many of the specific instances of alleged misconduct cited in the Complaint, however, NYAG acknowledges that PHEAA has already remediated whatever condition or error occurred once PHEAA was alerted to the issue.  For example, when borrowers identified errors in PHEAA's qualifying payment counts and provided evidence to support their claim, PHEAA updated the borrowers' payment counts.  (*See, e.g.*, Compl. ¶¶ 98–101, 112, 122.)  In other cases, PHEAA corrected borrowers' payment plans and payment counts when borrowers identified the payment plans as incorrect and provided an income certification.  (*See, e.g.*, *id.* ¶¶ 207–14.)  Further, NYAG alleges that New York borrowers have experienced a variety of harms based on PHEAA's performance under its federal contract, including the extension of repayment terms due to alleged undercounting of PSLF qualifying payments.  (*See id.* ¶¶ 11, 113, 168, 264.)  At least some New York borrowers referenced in the Complaint, though, are years away from potentially qualifying for PSLF forgiveness, (*see, e.g.*, *id.* ¶ 98 (borrower is at least six years from forgiveness)), and no specific New York borrowers are described as already eligible for forgiveness.

Based on the above alleged conduct, NYAG pleads six causes of action against PHEAA: claims for (1) deceptive, (2) unfair, and (3) abusive practices under the Dodd-Frank Act, 12 U.S.C. § 5531(a) *et seq.*; claims for (4) fraud and (5) deceptive acts and practices under N.Y. Executive Law § 63(12); and one claim for (6) deceptive acts and practices under N.Y. GBL § 349.

## LEGAL STANDARD

### I.   Motion to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In reviewing a motion under Rule 12(b)(1), courts place the burden of establishing jurisdiction upon the party asserting such jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  "The plaintiff bears the burden of alleging facts that affirmatively and plausibly suggest that it has standing to sue." *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 417 (2d Cir. 2015) (internal quotation marks, alterations, and citation omitted).  "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quotation marks omitted).  The court may review evidence outside the pleadings to determine whether jurisdiction exists. *Makarova*, 201 F.3d at 113.

### II.    Motion to Dismiss for Failure to State a Claim

When considering a motion to dismiss under Rule 12(b)(6), a court must accept all well-pleaded allegations of material fact as true and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The court, however, need not accept as true a legal conclusion presented as a factual allegation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A pleading that offers only "labels and

conclusions or a formulaic recitation of the elements of a cause of action" will not survive a motion to dismiss under Rule 12(b)(6).  *Id.* (internal quotation marks omitted).

## III.    Motion to Dismiss for Failure to Join a Necessary Party

Under Rule 12(b)(7), an action must be dismissed for failure to join a party under Rule 19 if the absent party is (1) necessary but joinder is not feasible, and (2) indispensable to the action. *See Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724–25 (2d Cir. 2000).  In determining a Rule 12(b)(7) motion, a court may accept all factual allegations in the complaint as true and draw inferences in favor of the plaintiff.  *Am. Trucking Ass'n, Inc. v. N.Y. State Thruway Auth.*, 795 F.3d 351, 354 (2d Cir. 2015).  Furthermore, a court can consider matters outside the pleadings in deciding a Rule 12(b)(7) motion.  *Holland v. Fahnestock & Co.*, 210 F.R.D. 487, 495 (S.D.N.Y. 2002).

## ARGUMENT

## I.   The Court lacks subject-matter jurisdiction.

### A.    PHEAA is entitled to derivative sovereign immunity under *Yearsley*.

Because PHEAA is a federal contractor administering federal student loans at the direction of the Department, the doctrine of derivative sovereign immunity shields PHEAA from suit for complying with the Department's directives and its Servicing Contract with the Department.

#### 1.    Applicable Law

"[G]overnment contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States."  *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) (quotation marks omitted) (alteration in original). Consequently, it is "well-settled law that contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity."  *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000).   Such immunity derives from the

"government's unquestioned need to delegate governmental functions," such that "[i]mposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work." *Id.* (quotation marks omitted).  When claims against federal contractors are barred by derivative sovereign immunity, the proper course is to dismiss for lack of jurisdiction.  *See, e.g.*, *Cunningham v. Gen. Dynamics Info. Tech.*, 888 F.3d 640, 649 (4th Cir. 2018); *Chesney v. TVA*, 782 F. Supp. 2d 570, 586 (E.D. Tenn. 2011).

"Derivative immunity was first extended to private contractors in [*Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940)], where the contractor was working pursuant to the authorization and direction of the federal government and the acts of which the plaintiff complained fell within the scope of those government directives." *McCue v. City of New York (In re World Trade Ctr. Disaster Site, Litig.)*, 521 F.3d 169, 196 (2d Cir. 2008).  In *Yearsley*, a landowner sued a contractor for damages when part of his land was washed out after the contractor built a river dike under a federal contract.  *Yearsley*, 309 U.S. at 19.  The Supreme Court held that the contractor was not answerable to the landowner because "the work which the contractor had done in the river bed was all authorized and directed by the Government of the United States" and "performed pursuant to the Act of Congress."  *Id*. at 20.  The Supreme Court contrasted that scenario with instances where a government contractor had "exceeded his authority" or the authority "was not validly conferred."  *Id.* at 21.

In 2016, the Supreme Court reaffirmed the applicability of *Yearsley* immunity, explaining that, "[c]ritical in *Yearsley* was not the involvement of public works, but the contractor's performance in compliance with all federal directions."  *Campbell-Ewald*, 136 S. Ct. at 673 n.7.  Such immunity "reduces the risk that contractors will shy away from government work."  *Id.* at 673.  Other courts have since distilled the doctrine into a two-element test, under which a federal

13

contractor is immune from suit when "(1) the government authorized the contractor's actions and (2) the government 'validly conferred' that authorization, meaning it acted within its constitutional power." *Cunningham*, 888 F.3d at 643 (quoting *In re KBR, Inc., Burn Pit. Litig.*, 744 F.3d 326, 342 (4th Cir. 2014)).[2]  Consequently, to overcome an assertion of *Yearsley* immunity in the face of a valid federal contract, "a complaint must contain plausible factual allegations that a private contractor acted pursuant to invalidly conferred authority or exceeded its validly conferred authority . . . ." *Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 107 (D.D.C. 2017).

Here, the Department, had it been the target of NYAG's suit, would enjoy sovereign immunity from all monetary, injunctive, and equitable relief sought by NYAG.  "It is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (alterations and quotation marks omitted). Thus, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)).  "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (internals citation omitted).  The burden of establishing a waiver of sovereign immunity "rests upon the party asserting jurisdiction." *Kokkonen,* 511 U.S. at 377.  Like any other federal government agency, the Department is protected by sovereign immunity apart from express

---

[2]     Prior to *Campbell-Ewald*, which reaffirmed the vitality of *Yearsley* as a standalone doctrine, courts within the Second Circuit at times combined *Yearsley* immunity with the contractor defense outlined in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1998). *See, e.g.*, *In re World Trade Center Disaster Site Litig.*, 521 F.3d at 196.  To the extent that the Court believes that the *Boyle* immunity analysis may apply, PHEAA requests permission to submit supplemental briefing on this issue.

waiver.  *See Johnson v. DeVos*, 775 F. App'x 86, 87 (4th Cir. 2019) (affirming dismissal for lack of subject-matter jurisdiction based on sovereign immunity).

PHEAA, as a federal contractor servicing loans pursuant to a valid federal contract and in accordance with all federal directions, is entitled to derivative immunity in the same measure as the federal government.  This Court therefore should dismiss NYAG's claims for lack of subject-matter jurisdiction.

### 2.    The Department validly conferred authority to PHEAA to administer federal student loans.

Under *Yearsley*, "[a]uthorization is 'validly conferred' on a contractor if Congress authorized the government agency to perform a task and empowered the agency to delegate that task to the contractor, provided it was within the power of Congress to grant the authorization." *Cunningham*, 888 F.3d at 647 (citing *Yearsley*, 309 U.S. at 20).  Nothing in the Complaint would support a finding that PHEAA performed federal student loan servicing tasks without validly conferred authorization.

Under the HEA, Congress authorized the Department to issue Direct Loans, 20 U.S.C. §§ 1071–1099c, and to contractually delegate the task of servicing such loans, 20 U.S.C. § 1087f(a), (b)(2), (4).  In 2009, pursuant to that mandate, the Department contracted with PHEAA to service federal loans, and later expanded that contract to include administration of the PSLF program. (Compl. ¶¶ 34, 64.)  The Complaint does not contest either the fact of congressional delegation of authority to the Department, or the Department's contractual delegation of work to PHEAA.  As a result, this element of *Yearsley* immunity is satisfied.

### 3.    PHEAA has serviced New York borrowers' federal loans in accordance with federal directives.

The second question under *Yearsley* is whether PHEAA's performance under the Servicing Contract accords with the Department's directives.  *In re World Trade Ctr. Disaster Site, Litig.*,

521 F.3d at 196 (derivative immunity applies where "the acts of which the plaintiff complained fell within the scope of [the] government directives" (citing *Yearsley*, 309 U.S. at 20–21)); *see also Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009) (holding that "the district court did not err in dismissing the action" because plaintiffs failed to "allege that the Contractor Defendants exceeded their authority or in any way deviated from Congress's direction or expectations"); *In re Oil Spill*, MDL No. 2179, 2016 U.S. Dist. LEXIS 18248, at *33–34 (E.D. La. Feb. 16, 2016) (plaintiffs' "nonspecific and generalized allegations" were insufficient to show that defendants "exceed[ed] or disobey[ed] the authority conferred by the federal government"; defendants are thus "entitled to derivative immunity").

Here, NYAG does not allege that PHEAA violated any specific federal loan-servicing regulation, or acted in contravention of any federal directive.  Instead, NYAG contends that in its own assessment, PHEAA, while performing under the Servicing Contract, engaged in fraud and unfair, deceptive, or abusive acts and practices.  But second-guessing of that nature is precisely what *Yearsley* is intended to prevent.  The Department contracted with PHEAA to administer federal student loans under the Department's close supervision, and the Complaint establishes that PHEAA has done exactly that.

More specifically, the Servicing Contract unambiguously anticipates that PHEAA's performance of its contractual obligations will at times include servicing errors, and that PHEAA will work with the Department to remediate such errors as they arise.  (Ex. 1, Servicing Contract, Attachment A-1 at 7 (providing that PHEAA is "responsible for resolving all deficiencies identified during audits and participating in corrective action plans as needed").)  NYAG's allegations that individual borrowers have at times experienced delay or manual processing errors during the course of PHEAA's loan servicing, then, do not establish that PHEAA has failed to

16

comply with all governmental directives.  Indeed, many federal contracts incorporate a degree of error tolerance, within which the contractor remains in contractual compliance.  *See, e.g.*, *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1221 (11th Cir. 2012) (tolerating 5% error rate in medical billing); *Milmark Services, Inc. v. United States*, 2 Cl. Ct. 116, at *126–27 (Cl. Ct. 1983) (tolerating 2.5% error rate in immigration data entry contract).  Further, given the Servicing Contract's provisions permitting PHEAA to correct deficiencies under the Department's supervision, even an allegation that PHEAA exceeded an error tolerance would not suffice to undermine PHEAA's claim of immunity, so long as PHEAA remediated the issue under the Department's oversight and to the Department's satisfaction.  *See, e.g.*, *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d at 345 (observing that probative evidence in the *Yearsley* analysis includes "whether the military permitted or required [the contractor] to deviate from the contract's terms under certain circumstances").

PHEAA is entitled to derivative sovereign immunity because the Complaint establishes that NYAG seeks to hold PHEAA liable for conduct performed at the direction of the federal government and for which the federal government would be immune.  Because the Complaint alleges no instance of PHEAA's failure to comply with federal directives, the Complaint must be dismissed for lack of subject-matter jurisdiction.

## B.     NYAG's state-law claims are barred by intergovernmental immunity.

The intergovernmental immunity doctrine provides that under the Supremacy Clause of the U.S. Constitution, the federal government is immune from suit under any state or local law that would directly or discriminatorily regulate the federal government or interfere with the execution of federal functions.  *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180–81 (1988), *M'Culloch v. Maryland*, 17 U.S. 316, 425–37 (1819).  This immunity extends to private contractors carrying out federal functions.  *See Boeing Co. v. Movassaghi*, 768 F.3d 832, 836 (9th Cir. 2014) (granting

immunity to private contractor where state law would have impeded the performance of a federal function); *Black Hills Power & Light Co. v. Weinberger*, 808 F.2d 665, 669 n.4 (8th Cir. 1987) ("[A] state cannot diminish the constitutional authority of the United States government by regulating the parties with whom it may contract."); *cf. Nat'l Jewish Democratic Council v. Adelson*, No. 18-cv-8787, 2019 U.S. Dist. LEXIS 168675, at *5 (S.D.N.Y. Sept. 30, 2019) (state governments "have no power. . . to retard, impede, burden, or in any manner control" federal operations (quoting *M'Colloch*, 17 U.S. at 436)).

"Direct regulation" occurs when a state government interferes with federal functions by mandating that the federal government (or its contractor) comply with state-law procedures or standards. *See, e.g.*, *Boeing Co.*, 768 F.3d at 840 (law directly regulated the functions of federal government where it mandated how defendant could render its contractual services); *United States v. Virginia*, 139 F.3d 984, 988–89 (4th Cir. 1998) (law directly regulated federal government by imposing requirements on potential federal contractors). The fact that a state law is one of general applicability is of no moment if the federal government's activities are nonetheless impacted. *See, e.g.*, *Blackburn v. United States*, 100 F.3d 1426, 1435, 1435 n.3 (9th Cir. 1996) (National Park Service immune from state law mandating warning signs and other safety features associated with "resort[s]" at large).

In *Boeing Co. v. Movassaghi*, the Ninth Circuit recently applied the intergovernmental immunity doctrine under similar circumstances, finding that a federal contractor was immune from suit under state law where California, unsatisfied with the federal government's proposed clean-up plan for a contaminated federal test site, passed a bill requiring the contractor to adhere to more onerous standards. 768 F.3d at 835–40. The court explained that the California law impermissibly "mandates the ways in which Boeing renders services that the federal government hired Boeing to

perform" and "replaces the federal cleanup standards that Boeing has to meet to discharge its contractual obligations to [the Department of Energy] with the standards chosen by the state." *Id.* at 840. Thus, the Ninth Circuit found that the law "regulates not only the federal contractor but the effective terms of [the] federal contract itself." *Id.*

Here, through its application of Executive Law § 63(12) and GBL § 349, NYAG attempts to mandate the ways in which PHEAA renders services that the Department hired PHEAA to perform. Specifically, NYAG seeks to require PHEAA to provide federal student loan borrowers, at specific times and in specific ways, with information about federal repayment provisions, including PSLF payments, monthly loan payment amounts, repayment options, loan consolidation, and cancer deferments. (*See* Compl. ¶¶ 350a-h, 355a-h, 359a-h.) The Department, however, already dictates all of PHEAA's contractual performance and supervises that performance through the various enforcement mechanisms available to it. NYAG, by seeking injunctive and monetary relief that would require PHEAA to go beyond the performance mandated by the Department, effectively seeks to supersede the Department's operational oversight and the effective terms of the Servicing Contract.

NYAG's state-law claims also separately constitute an impermissible effort to directly regulate the federal government because of their impact on federal property. *See, e.g.*, *Blackburn*, 100 F.3d at 1435 (holding that state law would impermissibly regulate "the Federal Government's operation of its property at Yosemite"). Here, many of NYAG's claims are directed at PHEAA's administration of the PSLF program, (*see* Compl. ¶¶ 76–174, 229–76), which is a benefit offered only in connection with government-owned Direct Loans. *See* 34 C.F.R. § 685.219(c)(1)(iii); 20 U.S.C. § 1087a. NYAG's efforts to dictate the manner in which PHEAA services Direct Loans

will therefore have a direct impact on federal property, and the Supremacy Clause prohibits that effort.

**C.    Alternatively, PHEAA requests that the Court allow for jurisdictional discovery to determine whether PHEAA is entitled to immunity.**

A party's meritorious claim of immunity "represents not simply a bar on liability but also an 'entitlement not to stand trial or face the burdens of litigation.'" *Edrei v. Maguire*, 892 F.3d 525, 532 (2d Cir. 2018) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Consequently, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)) (alteration in original); *accord Morales v. New York*, 22 F. Supp. 3d 256, 274 (S.D.N.Y. 2014); *see also Campbell-Ewald*, 136 S. Ct. at 672–73.  On that basis, federal courts have authorized limited jurisdictional discovery on the question of immunity where the pleadings alone do not permit full resolution of the claim.  *See, e.g.*, *Cunningham*, 888 F. 3d at 645 (district court granted limited jurisdictional discovery to determine defendant's entitlement to *Yearsley* immunity); *Scott*, 296 F. Supp. 3d at 108 (permitting limited discovery to determine defendant's entitlement to *Yearsley* immunity).  Here, to the extent that the Court deems additional development of the record necessary to resolve PHEAA's claims of derivative sovereign immunity and intergovernmental immunity, PHEAA asks that the Court order such limited discovery as is necessary to resolve PHEAA's entitlement to those immunities.

**D.    The Court lacks subject-matter jurisdiction because NYAG's claims relating to borrowers who have not yet reached 120 payments under PSLF are not ripe.**

NYAG repeatedly alleges that borrowers will be required to make more than the necessary 120 payments to obtain PSLF loan forgiveness due to PHEAA's alleged miscounting of payments (Compl. § IV.A), delayed explanations (*id.* § IV.B), and inconsistent error resolutions (*id.* § IV.D). (Compl. ¶¶ 11, 113, 168, 264.)  Because these alleged harms are contingent upon future events

that may or may not occur, NYAG's claims reliant on these harms are not ripe and should be dismissed.

### 1.    Applicable Law

"To be justiciable, a cause of action must be ripe—it must present 'a real, substantial controversy, not a mere hypothetical question.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (quoting *AMSAT Cable Ltd. v. Cablevision of Conn.*, 6 F.3d 867, 872 (2d Cir. 1993)). "Ripeness 'is peculiarly a question of timing.'" *Id.* (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)). Claims are not ripe if they depend upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citations and quotation marks omitted). The ripeness doctrine's principal purpose is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).

The ripeness inquiry has two dimensions: constitutional and prudential. *Simmonds v. INS*, 326 F.3d 351, 356–57 (2d Cir. 2003). "[A] determination that a case is not 'ripe,' under either doctrine, results in dismissal." *Id.* at 357. "Constitutional ripeness . . . is really just about the first [*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)] factor—to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical.'" *Walsh*, 714 F.3d at 688. It "prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it." *Simmonds*, 326 F.3d at 357. Prudential ripeness, by contrast, is a discretionary tool a court may employ when "the case will be *better* decided later and [ ] the parties will not have constitutional rights undermined by the delay." *Id.* (emphasis in original). Prudential ripeness is employed by courts "to enhance the accuracy of their decisions

and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial." *Id*.

### 2. NYAG's claims are not constitutionally ripe because the alleged harm is not actual or imminent.

Because the requirements of constitutional ripeness overlap with the standing requirement that a plaintiff's injury be imminent, courts apply the same analysis for constitutional ripeness that they apply for injury-in-fact. *See Walsh*, 714 F.3d at 688–89 (summarizing cases). Here, the injuries stemming from PHEAA's alleged PSLF-related errors consist of increased loan balances, a prolonged repayment term, or inappropriate denial of forgiveness. (*See* Compl. ¶¶ 11, 113–16, 124.) All of these constitute risks of a future, not present, harm. To the extent that NYAG anonymously identifies specific New York borrowers with alleged payment-count issues, such borrowers appear to be years away from potential loan forgiveness. (*See, e.g.*, *id.* ¶ 98 (describing only 44 qualifying payments).)[3]

While plaintiffs may, under some circumstances, rely on the risk of a future harm to support their injury-in-fact, such future injuries are only "actual or imminent" where the "threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)). A plaintiff alleging only an "objectively reasonable likelihood" that it will sustain the cited harm at some future time does not satisfy this requirement. *Clapper*, 568 U.S. at 410. Courts are also "generally hostile to 'standing theories that require guesswork as to

---

[3]   NYAG identifies two borrowers who were allegedly denied loan forgiveness despite having made 120 qualifying payments, but the first appears to be a resident of Washington, and the second is a resident of Illinois. (*See* Compl. ¶¶ 122–23 & nn.16–17.)

how independent decisionmakers will exercise their judgment,' which almost by definition require speculation as to the likelihood of injury resulting from the third party's actions." *Cohen v. Facebook*, 252 F. Supp. 3d 140, 150 (E.D.N.Y. 2017) (quoting *Clapper*, 568 U.S. at 413) (internal citation omitted); *see also Taylor v. Bernanke*, No. 13-cv-1013, 2013 U.S. Dist. LEXIS 128533, at *18 (E.D.N.Y. Sept. 9, 2013) ("Where the occurrence of the future injury depends on the actions of a third party not included in the plaintiff's suit, the Supreme Court has shown particular reluctance to conclude that the 'imminence' requirement is met."). Moreover, a "highly attenuated chain of possibilities[] does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.

Here, NYAG alleges that New York borrowers have missed PSLF payment opportunities, received inaccurate PSLF payments counts, or endured other unnecessary delays that will increase their loan balances and prolong their process of obtaining PSLF loan forgiveness. (*See* Compl. ¶¶ 11, 113–16, 124.) NYAG does not, however, identify any New York borrower who has obtained PSLF loan forgiveness but for whom the process took longer than necessary because of PHEAA's unlawful actions, or who "overpaid" for such forgiveness. The injuries alleged by NYAG thus remain contingent on a highly attenuated chain of events. Specifically, the borrowers identified by NYAG must continue to make on-time monthly student loan payments until they have made 120 payments that, in the absence of servicer error, would make them eligible for loan forgiveness. During that time, the borrowers must work for qualifying employers, and remain on a qualifying repayment plan. None of these things are guaranteed—a borrower may reasonably elect to abandon pursuit of PSLF on many grounds.

Further, Congress or the Department may change its directives and policies to allow for past ineligible payments to become eligible. *See, e.g.*, Consolidated Appropriations Act, § 315,

132 Stat. 348, 752–53 (extending PSLF forgiveness to borrowers who met PSLF program requirements but were enrolled in ineligible repayment plans). Indeed, the Department is actively considering the GAO's recommendations for changes to PSLF, and has refined PHEAA's performance obligations hundreds of times already. *See supra* at 7.

Citing these considerations, another federal court has already dismissed nearly identical claims raised by private plaintiffs against PHEAA in California. *See Winebarger v. PHEAA*, __ F. Supp. 3d ___, No. 19-cv-1503, 2019 U.S. Dist. LEXIS 196821, at *20–24 (C.D. Cal. Aug. 21, 2019) (finding lack of standing and ripeness where borrowers had not yet made 120 qualifying payments). This Court should dismiss NYAG's claims as constitutionally premature on the same basis.

### 3.    NYAG's claims are not prudentially ripe.

Courts assess prudential ripeness based on a two-part inquiry: (1) the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration. *Abbott Labs*, 387 U.S. at 149. The "'fitness' analysis 'is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur.'" *Simmonds*, 326 F.3d at 359 (quoting *Isaccs v. Bowen*, 865 F.2d 468, 478 (2d Cir. 1989)). Issues are not ripe when they would benefit from future factual development or when the court will be in a better position to adjudicate the issues in the future. *Id.* In assessing "hardship," courts "ask whether the challenged action creates a direct and immediate dilemma for the parties." *Id.* at 360 (quoting *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478 (2d Cir. 1999)). "The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." *Id.*

On the first prong—the fitness of the issues for decision—the Second Circuit's framework in *Simmonds* is instructive. 326 F.3d at 359. There, the Second Circuit assessed whether, by waiting for the occurrence of a future event before rendering a decision, the court would: (1)

increase the chance that the proper law is applied to the petitioner's claims; (2) reduce the chance of multiple proceedings; and (3) save the court from issuing a decision that may turn out to be unnecessary. *Id.* In this case, all three factors weigh in favor of finding that NYAG's claims relating to miscounted payments, delayed explanations, and inconsistent error resolution are not prudentially ripe.

The principle issue is that NYAG seeks the adjudication of harms that are contingent on future events that may never occur—namely, that borrowers will complete the 120 qualifying payments necessary for PSLF loan forgiveness and satisfy all other PSLF program requirements. Congress or the Department, too, may authorize PHEAA to make future adjustments to borrowers' qualifying payment counts. By waiting until the borrowers have completed the necessary 120 qualifying payments for loan forgiveness and all other PSLF program requirements, the Court will (1) ensure that it applies the appropriate statutes and regulations, which may be amended in the interim; (2) eliminate the possibility of entertaining a new suit every time PHEAA takes interim steps relating to a plaintiff's qualifying payment count; and (3) obviate the need for a decision that may turn out to be unnecessary or moot if the borrower never completes the PSLF program requirements. *See Vullo v. Office of the Comptroller of the Currency*, No. 17-cv-3574, 2017 U.S. Dist. LEXIS 205259, at *25–26 (S.D.N.Y. Dec. 12, 2017) (holding that claims based on future contingencies were not ripe until after a final agency decision).

In an action with parallel allegations and harms, the Central District of California similarly found that plaintiffs' claims were not ripe. *See Winebarger*, 2019 U.S. Dist. LEXIS 196821, at *23–24. The court explained that plaintiffs' concern that they would be required to pay more than the required 120 qualifying payments was speculative because that harm depended on two important contingencies: (1) that plaintiffs complete the 120 qualifying payments and (2) that there

would be no adjustment to correct plaintiffs' qualifying payment tally. *Id.* "Because those contingencies will not be removed for several years and because it is impossible to know if [p]laintiffs will be harmed when those contingencies are removed," the court concluded that plaintiffs' claims were not ripe. *Id*. at *24. As in *Winebarger*, NYAG's claims that allege harm consisting of a prolonged repayment period or potential denial of loan forgiveness are not yet ripe for a judicial determination.

Nor does NYAG's claim satisfy the second factor for prudential ripeness, which turns on whether plaintiffs will endure a hardship if a decision is withheld at this time. The possibility that borrowers will be harmed by making more payments than necessary for PSLF, or by waiting longer than necessary for PSLF, is a speculative future injury, not a present detriment, and does not constitute a hardship. *Simmonds*, 326 F.3d at 360. The Court should therefore dismiss NYAG's PSLF-related claims as to all borrowers who, in the absence of the alleged wrongdoing, would still not yet be eligible for PSLF loan forgiveness.

## II.    The Court should dismiss NYAG's state-law claims as preempted by the HEA.

NYAG's state-law claims should be dismissed under the Supremacy Clause for a second reason: they are preempted by federal law, both expressly under the HEA and because they stand as an obstacle to the federal government's administration of the Direct Loan program.

It is black-letter law that "'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'" *Vango Media v. City of New York*, 34 F.3d 68, 71 (2d Cir. 1994) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988)). Federal courts have recognized that this principle may arise in three analytically distinct ways:

> (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is

impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.

*N.Y. SMSA Ltd. P'Ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (internal quotation marks omitted).399

Although some courts have applied a presumption against preemption, that presumption does not apply where "considerable federal interests" are at stake.  *United States v. Locke*, 529 U.S. 89, 94 (2000); *accord Bell v. Blue Cross & Blue Shield*, 823 F.3d 1198, 1201–02 (8th Cir. 2016); *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1104–06 (10th Cir. 2015).  *Bell* and *Helfrich* rejected the presumption and applied preemption in the context of state-law efforts to regulate federal healthcare employee contracts.  The Tenth Circuit in *Helfrich* explained:

> The federalism concern (respecting state sovereignty) behind the presumption against preemption has little purchase in this case.  The preemption provision does not affect the relationships between private citizens. Section 8902(m)(1) governs only contracts for the benefit of federal employees.  It is an understatement to say that "there has been a history of significant federal presence," *Locke*, 529 U.S. at 108, in the area of federal employment.  Congress has legislated on the matter from the outset.

804 F.3d at 1105.  The Supreme Court later affirmed the finding of preemption in both *Bell* and *Helfrich*.  *Coventry Health Care of Mo., Inc. v. Nevils*, 137 S. Ct. 1190 (2017).

Here too, the Direct Loan program is implemented exclusively by way of the federal government's contracts with student borrowers, and its contracts with student loan servicers.  The paradigm was created by Congress and is administered by the Department.  The state-level interest in consumer protection that applies in the private sector carries less weight where the consumer's interaction is with a federally regulated contractor performing a federal function.  Consequently, the Court should decline to apply a presumption against preemption.

**A.     The HEA expressly preempts NYAG's state-law claims.**

The HEA, 20 U.S.C. § 1098g, provides that FFEL Loans and Direct Loans "shall not be subject to *any* disclosure requirements of *any* State law."[4]  *Id.* § 1098g (emphasis added). Numerous courts, including one in this Circuit, have held that § 1098g expressly preempts state-law claims relating to representations about loan payments.  *See, e.g.*, *Chae v. SLM Corp.*, 593 F.3d 936, 942–43 (9th Cir. 2010) (express preemption of misrepresentation claim as to FFEL Loans); *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1226 (11th Cir. 2002) ("Congress specifically intended for the HEA to preempt any State disclosure requirements relating to loans under the federal guaranteed student loan program." (interpreting predecessor to 20 U.S.C. § 1098g)); *Winebarger*, 2019 U.S. Dist. LEXIS 196821, at *25–26 (express preemption of misrepresentation claim as to PSLF-related communications for Direct Loans); *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, No. 17-cv-0253, 2018 U.S. Dist. LEXIS 199048, at *8–9 (N.D. Fla. Sept. 20, 2018) (same); *Linsley v. FMS Inv. Corp.*, No. 11-cv-961, 2012 U.S. Dist. LEXIS 53735, at *17 (D. Conn. Apr. 17, 2012) (express preemption of misrepresentation claim as to consolidation-related communications for federal loans).

Here, as detailed below, all three of NYAG's state-law claims relate to the same eight alleged acts or practices by PHEAA.  (*See* Compl. ¶¶ 350, 355, 359.)  All concern alleged disclosures that PHEAA made, or failed to make, to borrowers.  As a result, all three claims are expressly preempted in their entirety.

---

[4]     NYAG alleges, in passing, that its allegations encompass PHEAA's servicing of federal loans under the Federal Family Education Loan (FFEL) Program, under the name American Education Services (AES).  (*See* Compl. ¶¶ 7 n.4, 18, 37, 48 n.8, 175 n.23.) PHEAA's preemption arguments apply with equal force in that context. *See, e.g.*, *Chae*, 593 F.3d at 943, 950; *Winebarger*, 2019 U.S. Dist. LEXIS 196821, at *26–28.

### 1. The HEA preempts NYAG's omission-based claims.

The Complaint alleges that eight alleged acts and practices by PHEAA violate New York state law.  (*Id.*)  Three of those nominally involve an assertion that PHEAA misrepresented certain information to New York borrowers:

- "Misrepresenting repayment options available to struggling borrowers and steering borrowers into less-favorable repayment options such as forbearance" (the "Repayment Options claim");

- "Misrepresenting the benefits of loan consolidation and steering borrowers to consolidate" (the "Consolidation claim"); and

- "Misinforming borrowers as to their opportunities to seek exceptions to certain PHEAA policies and to seek reversals of certain PHEAA determinations" (the "Exceptions claim").

(*Id.* ¶¶ 350c-e; 355c-e; 359c-e.)  On closer examination, however, all three are actually claims that PHEAA omitted certain information from its disclosures to borrowers, placing those claims within the core area preempted by § 1098g.  *See Linsley*, 2012 U.S. Dist. LEXIS 53735, at *17 (holding that a plaintiff "may not avoid preemption by relabeling his otherwise-preempted claim as one of misrepresentation and not improper disclosure").

First, although NYAG attempts to characterize the Repayment Options claim as an affirmative misrepresentation by PHEAA, (*see* Compl. ¶¶ 287, 294–95), the underlying factual allegation is only that PHEAA failed to discuss IDR options with borrowers.  (*See id.* ¶¶ 287, 291, 293.)  Notably, disclosures of this nature are already governed by federal law: the HEA dictates the disclosures required when discussing a borrower's repayment options.  *See* 20 U.S.C. § 1083(e)(2).  It is unsurprising that Congress would expressly preempt state-law disclosure obligations on the same topic.

Second, NYAG's Consolidation claim, too, is described as being predicated on "false statements."  (Compl. ¶ 313.)  The underlying factual allegation, though, is that PHEAA has

omitted certain consolidation-related information from its website.  (*See id*. ¶¶ 300–09).  The only potential remedy for PHEAA's alleged violation would be to make additional disclosures— meaning that this claim, too, is preempted.

Third, NYAG's Exceptions claim is purportedly based on a misrepresentation by PHEAA, (*see id.* ¶¶ 350e, 355e, 359e), but is in fact based exclusively on PHEAA's "failure to inform" New York borrowers about the opportunity to have certain payments counted as eligible for PSLF (*see id*. ¶¶ 240–41, 266–67) or the opportunity to "appeal" their PSLF payment count (*see id.* ¶¶ 275– 76).  These claims, too, boil down to assertions that PHEAA should have, but did not, make certain disclosures to New York borrowers, and they too are expressly preempted.

### 2.  The HEA preempts NYAG's claims based on alleged affirmative misrepresentations by PHEAA.

NYAG's remaining five acts and practices (Compl. ¶¶ 350a, b, f, g, h, 355a, b, f, g, h, 359a, b, f, g, h) rely on supposed misrepresentations by PHEAA.  The most well-reasoned position, however, is that claims predicated on affirmative misrepresentations, too, are expressly preempted under § 1098g because "[c]laims that a servicer provided inaccurate information is no different than a claim that [it] failed to make proper disclosures."  *Lawson-Ross*, 2018 U.S. Dist. LEXIS 199048, at *9; *see also Chae*, 593 F.3d at 943 (holding that "the state-law prohibition on misrepresenting a business practice '[was] merely the converse' of a state-law requirement that alternate disclosures be made" and finding the plaintiff's claims to be preempted).  In the only opinion to address claims concerning alleged misrepresentation of PSLF payment counts—exactly what NYAG alleges here—a federal district court found that such claims, whether based on omissions or affirmative misrepresentations, were expressly preempted.  *See Winebarger*, 2019

U.S. Dist. LEXIS 196821, at *26 (state-law claims preempted because "the failure to provide accurate information is, in essence, nothing more than a disclosure claim").[5]

Because the weight of persuasive authority supports that § 1098g expressly preempts state-law misrepresentation claims, this Court should dismiss all of NYAG's state-law claims here.

### B.    NYAG's state-law claims should also be dismissed based on conflict preemption.

NYAG's state-law claims, along with being expressly preempted by the HEA, are also preempted because they would conflict with and impede the federal government's ongoing implementation of the Direct Loan program, and thus run afoul of the Supremacy Clause.  Conflict preemption arises when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which [is] . . . implied is of no less force than that which is expressed."); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992) ("A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach that goal." (internal quotation marks and citations omitted)).

---

[5]    Three district courts in this Circuit have found that § 1098g does not preempt state-law misrepresentation claims.  The first two opinions rely heavily on the fact that the alleged misstatements, which pertained only to FFEL Loans, were not "explicitly regulated and sanctioned by federal law."  *See Davis v. Navient Corp.*, No. 17-cv-00992, 2018 U.S. Dist. LEXIS 41365, at *6 (W.D.N.Y. Mar. 12, 2018); *Genna v. Sallie Mae, Inc.*, No. 11-cv-7371, 2012 U.S. Dist. LEXIS 54044, at *23 (S.D.N.Y. Apr. 17, 2012).  Here, by contrast, PHEAA's Direct Loan servicing performance is closely monitored by the Department.  *See supra* at 5–9.  The third opinion wrongly applied a heightened standard to Navient's preemption defense, *see Hyland v. Navient Corp.*, No. 18-cv-9031, 2019 U.S. Dist. LEXIS 113038, at *16 (S.D.N.Y. July 8, 2019)  (requiring "compelling evidence of an intention to preempt"), despite the "considerable federal interests" at stake in the context of federal student lending.  *See supra* at 27.

Through the HEA, Congress provided "a clear command for uniformity." *Chae*, 593 F.3d at 945. Speaking to Congress's objectives through the FFEL Program, the Ninth Circuit noted that "[o]ne need not have an advanced degree in risk management and financial practices to believe . . . that exposure to lawsuits under fifty separate sets of laws and court systems could make lenders reluctant to make new federally-guaranteed student loans." *Id.* at 945 (citation and quotation marks omitted). The same uniformity concerns motivated the Direct Loan Program. *See Winebarger*, 2019 U.S. Dist. LEXIS 196821, at *28–29 (holding that state law claims regarding alleged inaccurate disclosures would "undermine Congress's unequivocal objective of uniformity" for Direct Loans); *Chae*, 593 F.3d at 945 ("Congress created a policy of inter-program uniformity by requiring that 'loans made to borrowers . . . shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers under [the FFEL program].'" (quoting 20 U.S.C. § 1087e(a)(1))).[6]

Here, as recognized in *Chae*, NYAG's state-law claims would undermine Congress's objective of uniformity with respect to the federal student loan regime. It is unreasonable to assume that Congress intended to subject federal loan servicers' representations and conduct to the disparate laws of fifty states. Rather, it envisioned that such questions would be resolved by federal law, embodied by the HEA itself, the Department's regulations, and federal contracts with loan servicers. Because NYAG's state-law claims conflict with Congress's overarching goal of uniformity in this context, those claims are preempted.

---

[6]     PHEAA respectfully submits that for the reasons described above, *Hyland*, *Davis*, and *Genna* were wrongly decided as to conflict preemption as well. *Hyland*, 2019 U.S. Dist. LEXIS 113038, at *21; *Davis*, 2018 U.S. Dist. LEXIS 41365, at *6–7; *Genna*, 2012 U.S. Dist. LEXIS 54044, at *24–27.

**C.      The Department's position on preemption under the HEA supports PHEAA's motion and is entitled to substantial deference.**

A federal agency's interpretation of the preemptive effect of federal law is entitled to so-called *Skidmore* deference, with the weight of that deference depending upon the interpretation's "thoroughness, consistency, and persuasiveness." *Wyeth v. Levine*, 555 U.S. 555, 576–77 (2009) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Here, in its recent Preemption Notice, the Department voiced its view that state servicing laws "attempt[ing] to impose new prohibitions on misrepresentations or the omission of material information . . . run afoul of the express preemption provision of 20 U.S.C. § 1098g." Preemption Notice, 83 Fed. Reg. at 10621. Such laws, according to the Department, are "barred whether they are enacted legislatively or implied judicially in the context of a tort suit." *Id.* The Preemption Notice is consistent with the position that the Department has taken in other cases involving application of consumer protection laws to alleged misrepresentations by loan servicers. *See* Ex. 2, MA Statement of Interest at 1–2; Brief of Plaintiff-Intervenor-Appellee at 8, Statement of Interest, *Chae v. SLM Corp.*, No. 08-56154 (9th Cir. Feb. 26, 2009) (Dkt. No. 22).[7]

The Department has also expressed its view that conflict preemption applies under these circumstances because "the purpose of the Direct Loan Program [was] to establish a uniform, streamlined, and simplified lending program managed at the Federal level." Preemption Notice, 83 Fed. Reg. at 10621. The Department has specifically observed that "the imposition of liability on Government contractors will directly affect the terms of Government contracts, at the very least

---

[7]      The Department did not take a contrary position on this specific issue in *Sanchez v. ASA College, Inc.*, No. 14-cv-5006 (S.D.N.Y. Jan. 23, 2015) (Dkt. No. 64). The claims in *Sanchez* involved a privately owned for-profit college making misrepresentations about the programs it offered, the cost of enrollment, the availability of federal funding, and job placements. *Id.* The *Sanchez* action did not involve federal student loans; indeed, the Department did not even discuss the HEA's disclosure provision. *Id.*

by raising the price of such contracts and the interests of the United States will be directly affected." *Id.* (citation and quotation marks omitted).

Although federal courts have split on the degree of deference to which the Preemption Notice is entitled, PHEAA submits that the correct view was adopted in *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, in which the court found that the Preemption Notice "is persuasive and due deference under *Skidmore* . . . ." 2018 U.S. Dist. LEXIS 199048, at *8. Characterizing the Preemption Notice as "well-reasoned and sensible," the court observed that "[i]t articulates unique federal interests in controlling student loan servicers through government contracts that advance the comprehensive disclosure requirements detailed in federal regulations." *Id.* This Court, too, should deem the Preemption Notice persuasive and defer to the Department's interpretation of the federal statutory framework it is charged with implementing.

III.    **The Court should dismiss the Complaint for failure to join the U.S. Department of Education.**

NYAG brings suit on behalf of exclusively federal student loan borrowers. The funds for those borrowers' loans came from the federal government; they are repaying the federal government; and the terms and conditions applicable to their loans, including the parameters of the PSLF program, are set by the federal government. The federal government is the only party in privity of contract with both these borrowers and PHEAA, and it has both rights and obligations with respect to both parties, including an obligation to remediate any ongoing borrower harm, that will be affected by this litigation. The relief sought by NYAG would in most instances set new standards of conduct for PHEAA's performance of a federal contract. Despite these factors, NYAG has not sued the federal government; it has sued PHEAA. In the Department's absence, this suit threatens to impair the Department's ability to protect its interests with respect to both PHEAA and New York borrowers' loans. The suit also subjects PHEAA to a substantial risk of

incurring inconsistent obligations.  Because the Department cannot be joined, however, the matter should be dismissed under Rule 19.

### A.      Applicable Law

Rule 19 requires joinder of a non-party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

> (i) as a practical matter impair or impede the person's ability to protect the interest; or

> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).  Where a necessary non-party cannot be joined for jurisdictional or other reasons, the court must determine if the party is indispensable, i.e., "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b); *see also Viacom*, 212 F.3d at 724 (setting forth "two-step test" under Rule 19).

A federal agency qualifies as an indispensable party in a wide variety of circumstances, such as where an action would "'indirectly attack' its administrative decisions," *Two Shields v. Wilkinson*, 790 F.3d 791, 796–97 (8th Cir. 2015) (United States indispensable where plaintiff contested a federal lease for oil and gas mining rights), or where an agency's ongoing regulation of the lawsuit's subject matter creates the possibility of inconsistent obligations, *see Ins. Co. of the West v. Emp't Dev. Dep't*, No. 16-cv-248, 2016 U.S. Dist. LEXIS 73212, at *18–20 (C.D. Cal. May 24, 2016) (Internal Revenue Service indispensable where plaintiff sought to obtain property covered by tax levy); *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1473 (10th Cir. 1987) (United States indispensable where plaintiff tribe claimed ownership of federal land); *McKenna v. Udall*, 418 F.2d 1171, 1174 (D.C. Cir. 1969) (General Services Administration

indispensable where plaintiff claimed that it wrongfully sold federal property).  The common thread joining these cases is that in each instance, the plaintiff's desired relief would have an impact on a federal agency's ability to administer its property.

Further, as a more general matter, "[i]t is well-established that a party to a contract which is the subject of the litigation is considered a necessary party." *Ryan v. Volpone Stamp Co. Inc.*, 107 F. Supp. 2d 369, 387 (S.D.N.Y. 2000); *see also Envirotech Corp. v. Bethlehem Steel Corp.*, 729 F.2d 70, 75–76 (2d Cir. 1984) (affirming finding that Envirotech was an indispensable party, in part, because Envirotech's involvement in the contracts at issue was considerable).  Where that contracting party is a sovereign, federal courts have regularly found them indispensable.  *See Yashenko v. Harrah's NC Casino Co., LLC*, 446 F3d 541, 553 (4th Cir. 2006) (holding sovereign tribe was a necessary but indispensable party because any judgment "would threaten to impair the [tribe]'s contractual interests, and thus, its fundamental economic relationship with the private party, as well as its sovereign capacity to negotiate contracts and, in general, to govern the reservation." (quotation marks and citations omitted)).

### B.      The Department of Education is a necessary party.

The Department is a necessary party here for two reasons: first, because permitting this action to go forward would "impair and impede" the Department's ability to protect its unique federal interest in student loans, and second, because in the Department's absence, PHEAA is subjected to a "substantial risk" of incurring conflicting legal obligations.

It is beyond dispute that the Department has claimed multiple interests relating to the subject matter of this action: the treatment of federal borrowers (both by PHEAA and as potential recipients of court-ordered relief, in the event it is awarded); the uniform servicing of federal loans pursuant to federal contracts; and availability of federal loan forgiveness, which directly affects the federal Treasury.  The Department has explicitly reiterated these interests many times.  *See*

36

Preemption Notice, 83 Fed. Reg. 10619 ("[T]he servicing of Direct Loans is an area 'involving uniquely Federal interests' that must be 'governed by Federal Law.'" (quoting *Boyle*, 487 U.S. at 504)); Ex. 2, MA Statement of Interest at 2 (identifying the "important federal interest in cost-effectively and uniformly administering and streamlining the federal loan program"); Ex. 3, SLSA Statement of Interest at 1.

The record is also clear that NYAG's suit may "impair and impede" the Department's ability to protect those interests. As the Department has noted, "the 'imposition of liability on Government contractors will directly affect the terms of the Government contracts,' at the very least by raising the price of such contracts, and 'the interests of the United States will be directly affected.'" Preemption Notice, 83 Fed. Reg. at 10621 (quoting *Boyle*, 487 U.S. at 507). Here, NYAG seeks both money damages (in the form of penalties and restitution) and injunctive relief that would prevent PHEAA from "engaging in the deceptive, unfair, and abusive practices identified in [the] Complaint." (Compl., p. 66.) PHEAA remains in good standing with the Department, however, and any of the requested relief will necessarily upset the status quo, either by increasing the cost of doing business for the federal government or by functionally revising the terms of the Servicing Contract. The Department is thus a necessary party.

Additionally, any disposition in the Department's absence threatens PHEAA with multiple or inconsistent obligations. The Department has emphasized its exclusive enforcement authority over the Direct Loan Program, as well as its view that "[t]he imposition of State-law requirements may conflict with legal, regulatory, and contractual requirements, and may skew the balance the Department has sought in calibrating its enforcement decisions to the objectives of the program." Preemption Notice, 83 Fed. Reg. at 10620. In the event that this Court were to enter an order requiring certain new or different disclosures as a matter of injunctive relief, for instance, the

Department might nonetheless seek to compel PHEAA, through its enforcement mechanisms, to not make such disclosures, consistent with its current servicing requirements.  As such, PHEAA's risk of incurring inconsistent obligations is both real and weighty.

### C.      The Department of Education is indispensable.

In determining whether a party is indispensable, courts consider the following factors:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).  "[W]hen an indispensable party is immune from suit, there is very little room for balancing of other factors set out in rule 19(b), because immunity may be viewed as one of those interests compelling by themselves."  *Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 548 (2d Cir. 1991) (quotation marks omitted).  The Department is immune from suit, *see supra* at 14, and is a paradigmatically indispensable party under every factor listed in Rule 19(b).

First, the Department would be prejudiced if the suit proceeds in its absence.  As explained above, the Department has an overriding and exclusive interest in the vindication of its rights and fulfillment of its obligations under its contracts with PHEAA and the borrowers.  Any relief granted in the Department's absence would inherently affect the Department's Servicing Contract with PHEAA, its contractual and legal relationships with its borrowers, and its ability to attract high-quality loan servicers as contractual partners in the future.

Second, no reasonable means exists by which to lessen or avoid that prejudice through the use of protective provisions or shaping of relief.  NYAG seeks both injunctive and monetary relief. (Compl., p. 66.)  Granting NYAG's request for injunctive relief with respect to the manner and content of PHEAA's communications with borrowers will necessarily impede the Department's

administration of the federal student loan regime by obligating PHEAA to comply with conditions not required by federal regulations or the Servicing Contract. Granting NYAG's request for monetary relief raises similar issues, because PHEAA and other loan servicers may be incentivized to shift the costs to the Department and, correspondingly, the federal Treasury.

Third, a judgment rendered in the Department's absence will not be adequate, because it would not bind the Department, the single party that has absolute control over its relationship with both the allegedly affected borrowers and with PHEAA. The Department would remain free to contract with another loan servicer to service New York loans according to its preferred guidance. *See Dawavendewa v. Salt River Projects Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1155–56 (9th Cir. 2002) (holding that court could not accord complete relief where the third-party tribe would not be bound by the judgment and could terminate defendant's lease and sign a new lease with the same allegedly illegal hiring terms).

Finally, New York student borrowers will continue to have an adequate remedy if the Court were to dismiss the action for nonjoinder. As noted above, NYAG concedes that over half the individual instances of alleged error by PHEAA were remediated before this lawsuit was filed. *See supra* at 10. Any borrowers with remaining grievances can lodge complaints with the Department. *See* GAO-18-547 at 23 ("Borrowers have several options for disputing payment counts and other aspects of the eligibility determination process, including contacting the PSLF servicer or filing an official complaint with Education's Federal Student Aid Ombudsman Group or through the Federal Student Aid Feedback System."). The Department remains capable of providing relief, including restitution, to any borrowers affected by servicing errors.

In sum, because the Department is a necessary and indispensable party due to its regulatory and contractual interest in the subject matter of this lawsuit, the Court should dismiss this case under Rule 12(b)(7).

## IV.    NYAG is not permitted to pursue civil penalties under the CFPA.

As relief in this matter, NYAG seeks, among other things, "a civil penalty of $1,000,000 per day in which PHEAA engaged in conduct that violated 12 U.S.C. § 5031 *et seq.*, pursuant to 12 U.S.C. § 5565(c)(2)."  (Compl., p. 66.)  The CFPA does not authorize NYAG to pursue this remedy.  Courts in this district have partially dismissed claims at this stage where the relief sought was impermissible.  *See Kunica v. St. Jean Fin.*, No. 97-cv-3804, 1998 U.S. Dist. LEXIS 11867, at *26 (S.D.N.Y. July 29, 1998) (dismissing punitive-damages claim because allegations did "not rise to the level of wanton dishonesty as to imply a criminal indifference to civil obligations necessary to award punitive damages"); *Monticello Heights, Inc. v. Morgan Drive Away, Inc.*, No. 73-cv-3806, 1974 U.S. Dist. LEXIS 6522, at *11 (S.D.N.Y. Sep. 30, 1974) (partially dismissing claim to the extent plaintiff impermissibly sought damages).

Under 12 U.S.C. § 5565(c)(1), "[a]ny person that violates . . . any provision of Federal consumer financial law shall forfeit and pay a civil penalty *pursuant to this subsection*."  (emphasis added).  The civil penalties subsection permits two entities to impose civil penalties: the Consumer Financial Protection Bureau (CFPB) or the court.  *See* 12 U.S.C. § 5565(c)(3) ("In determining the amount of any penalty assessed under paragraph (2), the *Bureau or the court* shall take into account. . . ) (emphasis added).  Indeed, under § 5565(c)(5), "[n]o civil penalty may be assessed under this subsection with respect to a violation of any Federal consumer financial law, unless (A) the Bureau gives notice and an opportunity for a hearing to the person accused of the violation; or (B) the appropriate court has ordered such assessment and entered judgment *in favor of the Bureau*."  (emphasis added).

The CFPA thus only permits a court to award civil penalties if it has entered judgment in favor of the CFPB.  Because the CFPB is not a party to this action, NYAG's request for civil penalties is not permitted by statute, and this Court should partially dismiss NYAG's claim insofar as it seeks such penalties.

## CONCLUSION

For the foregoing reasons, the Court should grant PHEAA's motion to dismiss based on derivative sovereign immunity, intergovernmental immunity, lack of ripeness, preemption of state law, failure to join an indispensable party, and pursuit of unavailable remedies.

DATED:     New York, New York
                January 31, 2020

Respectfully submitted,

*/s/ Marjorie J. Peerce*
Marjorie Peerce (1921683)
**BALLARD SPAHR LLP**
1675 Broadway, 19th Floor
New York, NY 10019-5820
Telephone: (212) 223-0200
Facsimile: (212) 223-1942

John C. Grugan (*pro hac vice application pending*)
Thomas F. Burke (*pro hac vice application pending*)
Brittany M. Wilson (*pro hac vice application pending*)
**BALLARD SPAHR LLP**
1735 Market St., 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 864-8500
Facsimile: (215) 864-8999

*Attorneys for Defendant, Pennsylvania Higher Education Assistance Agency*

41