**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

PEOPLE OF THE STATE OF NEW YORK, by
LETITIA JAMES,
Attorney General of the State of New York,

                        Plaintiff,

       v.

PENNSYLVANIA HIGHER EDUCATION
ASSISTANCE AGENCY, d/b/a
FEDLOAN SERVICING and AMERICAN
EDUCATION SERVICES,

                 Defendant.

Case No. 19-cv-9155 (ER)


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**


Letitia James
Attorney General for the State of New York

By:    Sarah E. Trombley
        Assistant Attorney General
        Carolyn Fast
        Assistant Attorney General
        Consumer Frauds and Protection Bureau
        28 Liberty St.
        New York, NY 10005
        Tel: 212-412-8294 (Trombley)
        Tel: 212-412-6250 (Fast)
        (additional counsel on signature page)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 3

    A.  Special functions of federal student loan servicers ................................ 3

    B.  The limited nature of federal regulation of student loan servicers ................ 5

    C.  PHEAA's performance as servicer ......................................................... 8

        1.  PSLF ................................................................................. 8

        2.  IDR Plans and Loan Consolidation ......................................... 10

STANDARD OF REVIEW .................................................................................. 12

STATUTORY FRAMEWORK ............................................................................. 15

ARGUMENT ................................................................................................... 16

I.    PHEAA IS NOT ENTITLED TO DERIVATIVE SOVEREIGN IMMUNITY ................. 16

    A.  Derivative sovereign immunity is available only where contractor performs conduct specifically "authorized and directed" by the federal government, in compliance with all federal directives .......................................................................... 16

    B.  The NYAG's claims, by their nature, arise from PHEAA's failure to service loans as "authorized and directed" ........................................................... 19

        1.  PHEAA cannot claim that ED intended it to report qualifying payment counts for PSLF that are incorrect under ED's own regulations ................................ 20

        2.  PHEAA cannot claim that ED intended it to provide incorrect monthly payment amounts in IDR plans, to fail to recertify applications in time, or to drop borrowers from plans without any reason ............................................. 21

        3.  PHEAA cannot claim it was "authorized and directed" to perform the misconduct giving rise to the NYAG's other claims .......................................... 23

II.   THE NYAG'S CLAIMS ARE RIPE ................................................................ 25

    A.  The NYAG's claims are constitutionally ripe ....................................... 25

        1.  The NYAG is injured by virtue of the alleged violations of law ................. 26

        2.  PHEAA's misconduct has injured borrowers ........................................ 27

    B.  The NYAG's PSLF-related claims are prudentially ripe .......................... 28

i

III. THE NYAG'S CLAIMS DO NOT IMPLICATE INTERGOVERNMENTAL
     IMMUNITY ................................................................................................. 30

IV. THE NYAG'S STATE-LAW CLAIMS ARE NOT PREEMPTED BY THE HIGHER
    EDUCATION ACT ...................................................................................... 34

     A. This Court should apply the traditional presumption against preemption of state
        consumer-protection laws ..................................................................... 34

     B. The NYAG's claims are not expressly preempted by the Higher Education Act ........... 36

          1. The Higher Education Act does not expressly preempt claims relating to affirmative
             misrepresentations and other misconduct by loan servicers ..................................... 36

          2. The NYAG's claims arise from PHEAA's affirmative misrepresentations and other
             voluntary misconduct, not "omissions" ..................................................... 39

     C. The NYAG's claims also are not preempted under the doctrine of obstacle preemption  42

     D. This Court owes no deference to ED's "Preemption Notice" ........................................... 44

V. ED IS NEITHER A NECESSARY NOR AN INDISPENSABLE PARTY UNDER FED. R.
   CIV. P. 19 .................................................................................................... 45

     A. ED is not a necessary party under Rule 19(a) ................................................... 45

     B. ED is not an indispensable party under Rule 19(b) ............................................... 46

VI. THE NYAG MAY RECOVER PENALTIES UNDER THE DODD-FRANK ACT ........... 49

   CONCLUSION ..................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ackerson v. Bean Dredging LLC*,
    589 F.3d 196 (5th Cir. 2009) .........................................................................................13, 19

*Adkisson v. Jacobs Eng'g Grp., Inc.*,
    790 F.3d 641 (6th Cir. 2015) ................................................................................................13

*Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*,
    436 F.3d 82 (2nd Cir. 2006) ............................................................................................ 13-14

*Altria Grp., Inc. v. Good*,
    555 U.S. 70 (2008) ................................................................................................................35

*Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*,
    795 F.3d 351 (2d Cir. 2015) ............................................................................................15, 45

*American Bar Ass'n v. United States Dep't of Educ.*,
    370 F. Supp. 3d 1 (D.D.C. 2019) .................................................................................... 27-28

*Bassett v. Mashantucket Pequot Tribe*,
    204 F.3d 343 (2d Cir. 2000) ............................................................................................ 48-49

*Bates v. Dow Agrosciences LLC*,
    544 U.S. 431 (2005) ..............................................................................................................35

*Bell v. Blue Cross & Blue Shield of Okla.*,
    823 F.3d 1198 (8th Cir. 2016) ..............................................................................................35

*Black Hills Power and Light Company v. Weinberger*,
    808 F.2d 665 (8th Cir. 1987) ................................................................................................33

*Blackburn v. United States*,
    100 F.3d 1426 (9th Cir. 1996) ..............................................................................................33

*Boeing v. Movassaghi*,
    768 F.3d 832 (9th Cir. 2014) ........................................................................................... 32-33

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1998) ..............................................................................................................25

*Burrell v. State Farm & Cas. Co.*,
    226 F. Supp. 2d 427 (S.D.N.Y. 2002) ..................................................................................50

iii

*Cabalce v. Thomas E. Blanchard & Assoc., Inc.*,
   797 F.3d 720 (9th Cir. 2015) ...............................................18

*Campbell-Ewald Co. v. Gomez*,
   136 S. Ct. 663 (2016), as revised (Feb. 9, 2016) ................................... 14, 16-17, 19

*Carter v. HealthPort Techs., LLC*,
   822 F.3d 47 (2d Cir. 2016)...............................................12

*Chae v. SLM Corp.*,
   593 F.3d 936 (2010)........................................... 38-39, 41, 43

*Chesney v. Tennessee Valley Auth.*,
   782 F. Supp. 2d 570 (E.D. Tenn. 2011)...............................................19

*Cipollone v. Liggett Grp., Inc.*,
   505 U.S. 504 (1992)...............................................44

*Coll. Loan Corp. v. SLM Corp.*,
   396 F.3d 588 (4th Cir. 2005) ...............................................43

*Consumer Financial Protection Bureau v. Howard*,
   No. 8:17-cv-00161, 2017 WL 10378953 (C.D. Ca. May 30, 2017)......................................27

*Consumer Financial Protection Bureau v. Navient Corp.*,
   2017 WL 3380530 (M.D. Pa. Aug. 4, 2017) ........................................23

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*,
   888 F.3d 640 (4th Cir.), cert. denied, 139 S. Ct. 417, 202 L. Ed. 2d 315 (2018) .............. 18-19

*Daniel v. Navient Sols., LLC*,
   328 F. Supp. 3d 1319 (M.D. Fla. 2018)........................................ passim

*Dawavendewa v. Salt River Project Agric. Improvement and Power Dist.*,
   276 F.3d 1150 (9th Cir. 2002) ...............................................49

*Denton v. McKee*,
   332 F. Supp. 2d 659 (S.D.N.Y. 2004)...............................................50

*Envirotech Corp. v. Bethlehem Steel Corp.*,
   729 F.2d 70 (2d Cir. 1984)...............................................47

*Equal Opportunity Employment Comm'n v. Day & Zimmermann NPS, Inc.*,
   265 F. Supp. 3d 179 (D. Conn. 2017)...............................................26

*Fed. Trade Comm'n v. Hornbeam Special Situations, LLC*,
   No. 17-cv-394, 2018 WL 6521516 (N.D. Ga. July 11, 2018) ...............................26

*Fluent v. Salamanca Indian Lease Auth.*,
   928 F.2d 542 (2d Cir. 1991)..........................................................................................48

*FMH Constructors, Inc. v. Canton Hous. Auth.*,
   779 F.Supp. 677 (N.D.N.Y. 1992) ...............................................................................49

*Geffner v. Coca-Cola Co.*,
   343 F. Supp. 3d 246 (S.D.N.Y. 2018), aff'd 928 F.3d 198 (2d Cir. 2019)....................35

*Gen. Motors Corp. v. Abrams*,
   897 F.2d 34 (2d Cir. 1990)............................................................................................35

*Genna v. Sallie Mae, Inc.*,
   No. 11-CV-7371, 2012 WL 1339482 (S.D.N.Y. Apr. 17, 2012) .................................. passim

*GEO Grp., Inc. v. City of Tacoma*,
   No. 18-cv-05233, 2019 WL 5963112 (W.D. Wash. Nov. 13, 2019).....................................31

*Hancock v. Train*,
   426 U.S. 167 (1976)......................................................................................................30

*Helfrich v. Blue Cross & Blue Shield Ass'n*,
   804 F.3d 1090 (10th Cir. 2015) ....................................................................................35

*Holland v. Fahnestock & Co.*,
   210 F.R.D. 487 (S.D.N.Y. 2002) ..................................................................................15

*Hu v. City of New York*,
   927 F.3d 81 (2d Cir. 2019)............................................................................................12

*Hyland v. Navient Corp.*,
   No. 18-CV-9031, 2019 WL 2918238 (S.D.N.Y. July 8, 2019) ..............................5, 36, 44-45

*Illinois v. Navient Corp.*,
   17-ch-761 (Ill. Cir. Ct. Cook Cnty. July 10, 2018)................................................34, 36, 37, 40

*In re KBR, Inc., Burn Pit Litig.*,
   744 F.3d 326 (4th Cir. 2014) ...............................................................................18-19, 25

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
   725 F.3d 65 (2d Cir. 2013)............................................................................................42

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
   928 F.3d 42 (D.C. Cir. 2019) ..................................................................................16-18

*Ivey v. Duncan*,
   No. CV 13-576, 2014 WL 11256897 (D.D.C. Aug. 4, 2014), *report and recommendation adopted*, No. 13-CV-00576, 2016 WL 1452326 (D.D.C. Apr. 13, 2016) ........................................................................................17

*James Stewart & Co. v. Sadrakula*,
   309 U.S. 94 (1940)........................................................................31

*Kuwait Pearls Catering Co. v. Kellogg Brown & Root Servs., Inc.*,
   853 F.3d 173 (5th Cir. 2017) ........................................................18

*Lawson-Ross v. Great Lakes Higher Ed. Corp.*,
   No. 17-CV-253, 2018 WL 5621872 (N.D. Fla. Sept. 20, 2018).............................................39

*Linsley v. FMS Inv. Corp.*,
   No. 11cv961, 2012 WL 1309840 (D. Conn. Apr. 17, 2012) ...........................39

*Massachusetts v. Pa. Higher Educ. Assistance Agency*,
   1784-cv-026682, 2018 WL 1137520 (Mass. Super. Mar. 1, 2018)..............................5, 47-48

*McKenna v. Udall*,
   418 F.2d 1171 (D.C. Cir. 1969) ....................................................49

*Minner v. Navient Corp.*,
   18-cv-1086S, 2020 WL 906628 (W.D.N.Y. Feb. 25, 2020)..........................................35-36

*Nat'l Org. for Marriage v. Walsh*,
   714 F.3d 682 (2d Cir. 2013)...........................................................26, 29

*Navajo Tribe of Indians v. New Mexico*,
   809 F.2d 1455 (10th Cir. 1987) .....................................................49

*Nelson v. Great Lakes Educ. Loan Servs., Inc.*,
   928 F.3d 639 (7th Cir. 2019) ................................................... passim

*New Mexico ex. rel. Balderas v. Real Estate Law Center, P.C.*,
   405 F. Supp. 3d 1233 (D.N.M. 2019) ...........................................50

*North Dakota v. United States*,
   495 U.S. 423 (1990)................................................................13, 30

*Northrop Corp. v. McDonnell Douglas Corp.*,
   705 F.2d 1030 (9th Cir. 1983) .....................................................47

*Office of the Attorney Gen. v. Berger Law Group, P.A.*,
   8:14-cv-1825, 2015 WL 5922933 (M.D. Fla. Oct. 9, 2015)....................................50

*Okyere v. Palisades Collection, LLC*,
   961 F. Supp. 2d 522 (S.D.N.Y. 2013)........................................................................49

*Pa. Higher Educ. Assistance Agency v. Perez*,
   No. 18-cv-1114, 2019 WL 4393592 (D. Conn. Sept. 13, 2019)...............................47

*Pennsylvania v. Navient Corp.*,
   354 F. Supp. 3d 529 (M.D. Pa. 2018), motion to certify appeal granted, No.
   3:17-CV-1814, 2019 WL 1052014 (M.D. Pa. Mar. 5, 2019) ......................... passim

*Ross v. Bank of Am., N.A.*,
   524 F.3d 217 (2d Cir. 2008)...........................................................................26, 29

*Ryan v. Volpone Stamp Co.*,
   107 F. Supp. 2d 369 (S.D.N.Y. 2000).....................................................................47

*Scott v. J.P. Morgan Chase & Co.*,
   296 F. Supp. 3d 98 (D.D.C. 2017) .........................................................................19

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944).................................................................................................44

*Stauffer v. Brooks Bros., Inc.*,
   619 F.3d 1321 (Fed Cir. 2010)...............................................................................26

*Student Loan Servicing Alliance v. Dist. of Columbia*,
   351 F. Supp. 3d 26 (D.D.C. 2018) ..............................................................5, 35, 45

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014).................................................................................................28

*Two Shields v. Wilkinson*,
   790 F.3d 791 (8th Cir. 2015) ..................................................................................49

*United States v. Locke*,
   529 U.S. 89 (2000)...................................................................................................35

*United States v. Virginia*,
   139 F.3d 984 (4th Cir. 1998) ..................................................................................33

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016)............................................................................................41

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
   529 U.S. 765 (2000).................................................................................................26

*Virginia Uranium, Inc. v. Warren*,
   139 S. Ct. 1894 (2019)............................................................................................42

*Washington v. GEO Grp, Inc.*,
    No. 3:17-cv-05806, 2018 WL 6448778 (W.D. Wash. Dec. 10, 2018) ...................................31

*Washington v. Navient Corp.*,
    No. 17-2-01115-1 (Sup. Ct. Wa. Oct. 30, 2018) ....................................................................37

*Winebarger v. Pa. Higher Educ. Assistance Agency*,
    411 F. Supp. 3d 1070 (C.D. Cal. 2019) ..................................................... 29, 41-42

*Wyeth v. Levine*,
    555 U.S. 555 (2009).............................................................................................35, 44

*Yashenko v. Harrah's NC Casino Co., LLC*
    446 F.3d 541 (4th Cir. 2006) ....................................................................................47

*Yearsley v. W.A. Ross Constr. Co.*,
    309 U.S. 18 (1940)....................................................................................................17

## FEDERAL STATUTES

12 U.S.C. § 5301 *et seq.*.................................................................................. passim

12 U.S.C. § 5531 ...................................................................................................15

12 U.S.C. § 5536(a)(1)(B) .....................................................................................15

12 U.S.C. § 5552(a)(1).....................................................................................15, 27, 50

12 U.S.C. § 5565(c)(3)............................................................................................50

12 U.S.C. § 5565(c)(5)............................................................................................50

20 U.S.C. § 1071 *et seq.*.........................................................................................3

20 U.S.C. § 1082(a)(2).............................................................................................17

20 U.S.C. § 1083......................................................................................................37

20 U.S.C. § 1087a *et seq.*.......................................................................................3

20 U.S.C. § 1087e(f)(3) ..........................................................................................24

20 U.S.C. § 1087e(m).............................................................................................20

20 U.S.C. § 1098g .......................................................................................... passim

## STATE STATUTES

General Business Law ("GBL") § 349 ............................................................2, 15, 27

New York Executive Law § 63(12) ................................................................................2, 15, 27

**FEDERAL REGULATIONS**

34 C.F.R. § 682.25(a)(4) ................................................................................................23

34 C.F.R. § 682.215 ........................................................................................................4

34 C.F.R. § 682.215(a)(4) ..............................................................................................11

34 C.F.R. § 682.215(e)(8)(i) ..........................................................................................10

34 C.F.R. § 685.215 ......................................................................................................21

34 C.F.R. § 685.219 ......................................................................................................20

34 C.F.R. § 685.221 ...................................................................................................4, 21

34 C.F.R. § 685.221(e)(8)(i) .....................................................................................10, 22

34 C.F.R. § 685.221(f) ..................................................................................................10

83 Fed. Reg. 10619 ....................................................................................................5, 44

**RULES**

Fed. R. Civ. P 12(b)(1) ..................................................................................................12

Fed. R. Civ. P. 12(b)(6) .................................................................................................12

Fed. R. Civ. P. 12(b)(7) ............................................................................................12, 15

Fed. R. Civ. P. 19(a) ................................................................................................15, 45

Fed. R. Civ. P. 19(a)(1) ................................................................................................45

Fed. R. Civ. P. 19(b) ............................................................................................... passim

**MISCELLANEOUS AUTHORITIES**

CFPB, *CFPB Education Loan Examination Procedures* (2020)........................... passim

CFPB, *Staying on track while giving back* (June 2017) ....................................9, 11, 22

CFPB, *Student loan servicing: Analysis of public input and recommendations for reform* (Sept. 2015)....................................................................................................7

Federal Student Aid, FedLoan Servicing PSLF Servicing Review (July 27, 2017)......................9

Federal Student Aid, FedLoan Servicing PSLF Servicing Review (Oct. 17, 2017)......................9

Federal Student Aid, FedLoan Servicing PSLF Servicing Review (Oct. 25, 2016)......................21

House Committee on Education and Labor, *Broken Promises: How the Department of Education Failed America's Public Servants* (Oct. 2019) ..............................9

15 Moore's Federal Practice - Civil § 101.70 (2019) ...........................................................28

U.S. Dep't of Education, Public Service Loan Forgiveness (PSLF) Program Data as of 3/31/19...........................................................................................................30

U.S. Dep't of Education, Public Service Loan Forgiveness (PSLF) Program Data as of 9/30/2019........................................................................................................30

U.S. Dep't of Education, Public Service Loan Forgiveness (PSLF) Program Review Report (Apr. 28, 2016).................................................................................9

U.S. Dep't of Education, Public Service Loan Forgiveness (PSLF) Program Review Report (Feb. 22, 2016).................................................................................9

U.S. Dep't of Education, Public Service Loan Forgiveness (PSLF) Program Review Report (Oct. 19, 2015).................................................................................9

U.S. Dep't of Education, *Recommendations on Best Practices in Performance-Based Contracting* (Aug. 2015)..............................................................................6

U.S. Dep't of Treasury, *A Financial System That Creates Economic Opportunities* (July 2018) ............................................................................................................7

U.S. Dep't of Education, Office of Inspector General, *Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally Held Student Loans* (Feb. 12, 2019) .................................................................................................10-11, 22-23

U.S. Gov't Accountability Office, GAO-16-196T, *Federal Student Loans: Key Weaknesses Limit Education's Management of Contractors: Hearing Before the Subcomm. on Gov't Operations of the H. Comm. on Oversight and Gov't Reform and the Subcomm. on Higher Educ. and Workforce Training of the H. Comm. on Educ. and the Workforce* (2015) ...........................................................7

U.S. Gov't Accountability Office, GAO-16-523, *Federal Student Loans: Education Could Improve Direct Loan Program Customer Service and Oversight* (2016) ...............................................................................................8

U.S. Gov't Accountability Office, GAO-18-547, *Public Service Loan Forgiveness: Education Needs to Provide Better Information for the Loan Servicer and Borrowers* (Sept. 2018) ("2018 GAO PSLF Report") .........................7

U.S. Gov't Accountability Office, GAO-18-587R, *Federal Student Loans:*
    *Further Actions Needed to Implement Recommendations on Oversight of Loan*
    *Servicers* (2018) ......................................................................................................8

**PRELIMINARY STATEMENT**

Across New York, hundreds of thousands of federal student loan borrowers, many of them struggling with massive loan debt, depend on defendant Pennsylvania Higher Education Assistance Agency ("PHEAA") to help them navigate the complex world of loan repayment and forgiveness options.  They have no choice: they are assigned PHEAA as a loan servicer. PHEAA controls their payment records, calculates their monthly payments in repayment plans for distressed borrowers, and makes the official determinations concerning when borrowers working in public service can qualify for a special forgiveness program.  The Department of Education ("ED") itself directs borrowers to rely on their servicer for accurate information.

Unfortunately, PHEAA's performance on these vital tasks has been incredibly deficient. It has repeatedly given borrowers misinformation and engaged in practices that are unfair or abusive.  Among other things, it has ignored countless payments by borrowers that should have counted towards forgiveness (causing some to be unfairly denied that forgiveness), failed to calculate monthly payments for repayment plans even when the borrowers apply by the statutory deadline, randomly dropped borrowers from repayment plans they were already enrolled in, and misinformed borrowers as to the benefits of certain loan options.  When borrowers confused by the bad information PHEAA is giving them have asked for further explanations or corrections, it frequently takes months, sometimes *more than a year*, to provide the justifications for its decisions—and PHEAA has admitted that, in many cases, it has had to go back to review records it should have considered before making any determination in the first place.   It even deceives borrowers about whether they can appeal its determinations at all.  The carelessness of PHEAA's approach to its servicing duties is on display in its brief here, where it implies that PHEAA deserves *credit* for finally bothering to do its job after borrowers struggle for months to correct

1

its glaring errors and end up having to seek help from a federal or state consumer protection agency to get it to address the issue effectively. (Jan. 31, 2020 Mem. of Law in Support of Def.'s Mot. to Dismiss Compl. ("PHEAA Mem.") 2).

The New York Attorney General ("NYAG") has brought this action as authorized by the Dodd-Frank Act, 12 U.S.C. § 5301 *et seq.*, to challenge PHEAA's deceptive, unfair and abusive practices. The NYAG action also raises supplemental state claims for fraudulent and deceptive business practices under New York Executive Law § 63(12) and General Business Law § 349. PHEAA ignores the NYAG's express statutory authority to bring this action and argues that the case is not ripe. PHEAA also attempts to recast the NYAG's lawsuit as unwarranted encroachment by a state on a highly-regulated federal contractor. However, neither preemption nor doctrines of immunity bar the NYAG's action. ED's oversight of PHEAA, even with respect to student loans owned by the federal government, is (and historically has been) modest and scattershot, leaving borrowers with few options if PHEAA neglects or mismanages its responsibilities. And, despite PHEAA's arguments, no doctrine exempts it from consumer protection laws of general applicability. It is thus both appropriate and necessary that New York step in to protect borrowers in its state.

In the end, PHEAA's arguments reduce to a simple claim: that it can harm borrowers in this state with impunity, answering to no one but ED. But that is not the law. Government contractor or not, PHEAA is still liable for its deceptive, unfair, and abusive conduct towards the student loan borrowers forced to rely on it, and the NYAG is authorized by both state and federal law to call it to account.

## STATEMENT OF FACTS

Defendant PHEAA is a federal student loan servicer for hundreds of thousands of New York residents.  (*See* Compl. ¶ 7)  The two major federal student loan programs under the Higher Education Act ("HEA") are the older Family Federal Education Loan ("FFEL") program (20 U.S.C. § 1071 *et seq.*), in which private lenders made and held federally-guaranteed loans, and the Direct Loan ("Direct") program (20 U.S.C. § 1087a *et seq.*), in which the government is the exclusive originator and holder of all loans, and which for new loans ultimately superseded the FFEL program completely in 2010.  (Compl. ¶ 48 & n.8)  In both programs, the holder of the loans generally retains one or more servicers to handle their administration, creating and managing borrower records, billing and collecting monthly payments, and helping borrowers who have questions.  (*Id.* ¶¶ 50-51)  Under varying names, PHEAA services FFEL loans still held by private lenders, FFEL loans that were purchased by ED after their origination by private lenders, and Direct loans.  (*Id.* ¶¶ 7 & n.4, 37)

### A.  Special functions of federal student loan servicers

In addition to their other functions, servicers like PHEAA play a key role in helping borrowers access the Public Service Loan Forgiveness ("PSLF") program (*id.* ¶¶ 70, 72, 76-77, 81-84) and "income-driven repayment" ("IDR") plans (*id.* ¶¶ 55-57).  PSLF and IDR plans are vital options for eligible student loan borrowers.  (*See id.* ¶¶ 2-5, 52, 178)  The borrower's servicer effectively operates as gatekeeper for these programs.  (*Id.* ¶¶ 9, 176-79)

Under PSLF, borrowers with Direct loans who make 120 qualifying monthly payments while working full-time for a qualifying public-service employer are eligible to have the remainder of their student loan balances forgiven.  (*Id.* ¶¶ 62-63, 66-68)  To count towards the 120 required payments, "Qualifying Payments" must also meet other regulatory requirements,

relating to, e.g., timing and amount of payment. (*Id*. ¶¶ 66-68) Determining how many Qualifying Payments a borrower has may require review of years of loan payment records from more than one servicer to determine which payments meet the regulatory requirements. (*Id*. ¶¶ 81-83) PHEAA is the exclusive servicer for borrowers who have expressed interest in the PSLF program; borrowers for whom PHEAA is not already the servicer and who file a form indicating that they wish to take advantage of PSLF[1] are transferred (*Id*. ¶ 20, 70). It is PHEAA's responsibility to undertake review of their records and inform them accurately at intervals about their Qualifying Payment counts. (*Id*. ¶¶ 70-72, 77-80)[2] Borrowers have no choice but to rely on the accuracy and completeness of those counts. (*Id*. ¶¶ 76-84)

IDR plans are intended to help struggling borrowers avoid default by limiting monthly loan payments based on income and family size. (*Id*. ¶ 17) In order to qualify for an IDR plan, a borrower must apply to the borrower's servicer. (*Id*. ¶ 55) The servicer applies ED regulations (set forth primarily in 34 C.F.R. §§ 682.215 and 685.221) to determine whether a borrower qualifies for a lower monthly payment and, if the borrower does, to calculate the borrower's new

---

[1] An Employer Certification Form ("ECF"), which provides information concerning the borrower's employer and dates of employment. (*See* Compl. ¶ 69) The first time a borrower files an ECF usually triggers a servicer transfer to PHEAA. (*Id*. ¶ 70) Borrowers seeking PSLF are encouraged to continue filing ECFs annually so they can receive updates on their Qualifying Payment counts. (*Id*. ¶ 71)

[2] Under the "PSLF Single Servicer requirements" established in 2011 by Federal Student Aid ("FSA"), the office within ED most responsible for the federal student loan program, including interactions with servicers, PHEAA is "require[d] to be able to…determine that the borrower has made qualifying payments [and] [t]rack PSLF eligibility status for the on-track borrower." FSA, Business Operations Change Request Form (Sept. 30, 2011), attached as Ex. A to the February 28, 2020 Affidavit of Sarah E. Trombley ("Trombley Aff.") at PHEAA-000000040. Specifically, PHEAA must "determine if PSLF qualifying payments were made on eligible loans, and track the number of PSLF qualifying payments made after the loans are transferred from the original servicer." *Id*. at PHEAA-000000035 (Req. #204.00). Then "[PHEAA] shall notify the borrower…of the number of qualifying payments made…and the remaining number required towards becoming eligible for PSLF." *Id*. at PHEAA-000000038 (Req. #206.02).

payment.  (*Id.* ¶ 56)  In order to remain in an IDR plan, the borrower must "recertify" income and family size annually with the servicer.  (*Id.* ¶ 57)

### B.  The limited nature of federal regulation of student loan servicers

Federal regulation of student loan servicers is patchwork in nature, especially when it comes to ordinary interaction with borrowers throughout the life of the loan.[3]  Servicers, as the main point of contact between loan-holders and borrowers, communicate with those borrowers daily through phone, email, mail, and website on a wide variety of subjects relating to their loans, from the amount of their balances to difficulties in making payments.  While federal statute and regulations govern the formal structure of the program, courts have noted that "nothing in the HEA...standardizes or coordinates how a customer service representative of a third-party loan servicer…shall interact with a [borrower] in the day-to-day servicing of his loan outside of the circumstance of pre-litigation informal collection activity"  *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529, 551 (M.D. Pa. 2018), *motion to certify appeal granted*, No. 3:17-CV-1814, 2019 WL 1052014 (M.D. Pa. Mar. 5, 2019) (citation omitted); *Hyland v. Navient Corp.*, No. 18-CV-9031, 2019 WL 2918238, at *6 (S.D.N.Y. July 8, 2019); *Genna v. Sallie Mae, Inc.*, No. 11-CV-7371, 2012 WL 1339482, at *8 (S.D.N.Y. Apr. 17, 2012).

---

[3] Many of PHEAA's claims to the contrary (e.g., that "[ED]'s oversight of PHEAA's performance is robust and multifaceted," PHEAA Mem. 7) rely heavily on citations to conclusory statements in ED's "Preemption Notice," 83 Fed. Reg. 10619 (Mar. 12, 2018).  Virtually every court to consider this Notice has rejected it as, e.g, "a retroactive, ex-post rationalization for [ED's] policy changes . . . which lacks the requisite thoroughness and persuasiveness."  *Student Loan Servicing Alliance v. Dist. of Columbia* ("*SLSA*"), 351 F. Supp. 3d 26, 50 (D.D.C. 2018).  *See infra* at IV.D.  This Court should not rely on it, either.  PHEAA also relies on ED's Statements of Interest in *Massachusetts v. Pa. Higher Educ. Assistance Agency*, 1784-cv-026682, 2018 WL 1137520 (Mass. Super. Mar. 1, 2018) and *SLSA* (PHEAA Mem. 7), which are nothing more than documents purpose-made for litigation that deserve even less weight.

The servicing contracts into which servicers enter with ED are similarly scattershot. For example, while PHEAA characterizes the Servicing Contract PHEAA has provided (PHEAA Mem. Ex. 1) as "voluminous" (PHEAA Mem. 6), even a cursory review will reveal that it contains dozens of pages about payments to PHEAA, invoicing, intellectual property regulations, handling of subcontractors, accounting, internal controls, the use of ED's logo, data security, and data sharing with ED—but virtually no specific instructions governing its day-to-day interactions with borrowers, merely a few generic requirements such as that, e.g., "the servicer shall respond and resolve customer complaints" (PHEAA Mem. Ex. 1, Attachment A-2, at 11).

In fact, repeated statements by the federal government itself—made outside the context of litigation—make it clear how incomplete federal oversight of student loan servicers is.[4] A task force in which ED participated recommended in 2015 that it should "set[] more specific requirements for contractors" for communications with student loan borrowers in order to "maintain a consistent baseline level of service [and] improve overall borrower communication."[5] The Consumer Financial Protection Bureau ("CFPB"), which gained authority to supervise student loan servicers under the Dodd-Frank Act, found in that same year that "[t]here are no consistent, market-wide federal standards for student loan servicing and servicers generally have discretion to determine policies related to many aspects of servicing operations....[T]here is no existing, comprehensive federal statutory or regulatory framework

---

[4] As explained in more detail *infra* at 12-14, although the Court need not look outside the Complaint to resolve PHEAA's motion to dismiss sovereign immunity claims, if it does choose to do so, it can either (more appropriately) await the development of facts relating to the jurisdictional issue through discovery or at trial or refer to evidence outside the pleadings.
[5] U.S. Dep't of Education, *Recommendations on Best Practices in Performance-Based Contracting* at 9 (Aug. 2015), attached as Trombley Aff. Ex. B.

providing consistent standards for the servicing of all student loans."[6]  In 2018, the U.S.

Department of the Treasury flatly concurred: "Federal student loan servicing currently lacks

effective minimum servicing standards."[7]   Concerning the PSLF program in particular, which

several of the NYAG's claims address, in 2018, the GAO reported, "Education does not have a

comprehensive document or manual to provide [PHEAA] guidance and instructions, *which*

*[PHEAA] officials said* makes it difficult to effectively administer the program and provide

consistent service to borrowers. . . . *According to [PHEAA] officials*, administering the program

based on [ED's] fragmented collection of guidance and instructions creates a risk that relevant

information may be overlooked."[8]

      Even with respect to its inadequate standards, ED has struggled to maintain effective

oversight of the servicers.  In 2015, the GAO reported that "[k]ey weaknesses limit [FSA]'s

ability to monitor servicers' interaction with borrowers and ensure servicers provide accurate

information and good customer service…[S]ervicers GAO interviewed reported various issues

resulting from absent, unclear and inconsistent guidance and instructions from FSA."[9] In 2018,

the GAO found that ED's mechanisms for carrying out oversight themselves were also flawed

and that, as a result, "[ED] had incomplete information on how well servicers met the needs of

---

[6] CFPB, *Student loan servicing: Analysis of public input and recommendations for reform* (Sept. 2015) ("2015 CFPB Report"), attached as Trombley Aff. Ex. C, at 3, 11.
[7] U.S. Dep't of Treasury, *A Financial System That Creates Economic Opportunities* (July 2018) ("2018 Treasury Report"), excerpts attached as Trombley Aff. Ex. D, at 125.
[8] U.S. Gov't Accountability Office, GAO-18-547, *Public Service Loan Forgiveness: Education Needs to Provide Better Information for the Loan Servicer and Borrowers* (Sept. 2018) ("2018 GAO PSLF Report"), attached as Trombley Aff. Ex. E, at 16 (emphasis added).
[9] *Federal Student Loans: Key Weaknesses Limit Education's Management of Contractors: Hearing Before the Subcomm. on Gov't Operations of the H. Comm. on Oversight and Gov't Reform and the Subcomm. on Higher Educ. and Workforce Training of the H. Comm. on Educ. and the Workforce*, 114th Cong. (GAO-16-196T) (2015) (statement of Melissa Emrey-Arras, Director, Education, Workforce, and Income Security, U.S. Gov't Accountability Office), attached as Trombley Aff. Ex. F, at Summary, 10.

borrowers."[10]  Additionally, "the performance metrics used [to evaluate servicers]…did not fully

align with [ED's] goals of superior service and program integrity."[11]  Indeed, despite ED's

authority to allocate borrower volume to servicers based in part on performance (*see* PHEAA

Mem. 8), the GAO has recognized that "because *no performance metrics relate to compliance*

*with program requirements*, servicers with more compliance errors experience no reduction in

assigned loans, even as their borrowers may experience servicing problems."[12]

### C.  PHEAA's performance as servicer

PHEAA has mismanaged its duties as exclusive PSLF servicer (Compl. ¶ 10) and as a

servicer for struggling borrowers seeking to enroll and remain in IDR plans (*id.* ¶ 17).  This

mismanagement results in deceptive, unfair and abusive practices towards New York borrowers.

### 1.  PSLF

PHEAA has proven an incompetent servicer for PSLF-seeking borrowers.  Although

PHEAA promises borrowers that it will calculate their Qualifying Payment counts for both their

most recent eligibility period and cumulatively (*id.* ¶¶ 78-80), it often inappropriately provides

them with inaccurate counts that do not reflect the actual number of Qualifying Payments made,

---

[10] U.S. Gov't Accountability Office, GAO-18-587R, *Federal Student Loans: Further Actions Needed to Implement Recommendations on Oversight of Loan Servicers* (2018) ("2018 GAO Oversight Report"), attached as Trombley Aff. Ex. G, at 3.
[11] *Id.* at 5.
[12] U.S. Gov't Accountability Office, GAO-16-523, *Federal Student Loans: Education Could Improve Direct Loan Program Customer Service and Oversight* (2016), attached as Trombley Aff. Ex. H, at Summary; *see also id.* at 26 (emphasis added).

based on the PSLF regulations (*id.* ¶¶ 89, 97-105, 108-112).[13] ED itself has recognized this problem. (*Id.* ¶ 90)[14] Inaccurate payment counts are harmful to borrowers generally. (*Id.* ¶¶ 107, 115) When PHEAA miscounts Qualifying Payments after the borrower has completed the required 120, this can lead to the denial of the loan forgiveness to which the borrower is statutorily entitled. (*Id.* ¶¶ 116-119, ¶¶ 122-23) PHEAA also delays (for up to a year) in providing borrowers who question their payment counts with explanations about which payments are Qualifying, and why. (*Id.* ¶¶ 129, 133, 135-38, 141, 146, 149-151) In some cases, it never provides an explanation. (*Id.* ¶ 156) PHEAA also misinforms borrowers about their

---

[13] The CFPB exercises federal supervisory authority over PHEAA and other student loan servicers. The CFPB's examination manual makes it clear that the federal government expects PHEAA to be accurate in counting Qualifying Payments. Among the subjects on which it is supposed to examine PHEAA for potential or actual violations of federal law are "whether the servicer accurately calculates the number of [PSLF] qualifying payments during [applicable] periods of employment" and "whether the servicer has appropriate policies and procedures to collect information…from prior servicers so that the servicer…can make an accurate determination about the number of qualifying payments the borrower made during the entire period of repayment," as well as whether it counts Qualifying Payments correctly in certain specific scenarios. *CFPB Education Loan Examination Procedures* (2020) ("CFPB Exam Manual"), attached as Trombley Aff. Ex. I, at 43-44.

[14] *See* U.S. Dep't of Education, Public Service Loan Forgiveness (PSLF) Program Review Report (Oct. 19, 2015), attached as Trombley Aff. Ex. J, at [3, 7] (identifying error rate of 23% in determining qualifying payments on PSLF accounts and noting ED expectation of "5% or less"); U.S. Dep't of Education, Public Service Loan Forgiveness (PSLF) Program Review Report (Feb. 22, 2016), attached as Trombley Aff. Ex. K, at [3-7] (error rate of 28%); U.S. Dep't of Education Public Service Loan Forgiveness (PSLF) Program Review Report (Apr. 28, 2016), attached as Trombley Aff. Ex. L, at [3-7] (error rate of 28%); Federal Student Aid, FedLoan Servicing PSLF Servicing Review (Oct. 25, 2016), House Committee on Education and Labor, *Broken Promises: How the Department of Education Failed America's Public Servants* (Oct. 2019) ("*Broken Promises*"), Ex. 1, attached as Trombley Aff. Ex. M, at 4-5; Federal Student Aid, FedLoan Servicing PSLF Servicing Review (July 27, 2017), *id.* Ex. 2, Trombley Aff. Ex. M, at 8; Federal Student Aid, FedLoan Servicing PSLF Servicing Review (Oct. 17, 2017), attached as Trombley Aff. Ex. N, at 3-5, 7-10 (collectively, "FSA Audits"); *see also* CFPB, *Staying on track while giving back* (June 2017) ("*Staying on track*"), attached as Trombley Aff. Ex. O, at 40-41 (expressing concern about reports that PHEAA may not be counting Qualifying Payments from prior servicers even though "the Department of Education…require[s] servicers to track payments through servicing transfers").

options and treats them inconsistently when they attempt to correct PHEAA's errors.  (*Id.* ¶¶ 222-23, 228-29, 234-37, 250-52, 268-71, 273)

### 2.  IDR Plans and Loan Consolidation

PHEAA has repeatedly failed to timely and accurately process applications and recertifications for IDR plans, as it is required to.  (*Id.* ¶175)[15]  PHEAA has miscalculated borrowers' monthly payments under the regulatory formulas by up to hundreds of dollars a month.  (*Id.* ¶¶ 185-190)  Its delays in processing applications and correcting its errors can force borrowers into forbearance, potentially leading to capitalization of interest on their loans. (*Id.* ¶¶ 191-97)[16]  Similarly, PHEAA has failed to process annual recertifications of borrowers enrolled in these plans, causing them to be dropped from the plans without cause, see their payments jump, and suffer interest capitalization.  (*Id.* ¶¶ 198-200)  In both cases, PHEAA's actions have led to a loss of eligible payments towards PSLF or IDR[17] forgiveness.  (*Id.* ¶¶ 201-202)  PHEAA

---

[15] Miscalculation of IDR repayments constitutes "noncompliance with…Federal loan servicing requirements."  U.S. Dep't of Education, Office of Inspector General, *Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally Held Student Loans* (Feb. 12, 2019) ("*Servicer Noncompliance*"), attached as Trombley Aff. Ex. P, at 10, 13-14.

[16] 34 C.F.R. §§ 685.221(e)(8)(i) (for Direct Loans) and 682.215(e)(8)(i) (for FFEL loans) dictate that if the borrower submits the information required for annual recertification in a timely manner, the new monthly payment amount should be "promptly determine[d]."  The CFPB Exam Manual, Trombley Aff. Ex. I, at 32, 44, directs examiners to "[d]etermine whether, when received timely, the servicer processes timely . . . recertification applications in time to prevent adverse consequences (including capitalization of interest . . . .)" and whether "processing delays or errors relating to [IDR] plan applications or recertifications resulted in months of forbearance that do not qualify towards PSLF."

[17] Borrowers who make payments under an IDR plan for 20 or 25 years, depending on the plan, are eligible to have the remainder of the balance forgiven.  *See, e.g.*, 34 C.F.R. § 685.221(f).

has even dropped borrowers without cause from IDR plans in which they were enrolled well before they were required to recertify and without any other justification.  (*Id.* ¶¶ 206-217)[18]

Further, when struggling borrowers not yet enrolled in an IDR plan contact PHEAA for help making their monthly loan payments, relying on PHEAA's promises that it will help them resolve their difficulties, they have often, in violation of regulations[19] and federal directives[20], been steered into taking costly forbearances rather than applying for IDR plans at all, which would require more work on PHEAA's part to process.  (*Id.* ¶¶ 283-87)  Other struggling borrowers are inappropriately encouraged to consolidate their loans (on a longer repayment schedule) to lower their monthly payments and assured that consolidation may also help them qualify for PSLF, even though loans on an extended repayment schedule are categorically ineligible for PSLF.  (*Id.* ¶¶ 300-308)[21]

Finally, PHEAA has even misinformed borrowers about the existence of a new deferment available to those with cancer.  (*Id.* ¶¶ 316-18)

---

[18] In *Staying on track*, Trombley Aff. Ex. O, at 40-41, the CFPB noted that removal of borrowers from their IDR plan upon servicer transfer would be contrary to ED's requirement that "servicers…track payments through servicing transfers."

[19] 34 C.F.R. § 682.215(a)(4).

[20] Misrepresentation of available repayment options and the cost of forbearance is "servicer noncompliance with…Federal loan servicing requirements."  *Servicer Noncompliance*, Trombley Aff. Ex. P, at 10-13.  *Servicer Noncompliance* further notes that FSA reviews of PHEAA's phone calls with borrowers revealed a significant rate of such failures, substantially above that of other servicers. (Compl. ¶¶ 288-292) (discussing *id.*)  *See also* CFPB Exam Manual, Trombley Aff. Ex. I, at 30 (directing examiner to "[d]etermine whether the servicer encourages federal loan borrowers with long-term financial hardship to sign up for forbearance or deferment instead of an Income-Driven Repayment plan").

[21] *See* CFPB Exam Manual, Trombley Aff. Ex. I, at 44 ("When borrowers express interest in using PSLF, [examiners should] determine whether the servicer confirms that the borrower is repaying using an Income-Driven Repayment plan, and if the borrower is not, *accurately describes which payment plans are eligible for PSLF*" (emphasis added)).

## STANDARD OF REVIEW

PHEAA brings this motion to dismiss under Fed. R. Civ. P. 12(b)(6), 12(b)(1), and 12(b)(7).[22]

**Rule 12(b)(6).**  Under Rule 12(b)(6), a plaintiff's "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) (internal citations omitted).  The "Court must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party."  *Id.*  In deciding a Rule 12(b)(6) motion, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken."  *Id.*

**Rule 12(b)(1).** The Second Circuit recognizes two types of motions under 12(b)(1) challenging the court's jurisdiction.  "When the Rule 12(b)(1) motion is facial, i.e., based solely on the allegations of the complaint…the plaintiff has no evidentiary burden. The task of the district court is to determine whether the [p]leading allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue….Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the [p]leading.  In opposition to such a motion, the plaintiffs will need to come forward with evidence of their own to controvert that presented by the defendant if the affidavits submitted on a 12(b)(1) motion…reveal the existence of factual problems in the assertion of jurisdiction."  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016) (internal citations omitted).

---

[22] While PHEAA has not clearly distinguished which grounds give rise to which motion, the NYAG infers that it has raised sovereign derivative immunity, intergovernmental immunity, and ripeness under 12(b)(1), preemption under 12(b)(6), and failure to join under 12(b)(7).

Although PHEAA contends that the issue of derivative sovereign immunity (or "*Yearsley*" immunity) is jurisdictional based on Fourth Circuit precedent (PHEAA Mem. 12), there is more persuasive authority to the contrary.  While there is no Second Circuit precedent on whether the defense of derivative sovereign immunity qualifies as jurisdictional, this Court should follow the reasoning of both the Fifth and Sixth Circuits, which have held that it is not. *See Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 647 (6th Cir. 2015) ("*Yearsley* immunity is, in our opinion, closer in nature to qualified immunity for private individuals under government contract, which is an issue to be reviewed on the merits rather than for jurisdiction"); *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207-08 (5th Cir. 2009) ("the Court's opinion in *Yearsley* itself countenances against its application to deprive the federal courts of jurisdiction").[23]

As PHEAA has cited to documents beyond the record (e.g., PHEAA Mem. 9),[24] it appears to be making a "fact-based" 12(b)(1) challenge.  In such a case, this the Court "has leeway as to the procedure it wishes to follow" in resolving PHEAA's challenge and can order limited discovery to decide the jurisdictional issue or postpone the resolution of this question until after discovery or even trial.  *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436

---

[23] PHEAA lumps its intergovernmental immunity defense in with its sovereign derivative immunity defense as "jurisdictional," but does not cite a single case in support of doing so.  The NYAG is not aware of cases in the Second Circuit in support of this proposition.  The Supreme Court has analyzed violations of intergovernmental immunity as violations of the Supremacy Clause, *North Dakota v. United States*, 495 U.S. 423, 434 (1990), making the defense akin to that of preemption, which is not jurisdictional.  This Court should treat PHEAA's motion on this point as being made under 12(b)(6).

[24] While PHEAA has attached part of its contract with ED and two of ED's Statements of Interest as exhibits to its motion, albeit without an affidavit to authenticate them, it also refers to a number of documents which it has not even provided as exhibits, much less attempted to authenticate to the Court by affidavit (e.g., PHEAA Mem. 9).  Such documents are thus not properly part of even this limited record, *see Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2nd Cir. 2006), and should be disregarded.

F.3d 82, 88 (2nd Cir. 2006).  In particular, as PHEAA's derivative sovereign immunity defense

rests on two controverted factual issues—what, precisely, ED directed it to do,[25] and what it

actually did (*see infra*, I.A-B)—the latter of which is intertwined with questions on the merits,

this Court may postpone resolution of this question until after discovery, or even trial.  "[W]here

the evidence concerning [jurisdiction] overlaps with evidence on the merits, the Court might

prefer to proceed to trial and make its jurisdictional ruling at the close of the evidence.…If,

however, the overlap in the evidence is such that fact-finding on the jurisdictional issue will

adjudicate factual issues required to be resolved by a jury, then the Court must leave the

jurisdictional issue for the trial."  *Id.* at 88.  However, to the extent the Court feels it appropriate

to resolve the jurisdictional issue now, without any discovery, the NYAG has attached evidence

from the public record in support of its allegations as exhibits to this motion and refers to them

where appropriate throughout.

Finally, in considering PHEAA's assertions of derivative sovereign immunity, the Court

should be guided by the most recent Supreme Court case to analyze the derivative sovereign

immunity defense.  As the Court noted, "[a]t the pretrial stage of litigation, we construe the

record in a light favorable to the party seeking to avoid summary disposition."  *Campbell-Ewald

Co. v. Gomez*, 136 S. Ct. 663, 673 (2016), *as revised* (Feb. 9, 2016).

---

[25] While PHEAA purports to have provided the Court with a copy of its contract with ED, it *also* claims that "since the Servicing Contract's inception, the Department has implemented more than 450 'change requests' [to modify the contract]."  (PHEAA Mem. 6-7)  These Change Requests have *not* been provided to the Court.  Thus, the full document governing PHEAA's responsibilities under its servicing contract is not even before the Court.  The NYAG has identified at least one such Change Request (*see supra* n.2) unquestionably relevant to the essential question of the content of ED's directives to PHEAA relating to the PSLF program.  It is unknown how many more there may be.  This glaring gap in the record underlines the desirability of the Court's not engaging in fact-finding at this stage of the litigation.

**Rule 12(b)(7).**  On a Rule 12(b)(7) motion to dismiss for nonjoinder, the court must "determine whether the party should be joined as a 'necessary party' under Rule 19(a).…If joinder of a 'necessary' party under Rule 19(a) is not feasible, the court consults Rule 19(b), which requires courts to consider whether, in equity and good conscience, the party is one without whom the action between the remaining parties cannot proceed—or, in the traditional terminology, whether the absent party is 'indispensable.'" *Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, 795 F.3d 351, 356-57 (2d Cir. 2015) (internal citations omitted).  The court should presume true "facts drawn from [the] complaint" and consider them "in the light most favorable to plaintiffs." *Id.* at 354.  As noted by PHEAA, under a 12(b)(7) motion, "[t]he moving party [*i.e., PHEAA*] has the burden of producing evidence showing the nature of the interest possessed by an absent party and that the protection of that interest will be impaired by the absence." *Holland v. Fahnestock & Co.*, 210 F.R.D. 487, 495 (S.D.N.Y. 2002) (internal citations omitted).

## STATUTORY FRAMEWORK

The NYAG brings this action pursuant to the Dodd-Frank Act, New York Exec. Law § 63(12), and New York General Business Law ("GBL") § 349.  The Dodd-Frank Act prohibits covered persons from engaging "in any unfair, deceptive, or abusive act or practice."  12 U.S.C. §§ 5531 and 5536(a)(1)(B).  The Dodd-Frank Act empowers state attorneys general to bring civil actions to enforce the Act.  12 U.S.C. § 5552(a)(1).

The NYAG is authorized under New York Exec. Law § 63(12) to bring an action to enjoin the continuance of repeated or persistent fraud or illegality in the carrying on of business in New York.  The NYAG is authorized to bring an action under GBL § 349 to enjoin deceptive acts or practices in the conduct of any business or in the furnishing of any service in New York.

## ARGUMENT

## I.   PHEAA IS NOT ENTITLED TO DERIVATIVE SOVEREIGN IMMUNITY

PHEAA asserts that it is entitled to dismissal of the NYAG's claims under the doctrine of "derivative sovereign immunity" (PHEAA Mem. 12), which would allow it to escape liability regardless of how egregious its conduct was.  However, because the NYAG's claims against PHEAA, by their very nature, do not attack conduct that was specifically authorized and directed by the federal government, they fall outside this narrowly-cabined doctrine, and the Court should deny PHEAA's motion to dismiss on this ground.  At most, the Court should postpone making any ruling on this defense until the factual record has been developed during discovery.[26]

### A.   Derivative sovereign immunity is available only where contractor performs conduct specifically "authorized and directed" by the federal government, in compliance with all federal directives

As the Supreme Court has made clear in its most recent case to address the defense, derivative sovereign immunity is limited in scope, applying only to actions "authorized and directed by the [federal government]." *Campbell-Ewald*, 136 S. Ct. at 673 (internal citations omitted).  Where the federal government itself would be immune to suit, "government contractors may sometimes obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 68 (D.C. Cir. 2019) (internal citations omitted).

---

[26] Additionally, as will be seen, derivative sovereign immunity is only available to government contractors, it is, by definition, inapplicable to PHEAA in its role (operating under the name "AES") servicing *privately-held* FFEL loans pursuant to contracts with the *private* loanholder, not the federal government.  (*See* Compl. ¶ 7.)  The NYAG's claims apply to such FFEL loans, except for those relating to PHEAA's administration of the PSLF program (which only applies to federally-owned Direct Loans).  Hence, PHEAA has made no argument at all under derivative sovereign immunity for dismissal of the NYAG's claims with respect to these loans.

However, in *Campbell-Ewald*, the court rejected the idea that even contractors on which authority has been "validly conferred" by the government[27] automatically share the government's "unqualified immunity." 136 S. Ct. at 673.  Rather, it noted that its leading precedent on the subject, *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940), had only recognized immunity for contractors "who simply performed as the Government directed."  *Id.* (citing *Yearsley*, 309 U.S. at 20-21). Thus, to raise the defense, a "contractor's performance in compliance with all federal directions" is "critical." *Id.* at n.7. The defendant contractor in *Campbell-Ewald*, which had allegedly violated federal law and the government's explicit instructions by texting U.S. Navy advertisements in violation of the Telephone Consumer Protection Act ("TCPA") to a list it had generated itself, therefore could *not* escape liability for its actions.  *Id.* at 672.

PHEAA argues that it is entitled to derivative sovereign immunity because it was authorized to service loans by ED, but points to no explicit government authorization for the specific conduct complained of here.  However, because "the driving purpose of derivative sovereign immunity is to prevent the contractor from being held liable when *the government is actually at fault* but is otherwise immune from liability,"[28] *OPM Data Sec. Breach Litig.*, 928 F.3d 42, 70 (D.C. Cir. 2019) (internal citations omitted) (emphasis added), rigorous adherence to government direction in carrying out the conduct at issue is the *sine qua non* of derivative

---

[27] The NYAG does not challenge ED's authority to enter into contracts with PHEAA and other loan servicers to service ED-owned federal student loans.

[28] As the portion of the HEA governing the FFEL program contains a classic "sue and be sued" clause, 20 U.S.C. § 1082(a)(2), Congress has waived sovereign immunity with respect to claims for noninjunctive relief relating to the FFEL program.  *Ivey v. Duncan*, No. CV 13-576 (RWR-AK), 2014 WL 11256897, at *4 (D.D.C. Aug. 4, 2014), *report and recommendation adopted*, No. 13-CV-00576 (APM), 2016 WL 1452326 (D.D.C. Apr. 13, 2016).  If there is no underlying sovereign immunity with respect to this subset of the NYAG's claims, PHEAA clearly cannot enjoy any *derivative* sovereign immunity with respect to them.

sovereign immunity for federal contractors. "[T]he contractor must adhere to the government's instructions to enjoy derivative sovereign immunity; staying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities the act[s] of the government." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014) (internal citations omitted); *Kuwait Pearls Catering Co. v. Kellogg Brown & Root Servs., Inc.*, 853 F.3d 173, 185 (5th Cir. 2017) ("A contractor may not be liable for harm resulting from its *strict execution of an…authorized government order*") (emphasis added). In *OPM Data Sec. Breach Litig.*, the most recent appellate case to consider the immunity defense, the contractor maintained inadequate cybersecurity measures for databases of federal employee information, resulting in massive data breaches. Noting that the contractor could not "point to a contractual provision or other [government] direction authorizing or directing" the complained-of-conduct, as well as its alleged violation of its regulatory duties, the court rejected the defense. 928 F.3d. at 70. *See Cabalce v. Thomas E. Blanchard & Assoc., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015) (no immunity where contractor did not "completely follow…government specifications").

The cases cited by PHEAA do not hold otherwise. In *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 645 (4th Cir.), *cert. denied*, 139 S. Ct. 417, 202 L. Ed. 2d 315 (2018), another government contractor made phone calls on behalf of the Centers for Medicare & Medicaid Services to potential participants in the Affordable Care Act marketplace. The list of phone numbers was provided by CMS, and CMS dictated both the timing of the call and the script of the message to be delivered. A recipient of such a call brought a TCPA claim against the contractor. The court found that the contractor had a derivative sovereign immunity defense because "[q]uite plainly, *[the contractor] performed exactly as CMS directed*: [it] called the number CMS instructed [it] to call, on the prescribed day, and followed CMS's provided script

18

when leaving the message." *Id.* at 647 (emphasis added).  The court distinguished *Campbell-Ewald* by noting that the contractor in that case had *not* been carrying out explicit instructions from the government to call particular phone numbers (it had assembled the list itself) and had violated both federal law and the government's instructions.  *Id.*

Thus, in *Cunningham*, the contractor's ability to raise a sovereign immunity defense hinged on the fact that the relevant conduct was specifically dictated by the federal government. The same applies in the other cases cited by PHEAA.  *See Campbell-Ewald,* 136 S. Ct. at 672 (discussed above); *In re KBR*, 744 F.3d at 345 (record at present stage of litigation did not adequately establish whether contractor "acted in conformity with [the contract], its appended task orders, and any laws and regulations that the contract incorporates", as required to assert defense); *Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 108 (D.D.C. 2017) (record at present stage of litigation did not make clear "whether [defendant asserting immunity] had to secure [government] approval as to the specific words it used to convey the terms of using the debit cards or the visual formatting of that information, or both….If…the government never approved that information before Defendant gave it to jurors, then immunity may prove elusive"); *Chesney v. Tennessee Valley Auth.,* 782 F. Supp. 2d 570, 585 (E.D. Tenn. 2011) (contractor merely carried out policy decisions of Tennessee Valley Authority).

## B.  The NYAG's claims, by their nature, arise from PHEAA's failure to service loans as "authorized and directed"

Puzzlingly, PHEAA claims that "NYAG does not allege that PHEAA violated any specific federal loan-servicing regulation, or acted in contravention of any federal directive." (PHEAA Mem. 16)  But the fact giving rise to every NYAG claim is precisely PHEAA's improper servicing of loans, in violation of the terms governing the federal student loan program. This is not a case like *Ackerson*, 589 F.3d at 207, where the "allegations attack [the federal

government's] policy…not any separate act of negligence by the [contractor]."  Rather, the

NYAG's fundamental argument is that PHEAA is servicing loans in ways it cannot possibly

argue that ED, or Congress, "authorized and directed" it to—or even could have intended it to.

     1.    *PHEAA cannot claim that ED intended it to report qualifying payment counts for PSLF that are incorrect under ED's own regulations*

      For example, with respect to the NYAG's claim concerning PHEAA's incorrect payment

counts for borrowers under the PSLF program (*see* Compl. ¶¶ 11, 62-127), the NYAG does *not*

challenge the established regulatory framework for determining which borrower payments count

as "qualifying payments" towards the 120 required for forgiveness under the PSLF program

("Qualifying Payments").  These standards, which have to do with, e.g., the timeliness of the

payment, the nature of the borrower's employer, and whether the loan is on an appropriate

repayment plan, are largely set out in 20 U.S.C. § 1087e(m) and 34 C.F.R. § 685.219.  (*See*

Compl. ¶¶ 2, 62-68)  The NYAG has no quarrel with them.  Rather, the NYAG's allegation is

that PHEAA, as exclusive servicer for the program, is responsible for applying these standards to

determine whether a borrower's given payment is, in fact, a Qualifying Payment (Compl. ¶¶ 70-

72, 76)[29], but often fails to do so accurately (Compl. ¶ 89).  As a result, it misrepresents to

borrowers how many Qualifying Payments they have.  (Compl. ¶ 89)  *In other words, the NYAG*

*alleges that PHEAA is failing to count payments as Qualifying Payments that objectively meet*

*the standards established by the federal government.*

      Regardless of the reasons for PHEAA's lack of compliance with federal directives

concerning PSLF,[30] the heart of the NYAG's claim is that PHEAA is providing objectively

---

[29] Sept. 30, 2011 Change Request Form, Trombley Aff. Ex. A, at PHEAA 35 (Req. #204.00) and PHEAA 38 (Req. #206.02); CFPB Exam Manual, Trombley Aff. Ex. I, at 43-44.

[30] PHEAA's non-compliance may be a consequence, at least in part, of its negligent management of records systems, especially when importing data from borrowers' prior servicers (Compl. ¶¶ 91-93), or woefully inadequate quality control measures (Compl. ¶¶ 95-96, 105-106, 111).  *See*

inaccurate counts of Qualifying Payments to borrowers.  Importantly, in a series of recent audits, ED *itself* has recognized and repeatedly criticized PHEAA's inaccurate payment counts. (Compl. ¶ 90)[31]  The Complaint provides numerous individual examples of such objectively inaccurate counts, a number of which PHEAA tacitly admitted were inaccurate after borrowers challenged them.  (*Id.* ¶¶ 98-102, 112, 122-23.)  PHEAA can hardly be heard to argue that ED "authorized and directed" it to provide borrowers with Qualifying Payment counts that are inaccurate according to ED's own regulations, especially when ED's own audits objected to such inaccuracy.  By the very nature of the NYAG's claim, PHEAA's conduct here *cannot* be "performance in compliance with all federal directions."

> 2.  *PHEAA cannot claim that ED intended it to provide incorrect monthly payment amounts in IDR plans, to fail to recertify applications in time, or to drop borrowers from plans without any reason*

Similarly, with respect to the IDR plans available to borrowers which base monthly payments on family size and income, the NYAG alleges that PHEAA is responsible for processing borrower applications to determine if borrowers qualify and calculate the appropriate monthly payment, and then annually recertifying continuing eligibility.  (Compl. ¶¶ 176-77)  The eligibility requirements for IDR plans, and the formulas for calculating IDR plan payments, are set out in federal regulations, including 34 C.F.R. §§ 685.215 and 685.221.  (*See id.* ¶¶ 52-58.) Again, the NYAG does not challenge the validity of these regulations.  Rather, the NYAG

---

Oct. 25, 2016 Federal Student Aid FedLoan Servicing PSLF Servicing Review, Ex. 1 to Trombley Aff. Ex. M.  This audit indicates ED's dissatisfaction with PHEAA's quality control measures.  PHEAA, it notes, "only performs quality assurance on a sample of manually tracked payments, and on payments counted via automated account scripting; however, FedLoan Servicing's quality assurance would not capture issues caused by [certain scenarios]…As a general practice, [ED] believes that FedLoan Servicing should perform a quality assurance review on all types of payment counts whether being counted initially or subsequent to account updates" and needs to "immediately put into place frequent quality assurance checks."  *Id.* at 7.
[31] FSA Audits, summarized *supra* at 9 & n.14, Trombley Aff. Exs. I-N.

alleges that PHEAA has failed to determine eligibility and payments as they direct.  (*Id.* ¶¶ 175,

180-83, 186, 206)

Servicer miscalculation of IDR monthly payment amounts is *not* authorized by the

federal government—in fact, as ED's Office of the Inspector General has explicitly stated, it

constitutes "noncompliance with…Federal loan servicing requirements."[32]  The Complaint

includes examples of borrowers whose required payments shot up even though their income and

family size had not changed meaningfully (¶¶ 186-190), borrowers given inaccurate monthly

payment amounts and forced to wait for months for corrections, thus inappropriately denied

opportunities to make payments towards PSLF forgiveness (¶¶ 203-205),[33] and borrowers

inexplicably dropped from plans they had already qualified for well before they were required to

recertify their eligibility annually and thereby forced to make payments higher than required (¶¶

207-217).[34]  In none of these cases does the NYAG attack the underlying regulations PHEAA is

required to apply, but rather PHEAA's inaccurate application of them.  Struggling borrowers are

objectively entitled under the IDR plan regulations to make lower (or no) monthly payments on

their loans. The NYAG's allegation is simply that PHEAA is denying them that relief without

justification.  Once more, it is implausible for PHEAA to argue—in contradiction of ED's own

Inspector General—that it was "authorized and directed" by ED to violate its own regulations by,

*e.g.*, providing borrowers with objectively inaccurate monthly payments or dropping borrowers

---

[32] *Servicer Noncompliance*, Trombley Aff. Ex. P, at 10, 13-14.
[33] 34 C.F.R. § 685.221(e)(8)(i) (for Direct Loans) and 682.215(e)(8)(i) (for FFEL loans) direct
that if the borrower submits the information required for annual recertification in a timely
manner, the new monthly payment amount should be "promptly determine[d]."  *See supra* n.16.
[34] *Staying on track*, Trombley Aff. Ex. O, at 40-41 (failing to count Qualifying Payments from
prior servicers may violate ED requirement that "servicers…track payments through servicing
transfers").

from IDR plans entirely with no basis.  Thus, there can be no defense of derivative sovereign immunity with respect to this claim.

>    3.    *PHEAA cannot claim it was "authorized and directed" to perform the misconduct giving rise to the NYAG's other claims*

PHEAA cannot plausibly argue that it was simply "performing as the Government directed" with respect to the NYAG's other claims, either:

**Borrower steering.**  The NYAG alleges that, in order to reduce its own costs, PHEAA "steered" struggling borrowers away from enrollment in IDR plans and into less suitable, more expensive forbearance, misrepresenting their repayment options.  (Compl. ¶¶ 277-292)  Steering is a violation of both federal regulation[35] and ED policy.  As ED's Office of the Inspector General explained in a recent report on loan servicers, misrepresentation of available repayment options, as well as the costs of forbearance, to struggling borrowers represents "servicer noncompliance with…Federal loan servicing requirements."[36]  The report further notes that FSA reviews of PHEAA's phone calls with borrowers revealed a significant rate of such failures, substantially above that of other servicers. (*Id.* ¶¶ 288-292)  In fact, the CFPB has sued another loan servicer which allegedly has engaged in similar forms of steering for abusive and unfair conduct under the Dodd-Frank Act.[37]  Thus, PHEAA cannot assert that ED (or the CFPB) "authorized and directed" it to steer struggling borrowers into forbearance or to misinform borrowers as to the effect of consolidation into an Extended Repayment Plan on their eligibility for PSLF.[38]  (*See id.* ¶¶ 296-308.)

---

[35] 34 C.F.R. § 682.25(a)(4).

[36] *Servicer Noncompliance*, Trombley Aff. Ex. P, at 10-13.

[37] *Consumer Financial Protection Bureau v. Navient Corp.*, 2017 WL 3380530, at *19-20 (M.D. Pa. Aug. 4, 2017).

[38] *See* CFPB Exam Manual, Trombley Aff. Ex. I, at 44 ("When borrowers express interest in using PSLF, [examiners should] determine whether the servicer confirms that the borrower is

*Delays in providing basis for payment counts.*  The NYAG alleges that PHEAA "compounds the harm to borrowers that results from its failure to accurately determine PSLF payment counts by failing to provide explanations to borrowers of the basis for its determinations in any reasonable time frame."  (*Id.* ¶ 128)  PHEAA has delayed in providing some explanations for over a year.  (*Id.*)  As the Complaint (¶ 147) notes, "The Department of Education has recently admitted that 'the time it takes for borrower accounts to be reviewed [by FedLoan] is a problem'"—hardly an endorsement of the conduct.

*Inconsistent application of policy.*  The NYAG also alleges that PHEAA treats borrowers inconsistently with respect to reclassifying payments made during forbearance, retroactive reapplication of payments to eliminate "paid-ahead status," and ability to appeal its determinations.  In the relevant allegations, the NYAG states plainly that it is *not* seeking to hold FedLoan "responsible for the Department of Education's policies," but for its inconsistent implementation of them (*Id.* ¶ 263), something it is difficult to believe was authorized and directed by ED.

*Misrepresentations as to cancer deferment.*  The NYAG also alleges that PHEAA has misinformed borrowers with cancer as to their statutory entitlement under 20 U.S.C. § 1087e(f)(3) for a special deferment.  (*Id.* ¶ 316)  PHEAA falsely told borrowers that the law had not gone into effect or that the borrowers did not qualify.  (*Id.* ¶¶ 317-318)  The Complaint notes that it does not seek to hold PHEAA responsible for any delay by ED in producing an application for this deferment, but PHEAA was nonetheless not entitled to misrepresent its availability.  (*Id.*

---

repaying using an Income-Driven Repayment plan, and if the borrower is not, *accurately describes which payment plans are eligible for PSLF*" (emphasis added)).

¶ 321) It is not conceivable that ED "authorized and directed" PHEAA to lie to borrowers about the availability of this statutorily-authorized deferment.

Finally, PHEAA claims (PHEAA Mem. 16-17) that its contract's inclusion of acceptable error rates and creation of error resolution mechanisms for some tasks represents a broad license for misconduct. That ED may elect not to sue for breach of contract over a certain level of misconduct by PHEAA does *not* mean that ED "authorized or directed" (or "permitted or required," *In re KBR*, 744 F.3d at 345) that misconduct. That it provides means for PHEAA to correct some errors does not constitute "authorizing and directing" those errors.

PHEAA's assertion of derivative sovereign immunity is ultimately premised on a profound mischaracterization of the NYAG's claims—as attacks on ED's *policy*, rather than on PHEAA's *failures in carrying out its duties* in accordance with federal directives—and must fail. If there is doubt, the Court should, at least, not determine that PHEAA's conduct was in compliance with all federal directives without permitting the development of a fuller factual record concerning both the directives and PHEAA's conduct.[39]

## II.     THE NYAG'S CLAIMS ARE RIPE

### A.  The NYAG's claims are constitutionally ripe

PHEAA wrongly asserts that the NYAG's claims related to miscounting PSLF payments, failing to provide timely PSLF-determination explanations, and employing inconsistent error resolution procedures are not ripe with respect to borrowers who have not yet reached the 120 Qualifying Payments required for forgiveness because injury to such borrowers is "speculative" and will not accrue until borrowers make 120 Qualifying Payments. (PHEAA Mem. 26)

---

[39] PHEAA chose not to argue the applicability of the "contractor defense" set forth in *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1998) and has thus waived this argument. It cannot save it for later in case the Court rejects its other arguments, as it suggests. (PHEAA Mem. 14 n.2)

PHEAA's argument rests on the incorrect premise that injury *to borrowers* is required to establish ripeness.  PHEAA ignores both the legal standard for justiciability in government enforcement actions and the fact that borrowers have been harmed.

> 1.     *The NYAG is injured by virtue of the alleged violations of law*

Where a government agency brings an enforcement action, the relevant injury for the justiciability analysis is the injury to the government that arises via the violation of the law.  *See Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) ("It is beyond doubt that the complaint asserts an injury to the United States . . . the injury to its sovereignty arising from violation of its laws"); *Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321, 1325 (Fed Cir. 2010) (finding statutory violation "inherently constitutes an injury to the [government]….The parties have not cited any case in which the government has been denied standing to enforce its own law.").  Accordingly, courts have repeatedly held that in enforcement actions, government agencies' allegations of law violations establish the required "injury-in-fact" under Article III.[40]  *See, e.g.*, *Equal Opportunity Employment Comm'n v. Day & Zimmermann NPS, Inc.*, 265 F. Supp. 3d 179, 192 (D. Conn. 2017) (finding EEOC has standing to enforce Americans with Disabilities Act because violation of the statute constitutes an injury to the government); *Fed. Trade Comm'n v. Hornbeam Special Situations, LLC*, No. 17-cv-394, 2018 WL 6521516, at *2 (N.D. Ga. July 11, 2018) (finding Federal Trade Commission ("FTC") has standing to enforce federal consumer protection law because the FTC is

---

[40] Because the requirements for establishing standing and ripeness "overlap" in "the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical," *Nat'l Org. for Marriage v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) (internal citations omitted), courts have found that injuries that meet the "actual and imminent" requirement of standing also fulfill the requirements of constitutional ripeness.  *See id.* (internal citations omitted); *see also Ross v. Bank of Am., N.A.*, 524 F.3d 217, 226 (2d Cir. 2008).

"constitutionally injured" by violation of law it is charged to enforce). *See also Consumer Financial Protection Bureau v. Howard*, No. 8:17-cv-00161, 2017 WL 10378953, at \*5 (C.D. Ca. May 30, 2017). The NYAG is authorized under federal law to enforce provisions of the Dodd-Frank Act which prohibit unfair and deceptive practices, 12 U.S.C. § 5552(a)(1), and is also authorized under state law to take action to enjoin repeated and persistent fraudulent and illegal conduct under New York Exec. Law § 63(12) and deceptive business practices under GBL § 349. PHEAA's violations of these federal and state laws constitute the requisite injury-in-fact to NYAG sufficient to establish the ripeness of NYAG's claims.

> ## 2. *PHEAA's misconduct has injured borrowers*

Apart from the applicable legal standard for determining ripeness in an action by the government for violations of law, as a matter of fact and as alleged in the Complaint, PSLF-related misconduct has already resulted in actual injury to PHEAA borrowers. As set out in the Complaint, tens of thousands of borrowers nationally have already reached 120 Qualifying Payments, and some have been wrongfully denied forgiveness. (Compl. ¶¶ 75, 116-119, 122-123, and nn.16-17) Additionally, PHEAA's misconduct has already resulted in actual injury to those PHEAA borrowers who have not yet reached 120 Qualifying Payments (*see, e.g.,* Compl. ¶¶ 113-15, 158-160, 169). The court in *American Bar Ass'n v. United States Dep't of Educ.*, 370 F. Supp. 3d 1, 23 (D.D.C. 2019), another case related to the PSLF program, recognized that borrowers being obstructed in their pursuit of PSLF suffered "immediate" and "significant" harm even before reaching the 120-payment mark. In that case, plaintiffs brought an action challenging ED's decision to change its criteria for public service employer eligibility in the PSLF program. ED argued that the plaintiffs failed to meet the requirements to bring a claim under the Administrative Procedure Act because the challenged PSLF employer eligibility

determinations were not "final agency actions," as they were provided before borrowers reached the 120-payment mark and applied for PSLF forgiveness.  *Id.* at 17.  The court rejected ED's argument as "nonsense," explaining that the pre-120-payment determination letters "quite obviously had an 'immediate' and 'significant' impact on [plaintiffs'] ability to plan their careers and finances, despite the fact that they have not had (and may never have) the opportunity to submit an application for loan forgiveness."  *Id.* at 23.

PHEAA's PSLF-related misconduct has similarly had an "immediate" and "significant" practical effect on borrowers who have not yet reached 120 Qualifying Payments.  PHEAA's misconduct has damaged those borrowers' ability to take steps to address PSLF ineligibility issues, such as changing from a non-qualifying repayment plan to a qualifying repayment plan or appealing PSLF determinations.  (Compl. ¶¶ 158-160)  And, as in *American Bar Ass'n*, PHEAA's PSLF-related misconduct damages borrowers' ability to plan careers and finances. (*Id.* ¶¶ 115, 169)

### B.  The NYAG's PSLF-related claims are prudentially ripe

PHEAA's argument that the NYAG's PSLF-related claims are not prudentially ripe also lacks merit.  Based on recent Supreme Court case law, this Court should not engage in such an analysis.[41]  If it decides to do so, it should find that the NYAG's claims are prudentially ripe.  To determine whether a claim is prudentially ripe, courts consider both the fitness of the issues for

---

[41] In *Susan B. Anthony List v. Driehaus*, the Supreme Court called into question the "continuing vitality" of the prudential ripeness doctrine, noting that the doctrine "is in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." 573 U.S. 149, 167 (2014) (internal citations omitted); *see also* 15 Moore's Federal Practice - Civil § 101.70 (2019) (warning that "reliance on the existence of a prudential ripeness element is risky" in light of the Supreme Court's recent decisions calling into question the vitality of the prudential ripeness doctrine).

judicial decision and the hardship to the parties of withholding court consideration.  *Nat'l Org. for Marriage v. Walsh*, 714 F.3d 682, 691 (2d Cir. 2013).

 NYAG's claims meet prudential ripeness requirements because postponing a decision with respect to borrowers who have not yet reached the 120-payment mark would impose a hardship on both NYAG and those borrowers.  Postponement would afford incomplete relief to the NYAG and raises the risk that the NYAG would be required to bring separate proceedings to obtain relief for each cohort of borrowers who reach 120 payments.  Postponement would also impose a hardship on borrowers who have not reached 120 payments but who are nonetheless subjected to ongoing harm from PHEAA's misconduct (*see supra* II.A.2).  Where alleged conduct causes ongoing harm, such harm constitutes a hardship sufficient to satisfy the requirements of prudential ripeness.  *See*, *e.g.*, *Ross v. Bank of Am., N.A*., 524 F.3d 217, 226 (2d Cir. 2008) (finding claims prudentially ripe where "[t]he injuries alleged by the cardholders are *present, ongoing harms* that continue to affect the credit market as long as consumer choice and the quality of credit services offered are artificially suppressed") (emphasis added)).

 PHEAA relies on *Winebarger v. Pa. Higher Educ. Assistance Agency*, 411 F. Supp. 3d 1070, 1089 (C.D. Cal. 2019), to argue that NYAG's claims are not "fit" for adjudication and are thus not prudentially ripe.  *Winebarger* is plainly distinguishable from this action.  *Winebarger* was brought by private individuals and was not a governmental enforcement action authorized by federal and state law.  *See id.* at 1078.  The *Winebarger* court's analysis rested on the court's determination that the injury to the three private plaintiffs in that lawsuit was speculative because there was a chance that the plaintiffs would never complete 120 payments.  *Id.* at 1088.  In this action, the injury giving rise to the claims against PHEAA is not speculative because NYAG has already been injured by PHEAA's violations of state and federal law.  In addition, in contrast to

29

*Winebarger*, borrower injuries are not speculative.  Hundreds of thousands seek PSLF forgiveness, and thousands reach the 120-payment mark every month.[42]  Thus, there is no possibility that postponement could obviate the need for a decision in the future.

## III.   THE NYAG'S CLAIMS DO NOT IMPLICATE INTERGOVERNMENTAL IMMUNITY

PHEAA incorrectly asserts that intergovernmental immunity shields it from liability for violations of state consumer protection laws prohibiting fraudulent and deceptive practices (the "state deceptive practices laws").[43]  (PHEAA Mem. 17)  The doctrine of intergovernmental immunity provides that a state law is invalid where it "regulates the United States directly or discriminates against the Federal Government or those with whom it deals."  *North Dakota v. United States*, 495 U.S 423, 435 (1990).  But intergovernmental immunity applies only narrowly: "[n]either the Supremacy Clause nor the Plenary Powers Clause bars all state regulation which may touch the activities of the Federal Government."  *Hancock v. Train*, 426 U.S. 167, 179-80 (1976).  The doctrine does not shield PHEAA from liability under the state deceptive practices laws because application of these laws to PHEAA does not directly regulate, nor discriminate against, the federal government.[44]

In considering whether intergovernmental immunity applies to a claim under a particular state law, courts distinguish between state laws that directly regulate the federal government through, for example, impairing the federal government's ability to choose contractors or

---

[42] In the past six months for which data is available alone, over 36,000 new applicants applied for forgiveness. *See* U.S. Dep't of Education, Public Service Loan Forgiveness (PSLF) Program Data as of 9/30/2019, attached as Trombley Aff. Ex. Q, and U.S. Dep't of Education, Public Service Loan Forgiveness (PSLF) Program Data as of 3/31/19, attached as Trombley Aff. Ex. R.

[43] NYAG's Dodd-Frank claims are not implicated by PHEAA's argument that the intergovernmental immunity doctrine shields it from liability from NYAG's state-law claims.

[44] PHEAA does not actually assert that the state laws in question here discriminate against the federal government or those with whom it deals.

otherwise impairing the government's ability to carry out its activities, and state laws that do not directly regulate the federal government.  Federal contractors are not shielded from liability under state law unless applying a state law to the contractor would directly regulate the government by impairing the government's ability to choose contractors or otherwise impairing the government's ability to carry out its activities.  For example, in *James Stewart & Co. v. Sadrakula*, 309 U.S. 94 (1940), the Supreme Court held that intergovernmental immunity did not shield a federal contractor engaged to construct a building on federal property from liability under a state safety regulation.  *Id.* at 97-98, 105.  The Supreme Court concluded that although the state law required the contractor to undertake certain safety measures that went beyond the requirements of the federal contract and which might indirectly increase costs to the federal government, the contractor was not immune from liability because the regulation did not interfere with the federal government's ability to carry out its activities.  *Id.* at 103-05.

Similarly, in *Washington v. GEO Grp, Inc*., No. 3:17-cv-05806, 2018 WL 6448778, at *1, 4 (W.D. Wash. Dec. 10, 2018), the court found that intergovernmental immunity did not shield a federal contractor that operated a federal detention facility from application of a state labor law.  The court found that although the state law imposed minimum wage requirements that differed from the requirements of the federal contract, the federal contractor was not immune from the state labor law because the law did not "directly obstruct the activities of the Federal Government."  *Id.* at *4 (internal citations omitted).  *See also GEO Grp., Inc. v. City of Tacoma*, No. 18-cv-05233, 2019 WL 5963112, at *5 (W.D. Wash. Nov. 13, 2019) (finding federal contractor not immune from application of a local building regulation where regulation "does not necessarily impede" federal operations.)

Here, New York's state deceptive practices laws have even less of an impact on PHEAA than the state safety and labor laws at issue in *James Stewart & Co.* and *Washington v. GEO Grp, Inc.* The NYAG alleges that PHEAA violated state deceptive practices laws by making misrepresentations to borrowers. Requiring that PHEAA refrain from making such misrepresentations is fully consistent with PHEAA's contractual duties and with federal law and policy. PHEAA's contract with ED nowhere requires PHEAA to make misrepresentations to borrowers. In fact, PHEAA's contract with ED requires that PHEAA comply with state law.[45] Far from obstructing ED's activities, prohibiting PHEAA from making misrepresentations furthers ED's stated mission of ensuring that borrowers "receive world-class service" of their student loans. *See Servicer Noncompliance*, Trombley Aff. Ex. P, at 45.[46]

In contrast, the cases that PHEAA points to all involve state laws that directly interfered with the government's activities or its ability to hire contractors. For example, *Boeing v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), is inapposite. The *Boeing* court found that a state law imposing more stringent radioactive decontamination procedures on a federal site impermissibly obstructed the federal government's activities at the site where the state law targeted a particular federally-owned site where the federal government had engaged a federal contractor to conduct

---

[45] See PHEAA Mem. Ex. 1, section C.1.4.3 ("The contractor(s) will be responsible for maintaining a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur.").

[46] PHEAA incorrectly asserts that the NYAG "seeks to require PHEAA to provide federal student loan borrowers at specific times and in specific ways, with information about federal repayment provisions, including PSLF payments, monthly loan payments, repayment options, loan consolidation, and cancer deferments." (PHEAA Mem. 19) NYAG does not seek to impose requirements on PHEAA related to the timing or format of disclosures in connection with its state law deceptive practice claims. Rather, NYAG seeks only to enjoin PHEAA from making misrepresentations to borrowers.

decontamination procedures.  *Id.* at 836.  The court noted that the state law "affects nearly all of the [federal agency's] decisions with respect to the cleanup, including the environmental sampling that is required, the cleanup procedures to be used, and the money and time that will be spent." *Id.* at 839.  In contrast, the New York state laws prohibiting misrepresentations do not impose obligations on PHEAA that are inconsistent with federal law or policy.

*Black Hills Power and Light Company v. Weinberger*, 808 F.2d 665 (8th Cir. 1987), and *United States v. Virginia*, 139 F.3d 984 (4th Cir. 1998), are also distinguishable.  In *Black Hills*, the Eighth Circuit held that a state utility franchise law was invalid because the law would prevent the federal government from selecting the utility company of its choice to provide power to an Air Force base.  *Black Hills*, 808 F.2d at 670-71 ("[b]y ordering the United States to contract with a particular utility…the [state] has directly interfered with the United States' control over the provision of electrical service within the base").  Similarly, in *United States v. Virginia*, the Fourth Circuit found that a state licensing regime for public investigators interfered with the Federal Bureau of Investigation's ability to select its own contractors.  139 F.3d at 989.  The New York deceptive practices laws, unlike the laws at issue in *Black Hills* and *United States v. Virginia,* do not impair the federal government's ability to select employees or contractors.

Finally, PHEAA asserts that PHEAA is shielded from liability by the intergovernmental immunity doctrine because application of state deceptive practices laws would "impact federal property."  PHEAA cites *Blackburn v. United States*, 100 F.3d 1426 (9th Cir. 1996), to support this assertion.  *Blackburn* is inapposite.  In *Blackburn*, the Ninth Circuit held that a state safety regulation did not apply to the National Park Service because applying the law to the federal agency would obstruct the agency's ability to carry out its activities and would conflict with the agency's mission to simultaneously ensure visitor access to and preserve wilderness areas.  *Id.* at

1435.  In contrast, the state deceptive practices laws at issue here do not impose any obligations on PHEAA that impair the federal government's ability to carry out its activities.

## IV.   THE NYAG'S STATE-LAW CLAIMS ARE NOT PREEMPTED BY THE HIGHER EDUCATION ACT

PHEAA argues that the NYAG's state-law claims[47] should be dismissed because they are preempted under the doctrines of express and obstacle preemption.  (PHEAA Mem. 26)  But, as a recent series of court cases have made clear,[48] the relevant provision of the Higher Education Act, 20 U.S.C. § 1098g, preempts only a narrow class of disclosure-related claims that does not include the NYAG's claims, which rest on misrepresentations and other affirmative misconduct. The enforcement of consumer-protection laws of general application is also no obstacle to the fulfillment of Congressional intent in the federal student loan program.  The Court should therefore deny PHEAA's motion to dismiss on this ground.

### A.  This Court should apply the traditional presumption against preemption of state consumer-protection laws

As an initial matter, PHEAA's argument that this Court should not apply the traditional presumption against preemption where there is no clear Congressional intent to displace state law (PHEAA Mem. 27) ignores the fact that the NYAG's claims are brought under consumer-protection law, an area of historic state authority in which state law is due special consideration. "[I]n all pre-emption cases, *and particularly in those in which Congress has legislated…in a field which the States have traditionally occupied*…we start with the assumption that the historic

---

[47] NYAG's federal-law claims under the Dodd-Frank Act cannot, of course, be preempted.
[48] Every court to date to consider an argument of preemption in the context of a consumer-protection claim brought by a state has rejected it.  *See, e.g., Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d at 549-50 (no preemption of claims relating to forbearance steering); *Illinois v. Navient Corp.*, 17-ch-761 (Ill. Cir. Ct. Cook Cnty. July 10, 2018) (Order Denying Mot. To Dismiss) (same), attached as Trombley Aff. Ex. S, at 12-13.

police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (emphasis added; internal citations omitted).  It is well-established that "consumer protection law is a field traditionally regulated by the states."  *Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41 (2d Cir. 1990).  Courts have therefore applied the presumption against preemption in any number of cases involving an alleged conflict between federal law and state consumer protection law.  *See, e.g., Altria Grp., Inc. v. Good,* 555 U.S. 70, 77 (2008); *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 450 (2005); *Geffner v. Coca-Cola Co.*, 343 F. Supp. 3d 246, 251-52 (S.D.N.Y. 2018), *aff'd* 928 F.3d 198 (2d Cir. 2019)*.*

Thus, it is unsurprising that courts which have recently considered similar consumer-protection claims against federal student loan servicers have also applied the presumption. *Minner v. Navient Corp.*, 18-cv-1086S, 2020 WL 906628, at *9  (W.D.N.Y. Feb. 25, 2020); *Daniel v. Navient Sols., LLC*, 328 F. Supp. 3d 1319, 1323-24 (M.D. Fla. 2018); *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d at 547-48; *Student Loan Servicing Alliance v. Dist. of Columbia* ("*SLSA*"), 351 F. Supp. 3d 26, 46-47 (D.D.C. 2018).  PHEAA ignores these cases and instead cites non-student loan servicing cases that involve uniquely strong federal interests.  Its leading case, *United States v. Locke*, 529 U.S. 89 (2000), fell into an area of traditional federal supremacy "from the earliest days of the Republic" (interstate maritime navigation, *id.* at 108); *see also Bell v. Blue Cross & Blue Shield of Okla.*, 823 F.3d 1198, 1201-02 (8th Cir. 2016) (insurance benefits for federal employees, implicating the government's interest in the health of employees); *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1105 (10th Cir. 2015) (employment contracts with federal employees).  Federal interests here are not nearly so

weighty.  Therefore, this Court, too, should apply the traditional presumption against federal preemption of state consumer-protection laws.

### B.  The NYAG's claims are not expressly preempted by the Higher Education Act

*1.  The Higher Education Act does not expressly preempt claims relating to affirmative misrepresentations and other misconduct by loan servicers*

PHEAA's express preemption argument relies on a provision of the HEA which states that student loans made, insured, or guaranteed by the federal government "shall not be subject to any disclosure requirements of any State law."  20 U.S.C. § 1098g.  But PHEAA's claim that "[n]umerous courts…have held that § 1098g expressly preempts state-law claims relating to representations about loan payments" (PHEAA Mem. 28) misstates the case law considering the application of § 1098g to state-law claims.  In fact, a long string of recent decisions in cases concerning representations made by federal student loan servicers have found no preemption under § 1098g.  "[Congress] most certainly did not enact [in the HEA] language imposing broad preemption on any state laws, or even any state consumer-protection or tort laws, that might apply to student loans and their servicing."  *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 648-49 (7th Cir. 2019) (no express preemption of claims concerning "affirmative misrepresentations" about loan payment options and forbearance steering); *Daniel*, 328 F. Supp. 3d at 1324 (no preemption of claims concerning PSLF-related misrepresentations); *Hyland v. Navient Corp.*, 2019 WL 2918238, at *5 (same); *Genna v. Sallie Mae, Inc.*, 2012 WL 1339482, at *8 (no preemption of claims concerning misrepresentations about loan repayment and forbearance); *Minner*, 2020 WL 906628, at *9-10 (no preemption of claims concerning misrepresentations concerning forbearance steering); *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d at 549-50 (same); *Illinois v. Navient Corp.*, 17-ch-761, at 12-13 (Ill. Cir. Ct. Cook Cnty. July 10, 2018) (Order Denying Mot. To Dismiss), attached as Trombley Aff. Ex. S (same);

*Washington v. Navient Corp.*, No. 17-2-01115-1, at 3 (Sup. Ct. Wa. Oct. 30, 2018) (Order

Granting in Part and Denying in Part Mot. for Judgment on the Pleadings) (same), attached as

Trombley Aff. Ex. T.

      The common thread among these court decisions is that § 1098g preempts, at most, only

claims attempting to impose additional disclosure requirements on particular types of

communications to borrowers mandated by the HEA,[49] not those concerning misrepresentations

or other forms of affirmative misconduct by servicers.  For example, in *Nelson*, the court held

that the plaintiff's claims concerning the servicer's "false and misleading statements…made

voluntarily…[did] not necessarily imply any additional disclosure requirements at all."  928 F.3d

at 648-49.  Similarly, in *Daniel*, the plaintiffs alleged that the servicer had misinformed

borrowers about whether they were eligible for PSLF.  The court held that there was no

preemption of these claims under § 1098g because "[p]laintiffs are not claiming that Defendant

merely failed to disclose the requirements of the PSLF program, but rather, they are asserting

that Defendant made affirmative misrepresentations to them."  328 F. Supp. 3d at 1324.  *See, e.g,*

*Genna*, 2012 WL 1339482, at *8 (no preemption where statements at issue "were neither

authorized by the Secretary of Education nor conformed to any explicit dictates of federal law");

*Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d at 550-51 (no preemption where state alleged

"affirmative misconduct"); Order Denying Mot. To Dismiss, *Illinois v. Navient Corp.*, at 12-13,

---

[49] For example, those mandated in 20 U.S.C. § 1083.  *See Nelson*, 928 F.3d at 647-48.

Trombley Aff. Ex. S (no preemption where state alleged servicer "schemed to steer borrowers into forbearances").[50]

The handful of cases cited by PHEAA do not call for a broader reading of § 1098g.  In the case it relies on most heavily, *Chae v. SLM Corp.*, the plaintiffs challenged several servicer practices, including the servicer's use of standardized billing statements that supposedly misled them into thinking that it was using the "installment method" of interest calculation rather than simple daily interest.  593 F.3d 936, 942-943 (9th Cir. 2010).  The Court held that, as this method of calculation was legal for FFEL loans and the billing statements themselves complied with FFEL regulations specifying their form, the plaintiffs' claim that the servicer had misrepresented the method of interest calculation was a restyled attempt to require additional disclosures concerning interest calculations in the billing statements.  Therefore, their claim was preempted.  However, the court then went on to state explicitly that "claims alleg[ing]…*the use of fraudulent and deceptive practices apart from the billing statements* are *not* impacted by any of the [law's] express preemption provisions."  *Id.* at 943 (emphasis added).  In other words, the express preemption in *Chae* reached only to claims challenging servicers' disclosures in compliance with federal regulation of federally-authorized servicer practices.

Other courts have recognized the narrowness of *Chae*'s holding.  As the *Nelson* court said: "Since the [*Chae*] defendant was required to disclose [specific] information by federal law and had disclosed it in ways permitted by federal law, [*Chae*] found that the plaintiffs were

---

[50] PHEAA attempts to distinguish some of the cases in this Circuit rejecting preemption of misrepresentation claims by arguing that those cases dealt with statements concerning FFEL loans that were not "explicitly regulated and sanctioned by federal law," while "PHEAA's Direct Loan servicing performance is closely monitored by the Department."  (PHEAA Mem. 31 n.5) The accuracy of this latter claim aside, see *supra* Statement of Facts Sec. B, general "performance monitoring" is a far cry from actually "regulat[ing] and sanction[ing]" the specific misrepresentations at issue.

implicitly seeking to impose additional disclosure requirements…but *Chae* itself made clear that § 1098g would not extend to other sorts of disclosures to borrowers."  928 F.3d at 650.  The *Genna* court similarly noted that "[b]ecause the billing statements…used by [the servicer]…complied with federal regulations governing such instruments, then…such billing statements and standardized forms could not 'simultaneously be misleading under state law.'" 2012 WL 1339482, at *8 (quoting *Chae*, 593 F.3d at 482).  But where the challenged statements were not "authorized by the Secretary of Education nor conformed to any explicit dictates of federal law," there was no preemption.  *Id.*[51]  *Chae* has no relevance, then, where the plaintiff challenges affirmative misrepresentations not made in compliance with federal dictates.

### 2. The NYAG's claims arise from PHEAA's affirmative misrepresentations and other voluntary misconduct, not "omissions"

In characterizing NYAG's claims as merely disguised failure-to-disclose or "omissions-based" claims, PHEAA ignores the NYAG's actual allegations of misrepresentations in favor of its own invented version of the claims.  First, PHEAA argues that "although NYAG attempts to characterize [its steering] claim as an affirmative misrepresentation by PHEAA, the underlying factual allegation is only that PHEAA failed to discuss IDR options with borrowers."  (PHEAA Mem. 29 (internal citation omitted))  But the NYAG has actually alleged that, in order to reduce its own costs, PHEAA voluntarily held itself out to borrowers as a source of reliable information

---

[51] PHEAA also cites a Connecticut district court case, *Linsley v. FMS Inv. Corp.*, No. 11cv961, 2012 WL 1309840, at *6 (D. Conn. Apr. 17, 2012), which, rather than determining whether servicer disclosures had been made in accordance with federal law, assumed that any disclosures made relating to HEA requirements must automatically have been properly made and could not be misleading.  This substantially overextends *Chae*, which considered whether the disclosures were made in accordance with regulation.  *See Chae*, 593 F.3d at 943.  Meanwhile, *Lawson-Ross v. Great Lakes Higher Ed. Corp.*, No. 17-CV-253, 2018 WL 5621872, at *3 (N.D. Fla. Sept. 20, 2018), relies heavily on the district-court decision that was overturned in *Nelson* and, in particular, ED's "Preemption Notice," which it is virtually the only court to have given any credence.  (See Sec. IV.D below.)

"to help ease that [financial] stress and find a solution that works for you and your budget" but, when borrowers sought help, instead pushed them into choosing forbearance rather than more beneficial IDR plans.  (Compl. ¶¶ 18, 282-287)  As a number of courts have found, such claims involve affirmative misrepresentations and other misconduct, not disguised failures to disclose. *See, e.g., Nelson*, 928 F.3d at 648-49; *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d at 549-50; Order Denying Mot. to Dismiss, *Illinois v. Navient Corp.*, Trombley Aff. Ex. S, at 12-13.

Similarly, PHEAA claims that the basis of NYAG's consolidation steering claim is merely "that PHEAA has omitted certain consolidation-related information from its website." (PHEAA Mem. 29-30)  This waves away the NYAG's allegations that on the consolidation page on its website, in its "Consolidation FAQ," and in its answers to a personalized website quiz (Compl. ¶¶ 300-303, 305, 307-308), PHEAA promised borrowers (in these or similar terms) that they could *both* make "lower monthly payments by extending the time you have to repay your loan" *and* be "eligible for…PSLF."  (Compl. ¶ 302)  Because loans on extended-repayment plans are categorically ineligible for PSLF (Compl. ¶ 303), a claim that *both* statements could be true is itself false.  Finally, the NYAG has alleged not only that PHEAA failed to inform borrowers where they could appeal PHEAA's decisions or that certain payments could be retroactively reclassified as Qualifying Payments, as PHEAA states (PHEAA Mem. 30), but rather affirmatively misrepresented to them "that there is no way to appeal [PHEAA] determinations," or gave them incorrect information about how to do so. (Compl. ¶¶ 271-273)  PHEAA also incorrectly told borrowers that payments made during forbearance could not be Qualifying Payments, even though there was an opportunity to have them count under certain

circumstances.  (Compl. ¶¶ 217 and n.28, 237)  All of these allegations hinge on PHEAA's affirmative misrepresentations and other misconduct and are not "omissions-based" claims.[52]

PHEAA's assertion that the NYAG's claims concerning misrepresentation of Qualifying Payment counts are "no different from a claim that [it] failed to make proper disclosures" is similarly flawed. (PHEAA Mem. 30)  What PHEAA appears to be saying is that, even if, e.g., a borrower has indisputably, objectively made 68 Qualifying Payments according to the PSLF regulations, for PHEAA to falsely inform the borrower in its official count that the borrower has only 7 Qualifying Payments is *not* a misrepresentation concerning the number of Qualifying Payments the borrower has made—but rather only a failure to disclose the correct number.  Such an analysis would swallow up the concept of a misrepresentation altogether.  In the only case PHEAA cites in support of this remarkable proposition, *Winebarger*, 411 F. Supp. 3d at 1089, the court assumed, in a single cursory paragraph, that *any* claim "rest[ing] on an alleged misrepresentation" must be "nothing more than a disclosure claim" and thus (citing *Chae*) preempted.  As noted above (Sec. IV.B.1), this is not even consistent with *Chae*, which recognized that claims concerning "the use of fraudulent and deceptive practices" are not preempted where they do not impose additional requirements on mandated disclosures, 593 F.3d at 943, and is a virtual inversion of the sound logic of *Nelson* and other cases finding no express preemption of claims relating to servicer misconduct precisely *because* those claims were based

---

[52] In any event, it is well-established that omissions may be materially misleading "if they render the defendant's representations misleading with respect to the goods or services provided."  *See, e.g., Universal Health Servs., Inc. v. United States ex. rel. Escobar*, 136 S. Ct. 1989, 1999 (2016). Thus, a claim that a statement is misleading because of a material omission rather than an express falsehood is not automatically preempted under § 1098g, but rather only where the statement is actually an approved disclosure.

on affirmative misrepresentations.[53] *See, e.g., Daniel*, 328 F. Supp. 3d at 1324 (no preemption of claims relating to misrepresentations of PSLF eligibility).

The Court should therefore reject PHEAA's argument that the NYAG's state-law claims are expressly preempted by § 1098g.

### C.  The NYAG's claims also are not preempted under the doctrine of obstacle preemption

PHEAA also argues that, if the HEA does not expressly preempt the NYAG's state-law claims, they must be preempted on the grounds that they conflict with the Congressional intent in establishing the federal student loan program.  (PHEAA Mem. 31)  This ill-supported and speculative defense also fails.

It is true that a state law may be preempted where the law "stands as an impermissible obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907 (2019) (internal citations omitted).  But *Warren* cautions that "any [e]vidence of pre-emptive purpose, whether express or implied, must…be sought in the text and structure of the statute at issue.…Efforts to ascribe unenacted purposes and objectives to a federal statute face many of the same challenges as inquiries into state legislative intent…[I]n piling inference upon inference about hidden legislative wishes we risk displacing the…compromises actually reflected in the statutory text." *Id.* (internal citations omitted).  And, as the Second Circuit has held, even where the purpose of the federal law is clear, "[t]he burden of establishing obstacle preemption…is heavy.…[F]ederal law does not preempt state law under obstacle preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *In re*

---

[53] Additionally, because *Winebarger* found that the plaintiffs lacked standing to bring their claims, 411 F. Supp. 3d at 1086-87, this analysis appears to be dicta.

*Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013) (internal citations omitted).

PHEAA argues that the enforcement of the NYAG's consumer-protection laws somehow conflicts with the HEA's supposed "command for uniformity" and thus the NYAG's claims are preempted under an obstacle preemption analysis.  (PHEAA Mem. 32, quoting *Chae*, 593 F.3d at 945.)  But, in fact, this "command for uniformity" appears nowhere in the relevant sections of the HEA.  "We are unable to confirm that the creation of 'uniformity'…was actually an important goal of the HEA."  *Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 597 (4th Cir. 2005) (finding it nowhere in "the purposes of [the federal student loan program] [that] are spelled out in § 1071(a)(1) of the HEA"); *Daniel*, 328 F. Supp. 3d at 1324 ("Uniformity, however, is not one of Congress's expressed goals in enacting the HEA, and broadening the scope of the preemption statute would not rest upon a fair understanding of congressional purpose.") (internal citations omitted).  *Chae* itself limited its discussion of uniformity to adherence to standardized forms, interest calculations, and determining due dates.  593 F.3d at 942.  This Court should not "pile inference upon inference" to interpolate a supposed "command" of the HEA which does not even appear in the statutory text.

In any event, PHEAA has not explained how state-law prohibitions against false and misleading conduct stand in "direct and positive" conflict with the goals of that program.  As *Nelson* held in discussing forbearance steering claims, "Properly understood, state law and federal law can exist in harmony here." 928 F.3d at 651.  Federal student loan servicers have no legitimate interest in making misrepresentations to borrowers, nor does the loan program sanction, much less depend upon, their ability to do so.  PHEAA's contends that "exposure [of servicers] to lawsuits under fifty separate sets of laws and court systems" would represent an

impermissible obstacle to the federal student loan program.  (PHEAA Mem. 32)  But this is effectively arguing that imposing *any* liability under *any* state law would fatally hamper servicers in carrying out the student loan program—a covert argument for sweeping field preemption, which even *Chae* explicitly rejected.  *Genna*, 2012 WL 1339482, at *9; *Hyland*, 2019 WL 2918238, at *8.  Hence, courts have refused to find that state consumer protection law exists in "direct and positive" repugnance with the HEA.  *See, e.g., Daniel*, 328 F. Supp. 3d at 1324; *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d at 552; *Genna*, 2012 WL 1339482, at *9; *see also Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 529 (1992) ("State-law prohibitions on false statements of material fact do not create diverse, nonuniform, and confusing standards") (internal citations omitted).

### D.  This Court owes no deference to ED's "Preemption Notice"

PHEAA argues that the Court owes deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), to ED's recent "Preemption Notice," 83 Fed. Reg. 10619 (Mar. 12, 2018), at least to the extent that it is persuasive.  (PHEAA Mem. 33)  This "Notice" claims that any state law prohibiting misrepresentations is preempted by § 1098g.  Importantly, this "Preemption Notice" is not the product of notice-and-comment rulemaking, but a mere informal interpretation of the law.  No deference is owed "to an agency's *conclusion* that state law is preempted." *Wyeth*, 555 U.S. at 576.  Courts have almost universally dismissed this Notice as an unexplained and unsupported *volte-face* by ED.  "The [ED] Notice is a retroactive, ex-post rationalization for [ED's] policy changes, and therefore does not merit *Skidmore* deference.  It does not analyze in any real way the regulations it cites….[T]he agency's view represents a stark, unexplained change in [ED's] position….[ED's] notice also lacks requisite thoroughness and persuasiveness because it fails to specify the regulations that it is interpreting….[It] draws broad conclusions about the

44

regulations' preemptive effect without actually interpreting any specific regulations."
*SLSA*, 351 F. Supp. 3d at 50-51; *Nelson*, 928 F.3d at 651 n.2 (explicitly endorsing *SLSA*'s
analysis); *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d at 552-53; *Hyland*, 2019 WL
2918238, at *7 (same).  This Court should also give it no weight.

    For the reasons given, the Court should not find that the NYAG's claims are preempted
either expressly or as an obstacle to the implementation of the HEA.

## V.   ED IS NEITHER A NECESSARY NOR AN INDISPENSABLE PARTY UNDER FED. R. CIV. P. 19

    Contrary to PHEAA's claims, ED is neither a necessary nor an indispensable party under
Rule 19.  The Second Circuit has recognized that "[f]ederal courts are extremely reluctant to
grant motions to dismiss based on nonjoinder and, in general, dismissal will be ordered only
when the defect cannot be cured and serious prejudice or inefficiency will result."  *Am. Trucking
Ass'ns, Inc.*, 795 F.3d at 357.  PHEAA has not met that standard here.

### A.  ED is not a necessary party under Rule 19(a)

    PHEAA incorrectly asserts that ED is a necessary party under Rule 19(a).  (PHEAA
Mem. 36)  Factors for determining whether a party is necessary under Rule 19(a) include
whether complete relief is possible without joinder of the non-party; whether the non-party's
ability to protect an interest may be impeded or impaired in the non-party's absence; and whether
non-joinder would leave an existing party subject to the substantial risk of incurring double or
inconsistent obligations.  Fed. R. Civ. P. 19(a)(1).  PHEAA's arguments that ED is a necessary
party because it has an interest in the uniform servicing of loans and has exclusive enforcement
authority over servicers fail for the same reasons as its preemption arguments discussed above.
Proceeding without ED would not impair ED's ability to protect its interest in federal loans or to
oversee administration of the federal loan program because this action does not seek to modify

ED's contracts either with federal loan borrowers or with PHEAA, nor does it seek to impose any obligations on PHEAA that are inconsistent with PHEAA's contract with ED.  Accordingly, there is no risk of prejudice to either ED's interest in the federal student loans or ED's interest in contracting with PHEAA.  For the same reason, there is no risk of PHEAA facing multiple or inconsistent obligations in this action.

PHEAA also asserts that permitting this action to proceed would prejudice ED by increasing contracting costs to ED.  However, awarding damages against PHEAA would result in no direct costs to ED, since nothing in PHEAA's contract requires ED to indemnify PHEAA for damages.  Any speculative concern that PHEAA or other servicers could attempt to negotiate higher fees in future contracts with ED is not sufficient to warrant dismissal of a claim under Rule 19(b).  If it were, Rule 19(b) would require dismissal of virtually any case that named a federal contractor, because liability would always raise a speculative risk of increased contracting costs for the federal government.  Rule 19(b) does not provide such broad immunity from liability to federal contractors.[54]

### B.  ED is not an indispensable party under Rule 19(b)

PHEAA also incorrectly asserts that ED is an indispensable party under Rule 19(b). (PHEAA Mem. 38.)  Factors considered in determining whether a party is indispensable include (1) the extent to which a judgment would prejudice the non-party or existing parties; (2) the extent to which any prejudice could be lessened or avoided by protective provisions in the

---

[54] PHEAA also argues that ED's interest in federal student loans would be prejudiced because the subject matter of this action is the availability of federal loan forgiveness, which directly affects the federal Treasury.  However, as set forth *supra* I.B, this action does not challenge any of ED's policies or any federal regulations concerning eligibility for forgiveness.  As a result, there is no risk that this action would expand eligibility to borrowers who are not eligible under federal regulations.

judgment; shaping the relief; or other measures; (3) whether a judgment rendered in the person's absence would be adequate, and (4) whether plaintiff would have an adequate remedy if the action were dismissed.  Fed. R. Civ. P. 19(b).  ED has not been deemed an indispensable party in any of the government enforcement actions by states or by a federal agency that are currently proceeding against student loan servicers.[55]

First, ED is not an indispensable party here because, contrary to PHEAA's claim, the contract between ED and PHEAA is not "the subject of this litigation."  NYAG does not challenge or seek to modify ED's contractual terms, nor enforce ED's contract with PHEAA. Nor does NYAG allege breach of contract.  Thus, *Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369 (S.D.N.Y. 2000), *Envirotech Corp. v. Bethlehem Steel Corp.*, 729 F.2d 70 (2d Cir. 1984), and *Yashenko v. Harrah's NC Casino Co., LLC* 446 F.3d 541 (4th Cir. 2006) are irrelevant.

Furthermore, proceeding without ED would not impair ED's ability to protect its interest in federal loans or in its administration of the federal loan program because this action does not seek to modify ED's contract with federal loan borrowers or with PHEAA, nor to impose obligations on PHEAA that are inconsistent with PHEAA's contract with ED.  *See, e.g.*, *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1044-45 (9th Cir. 1983) (federal government was not indispensable party in action against federal contractor where plaintiff sought no relief against contractor that would preclude contractor from complying with any

---

[55] Although there are at least seven other government enforcement actions proceeding against student loan servicers, only one has addressed whether ED is an indispensable party – *Massachusetts v. Pa. Higher Educ. Assistance Agency*, 2018 WL 1137520, at *10, where the court held that ED was *not* an indispensable party.  PHEAA also raised the issue in *Pa. Higher Educ. Assistance Agency v. Perez*, No. 18-cv-1114, 2019 WL 4393592 (D. Conn. Sept. 13, 2019), an action by PHEAA against ED and Connecticut challenging a state licensing law that required PHEAA to produce documents in violation of a directive of ED.  In that case, the court found that ED was necessary and joinable and thus did not reach the question of whether ED was indispensable.  ED has *never* sought to be treated as an indispensable party in any of these cases.

federal government directive).  Even if there was any risk of imposing inconsistent obligations, the Court could use its broad discretion to craft injunctive relief to lessen or avoid any potential risk of prejudice to non-parties or existing parties.  In a similar consumer-protection action brought by the Massachusetts Attorney General against PHEAA, the court held that ED was not indispensable because "any relief against PHEAA could be structured so as not to interfere or otherwise conflict with the Department's legal rights."  *Massachusetts v. Pa. Higher Educ. Assistance Agency*, 1784-cv-026682, 2018 WL 1137520, at *10 (Mass. Super. Mar. 1, 2018).

PHEAA also asserts that ED is an indispensable party because borrowers have an "adequate remedy" for PHEAA's misconduct if the Court were to dismiss for non-joinder of ED; *i.e.,* that borrowers can complain to ED.  This ignores that the State is statutorily authorized to bring this action to enjoin deceptive, unfair and abusive practices.  It also ignores that ED does not offer borrowers an adequate remedy since PHEAA does not consistently inform borrowers that complaining to ED is even an option, relies on borrowers to identify PHEAA's errors.  (*See* Compl. ¶¶  105, 146-56, 269-73.)

The cases relied on by PHEAA do not support PHEAA's assertion that ED is indispensable.  PHEAA cites *Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 548 (2d Cir. 1991), to inaccurately suggest that where an indispensable non-party is immune from suit, the non-party's immunity outweighs all of the Rule 19(b) factors and requires dismissal. However, the Second Circuit made clear in *Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 359-60 (2d Cir. 2000), that a non-party's immunity from suit does not override consideration of the Rule 19(b) factors.  In *Bassett*, the Second Circuit held that a district court erred in dismissing claims on grounds of non-joinder of an Indian tribe because the district court failed to analyze Rule 19(b) factors including "how or in what respects the Tribe's interests would be

48

impaired." *Id*. at 360, n.15.  Thus, ED's immunity is not, by itself, sufficient to render ED indispensable.

Two Shields v. Wilkinson, 790 F.3d 791 (8th Cir. 2015), *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455 (10th Cir. 1987), and *McKenna v. Udall*, 418 F.2d 1171 (D.C. Cir. 1969), are also inapposite.  These cases all involve allegations of illegal conduct by a non-party.  No such allegations are made here.  *See FMH Constructors, Inc. v. Canton Hous. Auth.*, 779 F.Supp. 677, 685-86 (N.D.N.Y. 1992).  ("[P]laintiffs do not allege that HUD misinterpreted or violated its own regulations or guidelines.  Nor are they challenging the legality of HUD's action under a statute….Under these circumstances, HUD can hardly be considered an indispensable party.").

Dawavendewa v. Salt River Project Agric. Improvement and Power Dist., 276 F.3d 1150 (9th Cir. 2002), is also not on point.  In *Dawavendewa*, the plaintiff challenged a racially-discriminatory hiring practice that was contractually mandated by a non-party Indian tribe.  There, the court held that the tribe was an indispensable party because it would not be bound by a judgment and could enter into new contracts containing the same illegal hiring terms.  Unlike *Dawavendewa*, this action does not challenge the legality of ED's policies or of ED's contractual terms with PHEAA.  ED's continued ability to contract with other servicers is thus irrelevant.

## VI.    THE NYAG MAY RECOVER PENALTIES UNDER THE DODD-FRANK ACT

PHEAA inaccurately argues that NYAG is not permitted to pursue civil penalties under the Dodd-Frank Act.  (PHEAA Mem. 40)  It is unnecessary, and in fact premature, for the Court to rule on the relief sought at the motion to dismiss stage.  Where a motion to dismiss challenges a form of damages, not a claim, courts have denied such motions as procedurally premature.  *See Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 536 (S.D.N.Y. 2013) (denying motion to dismiss plaintiffs' request for punitive damages as procedurally premature because "a motion to dismiss is addressed to a 'claim' – not to a form of damages"); *Denton v. McKee*, 332

F. Supp. 2d 659, 667 (S.D.N.Y. 2004) (denying motion to dismiss as premature "to the extent it seeks to preclude certain categories of damages"); *Burrell v. State Farm & Cas. Co.*, 226 F. Supp. 2d 427, 440 (S.D.N.Y. 2002) (denying motion to strike request for punitive damages because motion "address[es] the relief to which the plaintiffs are entitled rather than the sufficiency of the claims in the pleadings, and it would be premature to address these issues before these claims have been decided.").

Moreover, PHEAA is incorrect in asserting that the NYAG is not permitted to pursue civil penalties under Dodd-Frank. Dodd-Frank provides state attorneys general with authority to enforce the Dodd-Frank Act and "to secure remedies under provisions of this title." 12 U.S.C. § 5552(a)(1). The Act further provides that "any person that violates" any provision of the Act shall pay a civil penalty and provides that either the Bureau or a court may impose penalties. § 5565(c)(3). Although § 5565(c)(5) provides that penalties may only be imposed where a court has entered judgment "in favor of the Bureau," this provision encompasses suits by state attorneys general proceeding in the shoes of the Bureau under Dodd-Frank. Multiple courts have recognized state attorneys' general authority to recover civil penalties pursuant to Dodd-Frank. *See, e.g.*, *New Mexico ex. rel. Balderas v. Real Estate Law Center, P.C.*, 405 F. Supp. 3d 1233, 1259 (D.N.M. 2019) (state attorney general entitled to discovery relevant to determining appropriate penalties under Dodd-Frank); *Office of the Attorney Gen. v. Berger Law Group, P.A.*, 8:14-cv-1825, 2015 WL 5922933, at *9 (M.D. Fla. Oct. 9, 2015) (awarding civil penalties to state attorneys general pursuant to Dodd-Frank). No court that has held that state attorneys general lack authority to recover civil penalties under Dodd-Frank.

## CONCLUSION

For the reasons given above, the Court should deny PHEAA's motion to dismiss.

Dated: February 28, 2020
       New York, NY


                                        /s/Sarah E. Trombley

                                        Sarah E. Trombley
                                        Assistant Attorney General
                                        Consumer Frauds and Protection Bureau
                                        28 Liberty St.
                                        New York, NY 10005
                                        Carolyn Fast
                                        Assistant Attorney General
                                        Consumer Frauds and Protection Bureau

                                        *Of counsel:*

                                        Jane M. Azia
                                        Bureau Chief
                                        Consumer Frauds and Protection Bureau

                                        Laura Levine
                                        Deputy Bureau Chief
                                        Consumer Frauds and Protection Bureau