UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PEOPLE OF THE STATE OF NEW
YORK, *by Letitia James, Attorney General
of the State of New York*,

Plaintiff,

– against –

PENNSYLVANIA HIGHER EDUCATION
ASSISTANCE AGENCY, *d/b/a* FEDLOAN
SERVICING *and* AMERICAN EDUCATION
SERVICES,

Defendant.

**OPINION & ORDER**

19 Civ. 9155 (ER)

RAMOS, D.J.:

This case concerns the administration of the student loans serviced by the

Pennsylvania Higher Education Assistance Agency ("PHEAA"). According to the New

York Attorney General ("NYAG"), who brings this suit, PHEAA, the exclusive servicer

of loans in the Public Service Loan Forgiveness program, engages in unfair, deceptive,

and abusive practices in violation 12 U.S.C. § 5531 (Dodd-Frank), fraud and repeated

and persistent illegal conduct in violation of New York's Executive Law § 63(12), and

deceptive acts and practices in violation of New York's General Business Law § 349.

PHEAA moves to dismiss NYAG's claims, arguing that (1) it is entitled to derivative

sovereign immunity under *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940); (2) the

claims are barred under the doctrine of intergovernmental immunity; (3) the claims are

not ripe for adjudication; (4) the state law claims are preempted by the Higher Education

Act ("HEA"); and (5) the NYAG has failed to join the U.S. Department of Education

("DOE"), which it argues is a necessary and indispensable party under Fed. R. Civ. P. 19.

PHEAA also claims that the NYAG is not entitled to pursue civil penalties under the

Consumer Financial Protection Act.

For the forgoing reasons, PHEAA's motion is GRANTED in part and DENIED in part.

## I.    FACTUAL BACKGROUND

The following facts are taken from the Complaint and are presumed to be true for purposes of deciding this motion.

### A.    PHEAA

PHEAA is a large student loan servicer, which services approximately 20 percent of the nation's student debt, including the loans of tens of thousands of New York residents.  (Compl. ¶¶ 32, 35.)  It operates under the names FedLoan Servicing ("FedLoan") and American Education Services ("AES").  (*Id.* ¶ 7.)  FedLoan services direct loans (loans made directly by the federal government) and loans made by the (now-discontinued) Federal Family Education Loan Program ("FFEL") that are owned by the federal government.  (*Id.*)  AES services private loans and FFEL loans owned by private entities.  (*Id.*)

### B.    PSLF and IDR Plans

The NYAG's claims focus on, though do not necessarily exclusively pertain to, two programs that PHEAA administers, the Public Service Loan Forgiveness Program ("PSLF") and income-driven repayment ("IDR") plans.

PSLF was established by Congress in 2007.  (*Id.* ¶ 2.)  Its aim is to encourage students to work in public service jobs, which are frequently low-paying, by offering student loan forgiveness to those who make 120 monthly payments, while working full-time for a qualifying public service employer.  (*Id.* ¶ 62-64.)  Given the terms of the program, fall 2017 was the earliest any borrower could have completed the 120 qualifying payments requirement and seek loan forgiveness under the program.  (*Id.* ¶ 73.)  As of June 2019, more than 90,000 borrowers applied for loan forgiveness through

PSLF, but only approximately one percent had their loans discharged. [1] (*Id.* ¶ 75.) PHEAA has an exclusive contract with the U.S. Department of Education ("DOE") to service loans of borrowers seeking PSLF. (*Id.* ¶ 8.)

IDR plans also allow for loan forgiveness. IDR plans are meant to assist borrowers who are struggling financially avoid delinquency and default. (*Id.* ¶17.) IDR plans lower monthly payments based on income and household size, and allow for the borrower's remaining loan balance to be forgiven if the borrower makes payments for a specified period, typically twenty or twenty-five years. (*Id.* ¶¶ 17, 53, 201 n. 24.)

      C.    <u>PHEAA's Alleged Conduct</u>

In this action, the NYAG does not challenge the terms of the loans at issue, the statutes or regulations governing student loans, nor the policies of the Department of Education. Rather, the Complaint focuses on PHEAA's administration of the loans it services, asserting that PHEAA provides borrowers with incorrect and misleading information with regards to the loans it services. According to the Complaint, PHEAA's "deceptive, unfair, and abusive conduct . . . is a significant contributor" to the low PSLF approval rate. (*Id.* ¶ 75.) Broadly speaking, the Complaint charges PHEAA with four types of wrongdoing:

---

[1] The case appears to be part of a spate of recent cases brought by government enforcement agencies against student loan servicers (*see* Opp. at 47 n. 55 (noting at least seven such cases)), as well claims brought by private plaintiffs relating to PSLF. *See, e.g.*, *Commonwealth of Massachusetts v. Pennsylvania Higher Education Assistance Agency d/b/a FedLoan Servicing*, No. 1784 Civ. 02682 (KWS) (Mass. Super. filed Aug. 23, 2017); *Daniel v. Navient Solutions, LLC*, No. 8:17 Civ. 2503 (SCB) (M.D. Fla. filed Oct 25, 2018); *Love et al. v. Pennsylvania Higher Education Assistance Agency*, No. 19 Civ. 2387 (JPB) (M.D. Ga. filed May 24, 2019); *Winebarger v. Pennsylvania Higher Education Assistance Agency et al.*, No. 2:19 Civ 1503 (JFW) (C.D. Cal. filed Feb. 28, 2019); *Commonwealth of Pennsylvania v. Navient Corporation et al.*, No. 3: 17 Civ. 1814 (RDM) (M.D. Pa. filed Oct. 5, 2017); *CFPB v. Navient Corp.*, No. 17 Civ. 101 (M.D. Pa. filed Jan. 18, 2017); *Lawson-Ross, et al.* v. *Great Lakes Higher Education Corp.*, No. 1:17 Civ. 253 (MEW) (N.D. Fla. filed Oct 16, 2017); *Hyland, et al. v. Navient Corp. et al,* No. 18 Civ. 9031 (DLC) (S.D.N.Y. filed Oct. 3, 2018). These cases are at various procedural postures; some have been dismissed.

1.     *PHEAA Provides Borrowers With Inaccurate Information Leading to Undercounting and Delays in Loan Forgiveness*

The NYAG alleges that PHEAA provides borrowers with incorrect information about their loans.  For example PHEAA is responsible for determining whether a borrower's payment counts towards the 120 needed for PSLF loan forgiveness (payments must be made on-time, for the full amount, and while the borrower is enrolled in an eligible loan repayment plan and working full-time for a qualified employer), but frequently misrepresents to borrowers the number of PSLF-qualifying payments they have made.  (*Id.* ¶¶ 68, 76-112.)  Among the reasons for this misrepresentation is that PHEAA relies on inaccurate processes, lacks quality control mechanisms to ensure its information is correct, and fails to locate missing records (*Id.* ¶¶ 91-96, 103, 111.)  PHEAA's processes leads to undercounting the number of PSLF-qualifying loans a borrower has made, which causes improper denials of loan forgiveness applications, delays loan forgiveness, and prolongs the time that borrowers are in repayment.  (*Id.* ¶¶ 116, 124.)

PHEAA also allegedly miscalculates the amount of the monthly payment borrowers must make under IDR plans, sometimes by hundreds of dollars.  (*Id.* ¶¶ 180, 183-190.)  While borrowers may be able to consult online calculators for estimates, PHEAA is responsible for making the ultimate payment amount calculation.  (*Id.* ¶ 179.)  Borrowers who have applied for IDR plans are typically those who already have difficulty making payments, and inaccurately high bills force borrowers to choose between trying to make a payment that is far more than they are actually required to make, loan delinquency, or requesting a forbearance (a period in which no payment is due while PHEAA resolves its mistakes), but which increases costs on borrowers sometimes by hundreds or thousands of dollars and can delay forgiveness.  (*Id.* ¶¶ 178, 191-205.)

>2.      *PHEAA Delays in Providing Borrowers Information and*
>        *Processing Paperwork, Further Delaying Forgiveness*

The Complaint also alleges that PHEAA delays in providing borrowers with information and processing paperwork.  For example, the Complaint alleges that PHEAA can take many months, and sometimes over a year, to provide explanations to borrowers for PSLF payment count determinations, and on occasion, never does.  (*Id.* ¶¶ 128-156.) These delays harm borrowers because they may be unable to rectify the conditions that disqualify their payments, delaying their ability to obtain forgiveness, and may cause them to leave the program.  (*Id.* ¶¶ 159-170.)

PHEAA also allegedly fails to timely process paperwork with respect to IDR plans.  (*Id.* ¶¶ 175-200.)  For example, it delays so long in recertifying applications (a yearly process in which borrowers verify that they continue to need the IDR plan) that borrowers are dropped from their IDR plans, even though they applied for recertification on time.  (*Id.* ¶¶ 177, 181-182, 206-220.)

>3.      *When Contacted, PHEAA's Provides Borrowers with Incorrect*
>        *Information Further Reducing the Likelihood and Timing of*
>        *Forgiveness*

Moreover, when borrowers contact PHEAA for assistance, they are often provided with incorrect information.  (*Id.* ¶¶ 222-276.)  For example, some borrowers whose payments PHEAA determines to be ineligible for PSLF are told, incorrectly, that there is no way to appeal these decisions.  (*Id.* ¶¶ 268-275.)  Borrowers who feel that it is impossible to challenge errors and that PSLF is out of reach, may also give up on the program altogether.  (*Id.* ¶ 115.)  PHEAA also tells some borrowers that payments made during forbearance cannot qualify for loan forgiveness, while it allows exceptions for borrowers who persist in challenging that determination.  (*Id.* ¶¶ 217 and n. 28, 237.)

Further, PHEAA misrepresents information concerning benefits available to borrowers with cancer.  (*Id.* ¶¶ 316-324.)  Since September 2018, borrowers with cancer are entitled, by statute, to suspend their loan repayment.  (*Id.* ¶ 316.)  But borrowers who

qualify for this program have falsely been told that law is not yet in effect or that the borrower does not qualify for the deferment.  (*Id.* ¶¶ 317-318.)  Borrowers with cancer, therefore, have been unable to defer payment, and have often had to struggle to repay loans while seeking treatment.  (*Id.* ¶ 320.)

4.      *Forbearance and Consolidation Steering*

Lastly, the Complaint alleges that PHEAA attempts to steer struggling borrowers into forbearance or consolidation, options that are economically beneficial to PHEAA, rather than into IDR plans that can offer lower monthly payments.  (*Id.* ¶¶ 277-315.) Forbearance and consolidation also have negative effects on a borrower's ability to achieve forgiveness and add costs.  While a borrower need not make payments during forbearance, interest continues to accrue, adding hundreds or thousands of dollars to the costs of the loan.  (*Id.* ¶¶ 193-195.)  Moreover, if a borrower nonetheless decides to make payments during forbearance, those payments do not automatically count towards PSLF and IDR forgiveness.  (*Id.* ¶ 202.)  Consolidation, instead, may make a borrower's payments ineligible for PSLF entirely.  (*Id.* ¶ 303.)

With respect to forbearance, the NYAG alleges simply that PHEAA "misrepresents the options available to struggling borrowers by often failing to mention the option to enter IDR and instead steering borrowers into forbearance."  (*Id.* ¶ 287; *see also id.* ¶ 18.)  The Complaint's allegations with respect to consolidation are more robust. For example, the NYAG alleges that PHEAA's website contains a number of pages that promote consolidation often in misleading ways.  (*Id.* ¶¶ 300-309.)  The website allegedly includes a "pros" and "cons" list, a "Consolidation FAQ," and "Consolidation Quiz," all of which mention that consolidation has the potential to lower a borrower's monthly payments by extending the term of the loan and that consolidation may make loans eligible for PSLF.  (*Id.* ¶¶ 302, 305, 307.)  In reality, and as noted above, a borrower who reduces their monthly payments by consolidating and extending the term of their loans will no longer be able to make PSLF-qualifying payments.  (*Id.* ¶ 303.)

Throughout all of this, PHEAA represents to borrowers that it has "one goal:  to help you successfully repay your loans" and that it is "here to help you with every step of the PSLF process."  (*Id.* ¶¶ 15, 286.)

## II.    LEGAL STANDARD

### A.    12(b)(1):  Lack of Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate the case.  Fed. R. Civ. P. 12(b)(1).  The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists.  *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  "On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits. . .."  *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *see also Morrison*, 547 F.3d at 170 (citing *Makarova*, 201 F.3d at 113).  When evaluating a motion to dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as true but does not draw inferences from the complaint favorable to the plaintiff.  *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

### B.    12(b)(6): Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the mis-

conduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 557). However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n. 3 (2d Cir. 2007) (citation omitted), and "a complaint ... does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted). Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable. . ..."). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

### C.    12(b)(7): Failure to Join an Indispensable Party

Rule 19 "sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party" and the burden of showing that a

party is indispensable is on the moving party.  *Greenwich Life Settlements, Inc. v. Viasource Funding Grp., LLC*, 742 F. Supp. 2d 446, 455 (S.D.N.Y. 2010) (quoting *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000)); *King v. Pine Plains Cent. Sch. Dist.*, 918 F. Supp. 772, 782 (S.D.N.Y. 1996).

"First, the court must determine whether an absent party . . . qualifies as a 'necessary' party under Rule 19(a)."  *Greenwich Life Settlements*, 742 F. Supp. 2d 455 (citing *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000)).  If the criteria in 19(a) is met, the absent party must be joined.  *Greenwich Life Settlements, Inc.*, 742 F. Supp. 2d at 455.  An absent party is necessary to a litigation if "the court cannot accord complete relief among existing parties," or the absent party "claims an interest relating to the subject of the action and is so situated that disposing of the action in [that party's] absence may" either "(i) as a practical matter impair or impede [the absent party's] ability to protect the interest or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." *Id.* at 456 (citing Fed. R. Civ. P. 19(a)(1); *see also Johnson v. Smithsonian Inst.*, 189 F.3d 180, 188 (2d Cir. 1999)).

If joinder of the party is not feasible, the court must assess under the second step in Rule 19(b) "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *Id.* at 456; *see also Jota v. Texaco, Inc.*, 157 F.3d 153, 162 (2d Cir. 1998).  "[O]nly where the Court makes a finding that a party is necessary will it continue to the second inquiry."  *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 137 (E.D.N.Y. 2000)); *see also Temple v. Synthes Corp.*, 498 U.S. 5, 8 (1990) (*per curiam*).

"Federal courts are extremely reluctant to grant motions to dismiss based on non-joinder and, in general, dismissal will be ordered only when the defect cannot be cured and serious prejudice or inefficiency will result." *Am. Trucking Ass'n, Inc. v. New York*

*State Thruway Auth.*, 795 F.3d 351, 357 (2d Cir. 2015) (quoting 7 Charles Alan Wright &
Arthur R. Miller, Fed. Practice & Procedure § 1609 (3d ed. 2015).

## III.   DISCUSSION

PHEAA argues that (1) it is entitled to derivative sovereign immunity under
*Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940); (2) the NYAG's claims are barred
under the doctrine of intergovernmental immunity; (3) the claims are not ripe for
adjudication; (4) the state law claims are preempted by the HEA; and (5) the NYAG has
failed to join the DOE, which it argues is a necessary and indispensable party under Fed.
R. Civ. P. 19.  PHEAA also claims that the NYAG is not entitled to pursue civil penalties
under the Consumer Financial Protection Act.  The Court addresses each argument in
turn.

### A.   *Yearsley* Immunity

PHEAA moves to dismiss the Complaint pursuant to Rule 12(b)(1) arguing that
the Court lacks subject matter jurisdiction because PHEAA is entitled to "derivative
sovereign immunity" under *Yearsley*.[2]  (Mot. at 12-17.)

*Yearsley* holds that "'there is no liability on the part of the contractor' who simply
performed as the Government directed" where "the Government's 'authority to carry out
the project was validly conferred, that is, if what was done was within the constitutional
power of Congress.'"  *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 673 (2016)
(quoting *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20-21 (1940).  In *Yearsley*,
plaintiffs sought to recover damages for land that was washed away as the result of work
done by the defendant in building dikes in the Missouri River.  *Yearsley*, 309 U.S. at 19.

---

[2] The NYAG notes, and PHEAA does not dispute, that PHEAA's claim to *Yearsley* immunity does not apply
to FFEL loans given that the Congress waived sovereign immunity with respect to such claims for
noninjunctive relief.  (Opp. at 17 n. 28, Reply at 8 n. 5).  PHEAA also does not dispute that the doctrine is
inapplicable to the NYAG's claims with respect to privately-held FFEL loans, although the NYAG
concedes that the majority of its claims do not relate to these loans.  (*See* Opp. at 16 n. 26; Compl. ¶ 7 n. 4.)
Thus *Yearsley* immunity would apply only to PHEAA's servicing of loans made directly by the federal
government under the Direct Loan program.

In defense, the defendant argued that "the work was done pursuant to a contract with the United States Government, and under the direction of the Secretary of War and the supervision of the Chief of Engineers of the United States, for the purpose of improving the navigation of the Missouri River, as authorized by an Act of Congress." *Id.* Siding with the defendant, the Court held that if the authority "to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." *Id.* at 20-21. The Supreme Court in *Campbell-Ewald Co. v. Gomez*, recently clarified that while government contractors do not share the sovereign immunity of the United States, under *Yearsley* they may sometimes "obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald Co.*, 136 S. Ct. at 672 (quoting *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943).

As a preliminary matter, the NYAG argues that *Yearsley* immunity is not a jurisdictional barrier as PHEAA contends, but rather an issue to be considered on the merits. (Opp. at 13.) As the parties note, the Second Circuit has not weighed in on this question, and its sister circuits have come to differing conclusions—the Fourth Circuit has determined that it is a jurisdictional question, while the Fifth and Sixth Circuits have found that it is not. *See Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir.), *cert. denied*, 139 S. Ct. 417, (2018) ("Recently, in *In re KBR*, this Court reaffirmed that we treat the *Yearsley* doctrine as derivative sovereign immunity that confers jurisdictional immunity from suit.") (citing *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 343 (4th Cir. 2014)); *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009) ("Based on the Supreme Court's actions in *Yearsley*, we hold that concluding *Yearsley* is applicable does not deny the court of subject-matter jurisdiction."); *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 647 (6th Cir. 2015) (*Yearsley* immunity is, in our opinion, closer in nature to qualified immunity for private individuals under

government contract, which is an issue to be reviewed on the merits rather than for jurisdiction.")

Because sovereign immunity deprives federal courts of jurisdiction, much of the debate between the Circuits about whether *Yearsley* is a jurisdictional bar has involved discussion about whether *Yearsley* is based on sovereign immunity—a finding that *Yearsley* is grounded in the doctrine of sovereign immunity would suggest that the defense is jurisdictional in nature; the opposite would suggest that it is a merits question. *See*, *e.g.*, *Ackerson*, 589 F.3d at 207 ("If the basis for dismissing a *Yearsley* claim is sovereign immunity, then a *Yearsley* defense would be jurisdictional:  sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.")  As the Fourth and Fifth Circuits note, however, *Yearsley* does not address sovereign immunity.  *See id*. ("[T]he Court's opinion in *Yearsley* itself countenances against its application to deprive the federal courts of jurisdiction. *Yearsley* does not discuss sovereign immunity or otherwise address the court's power to hear the case.") Indeed, the Supreme Court in *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016), further suggested that the federal government's sovereign immunity does not cloak the actions of contractors.  *See* 136 S. Ct. at 672 ("Do federal contractors share the Government's unqualified immunity from liability and litigation?  We hold they do not.")

Moreover, the Second Circuit has treated the contractor defense outlined in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1998), which also traces its origins to *Yearsley*, 487 U.S. 500 (1998), as a defense on the merits, rather than a jurisdictional bar.[3]

---

[3] Despite not arguing the applicability of the contractor defense outlined in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1998), PHEAA requests permission to file supplemental briefing on the issue in the event that the "Court believes that the *Boyle* immunity analysis may apply."  (Mot. at 14 n. 2.)  PHEAA had ample opportunity to discuss the doctrine if it believed it meritorious, indeed the Court agreed to double the page limit typically applied to motion papers.  Having chosen not to do so, the argument has been waived for purposes of this motion.  The Court does not presently take a position on whether the contractor defense has been waived in its entirety, as the NYAG argues.  (*See* Opp. at 25 n. 39.)

*See, e.g.*, *Lewis v. Babcock Indus., Inc.*, 985 F.2d 83 (2d Cir. 1993)  The Court, therefore, finds that *Yearsley* immunity is a merits, as opposed to a jurisdictional, question.

Applying the doctrine to the facts here, the Court does not find that *Yearsley* immunity requires dismissal at this juncture.  Construing the facts in "light favorable to the party seeking to avoid summary disposition," as ordered by *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. at 673, the Court does not find that in performing the conduct alleged in the Complaint, PHEAA "simply performed as the Government directed."  *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. at 673.

While PHEEA contends that the DOE directs various aspects of its performance, it does not point to any evidence that in performing the complained-of conduct, it simply followed the DOE's instructions.[4]  It does not argue that the DOE instructed it to incorrectly report to borrowers the number of PSLF-qualifying payments borrowers made, to provide incorrect monthly payment amounts in IDR plans, to fail to recertify applications in a timely fashion, or any of the other conduct that forms the basis of the NYAG's Complaint.  Such an argument would strain credulity.

PHEAA cites only to a portion of its contract with the DOE that provides that PHEAA "shall be responsible for resolving all deficiencies identified during audits and participating in corrective action plans as needed."  (Mot. at 16 (quoting Burke Decl. Ex. 1, Servicing Contract, A-1 at 7.)  PHEAA contends that this clause "unambiguously anticipates that PHEAA's performance of its contractual obligations will at times include servicing errors" (Mot. at 16.), but, even if that is the case, it is a far cry from authorizing, much less directing, PHEAA to make errors.  Nor does it immunize PHEAA

---

[4] PHEEA argues that the NYAG "does not allege that PHEAA violated any specific federal loan-servicing regulation, or acted in contravention of any federal directive."  (Mot. at 16.)  The NYAG emphatically denies this (Opp. at 19-20), but, at this juncture, it is not the NYAG's burden to establish that *Yearsley* immunity does not apply, but PHEAA's to establish that it does.  *See, e.g.*, *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (on a motion to dismiss defendants "bear the burden of establishing qualified immunity. (citing *Vincent v. Yelich,* 718 F.3d 157, 166 (2d Cir. 2013)).

from liability for any errors it may make.  The "driving purpose of derivative sovereign immunity 'is to prevent the contractor from being held liable when the government is actually at fault but is otherwise immune from liability.'"  *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 70 (D.C. Cir. 2019) (quoting *In re World Trade Center Disaster Site Litig.*, 456 F. Supp. 2d 520, 560 (S.D.N.Y. 2006).  By anticipating that certain errors may occur and requiring that, when they do in certain instances, PHEAA is responsible for rectifying them, the DOE is not the party actually at fault for PHEAA's alleged misconduct.

Accordingly, the record at this stage does not permit the Court to dismiss the Complaint under *Yearsley*.  *See In re U.S. Office of Pers. Data Sec. Breach Litig.*, 928 F.3d at 69–70 ("Unsurprisingly, KeyPoint does not argue that OPM authorized and directed it to design its system with the security flaws that Arnold Plaintiffs identify.  So KeyPoint cannot wrap itself in derivative immunity garb on the ground that it simply performed as the Government directed.") (internal quotations omitted).

B.    Intergovernmental Immunity

PHEAA also argues that the intergovernmental immunity doctrine provides another jurisdictional bar to the NYAG's state law claims.[5]  (Mot. at 17-20.)  PHEAA cites no authority in support of its claim that the doctrine is a jurisdictional one, and the Court sees no reason to so find.  As the NYAG notes, the Supreme Court has not treated it as such.  *See, e.g.*, *North Dakota v. United States*, 495 U.S. 423 (1990).

Regardless of whether intergovernmental immunity is a jurisdictional or merits question, the Court does not find that the intergovernmental immunity doctrine requires dismissal of the NYAG's claims.

---

[5] As the NYAG notes in its opposition brief, its Dodd-Frank claims would not appear to be implicated by PHEAA's assertion of intergovernmental immunity (*see* Opp. at 30 n. 43), a point to which PHEAA's does not respond.

Contrary to PHEAA's assertions, the doctrine does not prohibit the application of laws of general applicability to government contractors.  (Mot. at 17-18.)  The Supreme Court has "thoroughly repudiated" the view that "any state regulation which indirectly regulates the Federal Government's activity is unconstitutional."  *North Dakota v. United States*, 495 U.S. at 434–35 (citing *James v. Dravo Contracting Co.*, 302 U.S. 134 (1937); *South Carolina v. Baker*, 485 U.S. 505, 520 (1988)).  Rather, the burdens imposed on the federal government by a neutral state law, as those here, have been recognized as "but normal incidents of the organization within the same territory of two governments." *North Dakota*, 495 U.S. at 435 (quoting *Helvering v. Gerhardt*, 304 U.S. 405, 422 (1938)).

Pursuant to the doctrine of intergovernmental immunity, a "state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals."  *North Dakota*, 495 U.S. at 435 (citing *South Carolina*, 485 U.S. at 523; *United States v. County of Fresno,* 429 U.S. 452, 460 (1977)).  The Supreme Court has urged "a functional approach to claims of governmental immunity, accommodating of the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State Governments."  *Id.* (citing *County of Fresno,* 429 U.S. at 467–468).  Because "'a [state] regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself,' intergovernmental immunity may apply to state regulation that impacts government contractors."  *Student Loan Servicing All. v. D.C.*, 351 F. Supp. 3d 26, 73 (D.D.C. 2018) (quoting *North Dakota*, 495 U.S. at 438).

PHEAA argues that the state laws at issue here, Executive Law § 63(12) and GBL § 349, are a direct regulation of the federal government.  (*See* Repl. at 12 n. 8.)  But PHEAA's unduly expansive view that "'[d]irect regulation' occurs when a state interferes with federal functions by mandating that the federal government (or its contractor)

comply with state-law procedures or standards" is plainly incorrect.  *See North Dakota*, 495 U.S. at 435 (The burdens imposed on the federal government by a neutral state law are "but normal incidents of the organization within the same territory of two governments.") (quoting *Helvering v. Gerhardt*, 304 U.S. 405, 422 (1938)); Mot. at 18. Indeed, PHEAA's contract with the Department of Education specifically requires that PHEAA "will be responsible for maintaining a full understanding of all federal and state laws and regulations . . . ensuring that all aspects of the service continue to remain in compliance as changes occur."  (Burke Decl. Ex. 1, Servicing Contract, at § C.1.4.3.)

PHEAA argues that the NYAG "through its application of Executive Law § 63(12) and GBL § 349 attempts to mandate the ways in which PHEAA renders services that the Department [of Education] hires PHEAA to perform."  (Mot. at 19.)  Specifically, it argues that the "NYAG seeks to require PHEAA to provide federal student loan borrowers, at specific times and in specific ways, with information about federal repayment provisions, including PSLF payments, monthly loan payment amounts, repayment options, loan consolidation, and cancer deferments."  (*Id*. (citing Compl. ¶¶ 350a-h, 355a-h, 359a-h).)  PHEAA argues, presumably, that this constitutes direct regulation of the federal government.  (*Id*.)  As discussed further below (*see infra* Section (III)(D)(1)), however, the Court rejects this characterization of the Complaint (with one exception, which the Court dismisses on preemption grounds).  As mentioned above, the NYAG takes no issue with the policies or procedures of the loan programs serviced by PHEAA on behalf of the federal government.  The NYAG does not seek to impose new disclosure requirements on PHEAA, but rather seeks to prevent PHEAA from making affirmative disclosures that are false, misleading, or otherwise unlawful.  Merely applying a state law to a federal government contactor and thereby seeking to enjoin

alleged illegal practices does not transform an otherwise neutral law into a direct regulation of the federal government.[6]

PHEAA argues this case is "most akin" to *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014) and *Blackburn v. United States*, 100 F.3d 1426 (9th Cir. 1996). An examination of those cases rather highlights their distance from the facts here.

*Boeing* concerned a California regulation regarding cleanup activities at the Santa Susana Field Laboratory site, where the Department of Energy and NASA tested rockets, nuclear reactors, and other nuclear applications. *Boeing*, 768 F.3d at 834. These agencies contracted with Boeing to assist them, and after the research was completed, hired Boeing to clean up the radioactive contamination at the Santa Susana site. *Id*. at 835-36. The statute being challenged was hardly one of "general applicability." It was titled "Cleanup of Santa Susana Field Laboratory" and prescribed cleanup standards for the site specifically. It specifically authorized California's Department of Toxic Substances Control to use legal remedies to "to compel a responsible party or parties" to take remedial action, and defined the Department of Energy as a responsible party. *Id*. at 839. PHEAA points to nothing in the statutes here that could be read as similarly targeting the federal government. Neither Executive Law § 63(12) nor GBL § 349 contains language

---

[6] There is some precedent to suggest that laws of general applicability can be seen to directly regulate the federal government where the law would impair the federal government's ability to carry out its functions. *See, e.g.*, *United States v. Virginia*, 139 F.3d 984, 987-89 (4th Cir. 1998) (finding that Supreme Court precedent precluded application of Virginia's licensing and registration requirements to private investigators working solely for the FBI in conducting background checks because Congress mandated the FBI to "select the low-cost 'responsible' bidder" and the FBI believed that application of state law would result in a "shortage or at least substantial delays in finding and ensuring the reliability of new investigators.") But requiring PHEAA not to make misrepresentations to borrowers can hardly be seen as impeding the federal government's functions or interfering with a congressional mandate. Further the Fourth Circuit in *United States v. Virginia* relied, almost exclusively, on *Leslie Miller v. Arkansas*, 352 U.S. 187 (1956), which the plurality opinion in *North Dakota* characterized as a decision on preemption, rather than intergovernmental immunity. *See North Dakota*, 495 U.S. at 435 n. 7.

that similarly makes clear that their purpose is to directly regulate the federal government.[7]

Blackburn concerned the application of a state safety regulation to Yosemite National Park.  100 F.3d at 1435.  The Ninth Circuit determined that application of the law would constitute "a direct and intrusive regulation by the State of the Federal Government's operation of its property at Yosemite."  (Id.)  PHEAA argues Blackburn is similar to the instant action because both relate to the federal government's property. (Repl. at 13.)  But NYAG does not seek here to regulate the direct loans owned by the federal government or impose new requirements on those loans, but rather apply laws of general applicability to PHEEA's allegedly illegal conduct with respect its customers. See North Dakota, 495 U.S. at 434, 436 (Concerns of direct interference not implicated where states "reporting requirement and the labeling regulation operate against suppliers [of liquor to military bases], not the Government" and noting that the Supreme Court has "decisively rejected the argument that any state regulation which indirectly regulates the Federal Government's activity is unconstitutional."); see also Washington v. GEO Grp.,

---

[7] Executive Law § 63(12) provides in relevant part:

Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of section four hundred forty of the former penal law" or section one hundred thirty of the general business law, and the court may award the relief applied for or so much thereof as it may deem proper.

General Business Law § 349 provides in relevant part:

 (a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

(b) Whenever the attorney general shall believe from evidence satisfactory to him that any person, firm, corporation or association or agent or employee thereof has engaged in or is about to engage in any of the acts or practices stated to be unlawful he may bring an action in the name and on behalf of the people of the state of New York to enjoin such unlawful acts or practices and to obtain restitution of any moneys or property obtained directly or indirectly by any such unlawful acts or practices.  In such action preliminary relief may be granted under article sixty-three of the civil practice law and rules.

*Inc.*, No. 3:17 Civ. 05806 (RJB), 2018 WL 6448778, at *3-4 (W.D. Wash. Dec. 10, 2018) (finding no direct regulation of federal government where state sought to apply minimum wage law to contractor operating detention facility where minimum wage law imposed no duty on the federal government itself and did not "directly obstruct the activities of the Federal Government.")  In any event, the Court finds *Blackburn*'s discussion of intergovernmental immunity to be of limited persuasive value.  It consists of two sentences, one which describes the doctrine, the other which applies it without citation to authority.  *See Blackburn*, 100 F.3d at 1435.  This cursory treatment is understandable given that in the paragraph prior, the court concluded that the defendant, the United States, was immune from suit under the doctrine of sovereign immunity.  *See id.*  The intergovernmental immunity discussion was merely additive.

Accordingly, the Court does not dismiss the Complaint on grounds of intergovernmental immunity.

C.     Ripeness

PHEAA argues that the Court cannot hear the NYAG's claims with respect to borrowers who have not yet made 120 payments because the claims are not ripe.  (Mot. at 20-24.)  PHEAA argues that the injury to these borrowers relies on the occurrence of a string of events that may not happen, including that the borrowers continue to make on-time payments, work for qualifying borrowers, remain on a qualifying repayment plan, and not abandon the program.  (Mot. at 23.)  PHEAA argues the claims are neither constitutionally nor prudentially ripe.

Ripeness is a twofold inquiry, including both constitutional and prudential questions.  *See Simmonds v. I.N.S.*, 326 F.3d 351, 356–58 (2d Cir. 2003).  "The first of these ripeness requirements . . . goes, in a fundamental way, to the existence of jurisdiction."  *Id.* at 357.  Constitutional ripeness "prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it."  *Id.*  However, prudential ripeness "is a more

flexible doctrine of judicial prudence, and constitutes an important exception to the usual rule that where jurisdiction exists a federal court must exercise it." *Id.* "[W]hen a court declares that a case is not prudentially ripe, it means that the case will be better decided later and that the parties will not have constitutional rights undermined by the delay." *Id.*

### 1.   *Constitutional Ripeness*

Under Article III of the Constitution, a case or controversy must be ripe for adjudication in order to prevent judicial entanglement "in abstract disagreements over administrative policies," and to avoid interference with an administrative decision before it "has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–149 (1967) (internal quotation marks omitted). "Often, the best way to think of constitutional ripeness is as a specific application of the actual injury aspect of Article III standing." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013). The first requirement of constitutional standing is that "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations and citations omitted). "[T]o say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical.'" *Nat'l Org. for Marriage*, 714 F.3d at 688 (quoting *Lujan*, 504 U.S. at 560). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotations and citations omitted).

While at least two courts examining similar claims against PHEAA have dismissed the actions on ripeness grounds, finding that plaintiffs had not suffered an actual and imminent injury, this case is distinct in at least one notable respect:  it is an

enforcement action brought by a government agency, not by private plaintiffs. [8]  *See Winebarger v. Pennsylvania Higher Education Assistance Agency, et al.* 411 F. Supp. 3d 1070, 1088 (C.D. Cal. 2019); *Love, et al.* v. *Pennsylvania Higher Education Assistance Agency*, 19 Civ. 02387 (JPB), Dkt. No.  32 (Mar. 16, 2020 N.D. Ga.).  And, the Supreme Court has recognized that a sovereign is injured by a violation of its law.  *See Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) ("It is beyond doubt that the complaint asserts an injury to the United States—both the injury to its sovereignty arising from violation of its laws (which suffices to support a criminal lawsuit by the Government) and the proprietary injury resulting from the alleged fraud.") *Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321, 1326 (Fed. Cir. 2010) ("From the government's perspective, a harm arises from an 'injury to its sovereignty arising from violation of its laws.'") (quoting *Vermont Agency,* 529 U.S. at 771).

In its reply brief, because *Vermont Agency* concerned an issue of standing, PHEAA appears to argue that this injury might be sufficient to establish standing but that it is insufficient for purposes of ripeness.  (Repl. at 8-9, n. 6.)  As, PHEAA conceded in its moving papers, however, "courts apply the same analysis for constitutional ripeness that they apply for the injury-in-fact" standing analysis.[9]  (Mot. at 22 (citing *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013).  Indeed, the Second Circuit

---

[8] To be clear, the Court does not hold that the injuries to borrowers are not relevant to either the constitutional or prudential ripeness inquiry.  Rather, because the Court finds that the NYAG is harmed by a violation of the laws it is tasked with enforcing, it need not also analyze PHEAA's contention that borrowers who have not yet made 120 qualifying payments have not been harmed by the alleged conduct, a claim of which the Court is skeptical.  A theme of the NYAG's Complaint is that PHEAA's conduct prevents borrowers from reaching 120 qualifying payments.  (*See, e.g.*, Compl. ¶¶ 113, 115, 158-160, 169.)  Moreover, as the NYAG notes, the Complaint "alleges that tens of thousands of borrowers nationally have reached 120 Qualifying Payments, and some have been wrongfully denied forgiveness."  (Opp. at 27.)  PHEAA dismisses this as a conclusory allegation, but the Complaint makes clear that this allegations rests on reporting from the DOE that fewer than 900 of the 90,000 borrowers who applied for PSLF forgiveness were granted it, and that over half of those who were denied "were deemed to qualify for the program based on employment, repayment plan, and loan type, but were denied based on FedLoan's finding that the applicant had not made 120 PSLF-qualifying payments."  (Compl. ¶¶ 117-118.)

[9] In its reply brief, PHEAA argues that the focuses of the standing and ripeness doctrines are different, the former focusing on the party seeking to bring the claim to court, the latter on whether the issues are fit for judicial resolution.  (Repl. at 9 n. 6.)  This conceptual difference does not alter the analysis at hand.

has recognized that injuries that are "actual and imminent" to establish Article III standing also establish that a claim is "ripe for adjudication, 'not merely speculative or hypothetical.'"  *Walsh*, 714 F.3d at 688-89 (citing *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 226 (2d. Cir. 2008)).  PHEAA's assertion that holding that a violation of a statute suffices for both ripeness and standing would allow a case to proceed "even without a showing of harm" misunderstands that the relevant harm is not simply to the borrowers, but to the sovereign as well.  (Repl. at 9 n. 6.)  PHEAA does not cite any precedent for finding a claim unripe where a sovereign is bringing an enforcement action for an alleged current or past violation of law.  Accordingly, the Court finds the claims constitutionally ripe.

### 2. *Prudential Ripeness*

"Prudential ripeness is . . . a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial."  *Simmonds v. I.N.S.*, 326 F.3d 351, 359 (2d Cir. 2003) (citation omitted).  To determine whether a claim is prudentially ripe, courts in this Circuit consider "(1) 'the fitness of the issues for judicial decision' and (2) 'the hardship to the parties of withholding court consideration.'"  *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 104 (2d Cir. 2014) (quoting *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005)).  "The fitness analysis is concerned with whether the issues sought to be adjudicated are contingent on unknowable future events."  *Id.* (citing *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 132 (2d Cir. 2008)).  As to the second prong, "'[t]he mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship.'"  *Grandeau*, 528 F.3d at 134 (quoting *Simmonds*, 326 F.3d at 359).

As NYAG notes, the Supreme Court recently cast doubt on the "continuing vitality" of the prudential standing doctrine, noting that it stands in "tension with [the

Supreme Court's] recent reaffirmation of the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'"  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014).  Since *Driehaus*, at least one Court in this District has held that given that decision, "the Court would have to find overwhelming prudential considerations to decline jurisdiction on" prudential ripeness grounds.  *Vullo v. Office of Comptroller of Currency*, 378 F. Supp. 3d 271, 288 (S.D.N.Y. 2019).

The Court finds no such overwhelming prudential considerations here.  Again, PHEAA focuses its analysis of harm to those experienced by borrowers, rather than those to the sovereign whose laws have been violated, as the Court believes is appropriate here. The NYAG alleges that it has already been injured by PHEAA's violations of state and federal law and the issues here are presently fit for adjudication—they "are [not] contingent on future events or may never occur," the focus of the fitness inquiry.  *See Simmonds*, 326 F.3d at 359.  Further, the Court finds that the NYAG would suffer hardship by delaying a resolution of its contentions that PHEAA has already violated the laws it is tasked with enforcing.  That borrowers who have not made 120 qualifying payments may never do so, or that the statutes might be amended, as PHEAA speculates may be the case (Mot. at 25), do not affect the claims here.[10]  *See Simmonds v. I.N.S.*, 326 F.3d at 359 (Issues are "deemed ripe when they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now.") (citing *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 479 (2001); *Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 81-82 (1978)).

---

[10] The Court notes that PHEAA does not appear to argue that the statutes under which the NYAG brings its claims here may be changed, but that "Congress or the Department may change its directives and policies to allow for past ineligible payments to become eligible."  (Mot. at 23.)

In essence, PHEAA asks the Court to determine that now is not the time for a government agency to enforce the laws with which it is tasked with enforcing.  PHEAA cites no precedent for such a decision, and the Court declines to so rule.

    D.     <u>Preemption</u>

PHEAA moves to dismiss the NYAG's state law claims on the grounds that they are preempted by the Higher Education Act..[11]  PHEAA argues the claims are both expressly preempted by the HEA and preempted under the doctrine of obstacle preemption.

As a preliminary matter, the parties disagree whether the Court should apply the presumption against preemption that is typically applied.  *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("[I]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'") (internal quotations and citations omitted); *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) ("[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'") (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

The NYAG argues the presumption applies here and cites a great number of cases that have applied the presumption in the face of similar state consumer protection claims against federal student loan servicers.  (Opp. at 35 (citing *Minner v. Navient Corp.*, 18 Civ. 1086S (WMS), 2020 WL 906628, at *9 (W.D.N.Y. Feb. 25, 2020); *Daniel v. Navient Sols. LLC*, 328 F. Supp. 3d 1319, 1323-24 (M.D. Fla. 2018); *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529, 547-48 (M.D. Pa. 2018); *Student Loan Servicing Alliance v. Dist. of Columbia*, 351 F. Supp. 3d 26, 46-47 (D.D.C. 2018)).  Nor is this list exhaustive.

---

[11] This argument does not impact NYAG's Dodd-Frank Act claims.

*See, e.g.*, *Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010) ("The Supreme Court has said that a 'presumption against preemption' may apply to preserve state law claims in the face of preemption claims.  Accordingly, we would not lightly decide that the plaintiffs' contract and consumer protection claims under California law are preempted by conflict preemption with the HEA.") (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 474 (1996)).

PHEAA argues that the Court should not apply the presumption against preemption here given "the considerable federal interests at stake in this context."  (Repl. at 13).  PHEAA argues that this case concerns "the federal government's contract with student borrowers, and its contracts with student loan servicers," and a "paradigm . . . created by Congress and . . . administered by the Department."  (Mot. at 27.)  In this regard, PHEAA argues this case is analogous to cases where courts have declined to apply the presumption, such as *United States v. Locke*, 529 U.S. 89, 94 (2000); *Bell v. Blue Cross & Blue Shield*, 823 F.3d 1198 (1201-02 (8th Cir. 2016); *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1104-06 (10th Cir. 2015.)  (Mot. at 27; Repl. at 13.)

But, *Locke* concerned regulation of "national and international maritime commerce," an area in which "Congress has legislated . . . from the earliest days of the Republic." *Locke*, 529 U.S. at 108.  *Bell* concerned a "federal health insurance plan for federal employees that arise from a federal law, and the field of federal employment where "[t]here is obviously a long history of federal involvement."  *Bell*, 823 F.3d at 1202.  And, *Helfrich*, also concerned federal employment, and a statute that "governs only contracts for the benefit of federal employees."  *Helfrich*, 804 F.3d at 1105.  No such interests are implicated here.  While the case does touch on a program established by the federal government, it concerns the relationship between two entities, PHEAA and borrowers, neither of which are the federal government, and a subject, consumer protection, that has historically been regulated by the states.  *See Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41–42 (2d Cir. 1990) ("Because consumer protection law is a field

traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area.")  PHEAA does not contend that history of the federal interest in student loan programs is nearly as long as those in national and international maritime commerce and federal employment.  Reading the exception against the presumption too broadly, for example, in any case involving an area where the federal government has acted, would quickly result in the exception swallowing the rule.  The Court, therefore, concludes the presumption against preemption applies in this context.  Moreover, as seen below, the application of ordinary rules of statutory construction yields the same result in this instance.

### 1.    Express Preemption

Express preemption "occurs when Congress withdraws specified powers from the States by enacting a statute containing an express preemption provision." *Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 238 (2d Cir. 2014) (citation omitted).  PHEAA argues that the HEA expressly preempts the NYAG's state claims here, specifically § 1098g, which provides that FFEL Loans and Direct Loans "shall not be subject to any disclosure requirements of any State law."  *See* 20 U.S.C. § 1098g.

All three of the NYAG's state law claims relate to the same eight alleged acts or practices of PHEAA:  (a) providing borrowers with false PSLF-qualifying loan counts; (b) providing borrowers with incorrect monthly loan payment amounts; (c) misrepresenting repayment options available to struggling borrowers and steering borrowers into less favorable options such as forbearance; (d) misrepresenting the benefits of loan consolidation and steering borrowers to consolidate; (e) misinforming borrowers as to their opportunities to seek exceptions to certain PHEAA policies and to seek reversals of certain PHEAA determinations; (f) misrepresenting that the law providing for cancer deferments has not yet gone into effect; (g) mispresenting that eligible borrowers do not qualify for a cancer deferment; and (h) falsely holding itself out as a reliable source of information to borrowers.  PHEAA characterizes three of these,

(c)-(e), as "omission-based claims," which it argues are "within the core area preempted by § 1098(g).  (Mot. at 29-30.)  The remainder, PHEAA argues are based on alleged affirmative misrepresentations, and PHEAA contends that a claim that a party provided inaccurate information is no different than one that it failed to make proper disclosures, an argument endorsed by a federal court in California considering similar claims against PHEAA brought by private plaintiffs, *Winebarger v. Pennsylvania Higher Education Assistance Agency, et al.* 411 F. Supp. 3d 1070, 1089-90 (C.D. Cal. 2019).  (Mot. at 30-31.)

The Court examines the statute to understand the scope of the § 1098g.  *See New York SMSA Ltd. Partnership v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) ("The key to the preemption inquiry is the intent of Congress.")  The HEA does not define the term "disclosure requirements," but the statute does include requirements that lenders and loan servicers make certain disclosures.  Specifically, § 1083 requires certain disclosures of information in specific contexts, for example, "at or prior to the time such lender disburses a loan," "at or prior to the start of the repayment period," "at the time such lender notifies a borrower of approval of a loan," and periodically, a "bill or statement . . . that corresponds to each payment installment time."  20 U.S.C. § 1083. The Court agrees with others to have considered the issue, that "disclosure requirements" "refers to the HEA's requirements that certain information be communicated to borrowers during the various stages of a loan."  *See Lawson-Ross v. Great Lakes Higher Educ. Corp.*, No. 18-14490, 2020 WL 1815966, at *6 (11th Cir. Apr. 10, 2020); *see also Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 648 (7th Cir. 2019) ("In the context of these express disclosure requirements in § 1083, the phrase "disclosure requirements" in § 1098g applies to information that must be given to borrowers who are struggling to repay their loans.")  Read in this context, § 1098g preempts state disclosure requirements of the type imposed by § 1083.  *See id.*

The Court first addresses PHEAA's argument that claims of affirmative misrepresentations are preempted by § 1098g.  The Court disagrees that this is the case.  *See also Hyland v. Navient Corp.*, No. 18 Civ. 9031(DLC), 2019 WL 2918238, at *6 (S.D.N.Y. July 8, 2019) (affirmative misrepresentations made by student loan servicers in the course of performing its duties not preempted by § 1098g).  The text of § 1098g expressly preempts "disclosure requirements" only, and courts have repeatedly recognized the distinction between failing to disclose information and affirmatively misrepresenting information one has no duty to disclose.  *See id.* 2020 WL 1815966 at *7 ("We find support for this distinction between affirmative misrepresentation and a failure to disclose in the law of torts."); *Nelson*, 928 F.3d at 649 ("The common law tort of fraud ordinarily requires a deliberately false statement of material fact.  An omission or failure to disclose, on the other hand, will not support a common law fraud claim . . ..") (citations omitted)).  The language of the HEA just does not support the broad preemption advocated by PHEAA.  *See Nelson*, 928 F.3d at 648 ("[T]he several specific preemption provisions in the HEA weigh against attributing to Congress a desire to preempt state law broadly . . . [Congress] most certainly did not enact language imposing broad preemption on any state laws, or even any state consumer-protection or tort laws, that might apply to student loans and their servicing.")  The presumption against preemption only further supports this reading.

Turning to the claims here, as even PHEAA concedes, the majority concern alleged affirmative misrepresentations.  (*See* Mot. at 30; Repl. at 15 n. 11.)  Because the NYAG is not alleging a duty to disclose, only a duty to speak truthfully when PHEAA chooses to speak, the Court does not find that they are preempted by the HEA.

The Court, however, agrees with PHEAA that the NYAG's state law claims that PHEAA allegedly "steer[ed] borrowers into less-favorable repayment options such as

forbearance," a portion of item (c) listed above, are preempted by the HEA.[12]  (*See* Compl. ¶¶ 350(c), 355(c), 359(c).)  The factual basis of this claim appears to be predominantly found in two paragraphs of the Complaint:  that "Borrowers who are told of the option to enter forbearance and not about the option to enter IDR may not be aware of IDR and therefore are unable to enroll (or even consider enrolling) in IDR" (Compl. ¶ 293); and "PHEAA misrepresents the options available to borrowers by often failing to mention the option to enter IDR and instead steering the borrowers to forbearance." (Compl. ¶ 287).  The Complaint, therefore, makes clear that the allegation is premised on a failure to disclose certain information, rather than an affirmative misrepresentation, and would impose additional disclosure requirements beyond those in the HEA.  The affirmative representation that NYAG points to is that "PHEAA voluntarily held itself out to borrowers as a source of reliable information 'to help ease that [financial] stress and find a solution that works for you and your budget' but, when borrowers sought help pushed them into choosing forbearance rather than more beneficial IDR plan." (Opp. at 39-40 (citing Compl. ¶¶ 18, 282-87).)  But the affirmative representation, that PHEAA held itself out as a reliable source of information, does not relate to an affirmative misrepresentation about repayment options.  Rather, it suggests, maybe that PHEAA's representation that it is a reliable source of information is incorrect, the basis of another aspect of the NYAG's state law claims (that PHEAA "[f]alsely [held] itself out as a reliable source of information and assistance to borrowers").  (*See* Compl. ¶¶ 350(e), 355(e), 359(e).)

---

[12] The Court does not find that the remainder of the claims that appear in paragraphs 350(c), 355(c), and 359(c) of the Complaint, that PHEAA "[m]isrepresent[ed] repayment options available to struggling borrowers," to be preempted.  While they are preempted to the extent that they rest on allegations that PHEAA failed to tell borrowers about IDR plans, other portions of the Complaint, including allegations that PHEAA affirmatively misrepresented the availability of cancer deferments (Compl. ¶¶ 316-324) and that PHEAA affirmatively misrepresented the benefits of loan consolidation (Compl. ¶¶ 300-309), can be read to support the allegation that PHEAA misrepresented available repayment options.

The remainder of what PHEAA characterizes as "omission-based claims," that PHEAA misrepresented the benefits of loan consolidation and steered borrowers to consolidate and that PHEAA misinformed borrowers as to their opportunities to seek exceptions to certain PHEAA policies and to seek reversals of certain PHEAA determinations, are, upon inspection of the Complaint, actually based on allegations that PHEAA made affirmative misrepresentations.  (*See* Compl ¶¶ 300-303, 305, 307-308, 271-273, 237.)  While, as PHEAA notes, the allegations do refer to alleged failures to disclose information (*e.g.* ¶ 306 ("There is no countervailing warning . . .") that does transform them into disclosure claims—highlighting the failure to provide information in this context is reasonably read as a means of illustrating why the affirmative representations the NYAG points to are allegedly misleading.

Accordingly, with the exception of the NYAG's claims that PHEAA allegedly "steer[ed] borrowers into less-favorable repayment options such as forbearance," the Court finds that the NYAG's state law claims are not preempted by the HEA.[13]

Because Rule 15, sets forth a "permissive standard" for the amendment of complaints, and because the Court does not find that amendment would be futile, the Court permits the NYAG, if it so choses, to replead the claims dismissed here as preempted.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

---

[13] The Court does not find that *Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010) compels a different result, as PHEAA suggests.  (*See* Mot. at 28.)  As two different appellate courts and one court in this District have noted, *Chae* concerned disclosures that were compelled by federal law and which were disclosed in a manner that comported with federal law, and therefore the Ninth Circuit found that plaintiffs were simply seeking to impose additional disclosure requirements.  *See Nelson*, 928 F.3d at 649–50; *Lawson-Ross*, 2020 WL 1815966, at *8; *Genna v. Sallie Mae, Inc.*, No. 11 Civ. 7371 (LBS), 2012 WL 1339482, at *8 (S.D.N.Y. Apr. 17, 2012).  This is plainly not the situation here.

2.      *Conflict Preemption*

"Conflict preemption arises where compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Coalition for Competitive Elec., Dynergy, Inc. v. Zibelman*, 906 F.3d 41, 49 (2d Cir. 2018) (citation omitted).  PHEAA alleges the second theory of conflict preemption applies here—that applying state law in relation to direct loans would conflict with Congress's supposed "objective of uniformity with respect to the federal student loan regime.  (Mot. at 32.)  PHEAA argues that "[i]t is unreasonable to assume that Congress intended to subject federal loan servicers' representations and conduct to the disparate laws of fifty states.  Rather, it envisioned that such questions would be resolved by federal law, embodied by the HEA itself, the Department's regulations, and federal contracts with loan servicers." (*Id.*)

The Second Circuit has recognized that the burden of establishing obstacle preemption is a heavy one.  *See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013).  "The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power."  *Madeira v. Affordable Hous. Found., Inc.,* 469 F.3d 219, 241 (2d Cir.2006). "Indeed, federal law does not preempt state law under obstacle preemption analysis unless 'the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together.'"  *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d at 102 (2d Cir. 2013) (quoting *Madeira*, 469 F.3d at 241).

Here, PHEAA alleges that the application of state law would conflict with Congress's desire for uniformity in enacting the HEA in two ways:  (1) "PHEAA would be forced to undertake various disclosures and remediations that to date have not been au-

thorized by the Department; and (2) "federal borrowers in New York would receive dis-
closures and other remedial treatment not authorized for, or required by the laws of other
states." (Repl. at 16.) But even if the Court were to recognize the HEA's supposed pur-
pose of uniformity (and there is weighty authority suggesting that it is not the case, *see
Lawson-Ross*, 2020 WL 1815966, at \*10 (collecting cases)), the Court sees no conflict
between a desire for uniformity and an order that New York law prohibits PHEAA from
making affirmative misrepresentations in servicing the loans at issue here. *See Cipollone
v. Liggett Grp., Inc.*, 505 U.S. 504, 529 (1992) ("State-law prohibitions on false state-
ments of material fact do not create 'diverse, nonuniform, and confusing' standards.");
*Lawson-Ross*, 2020 WL 1815966, at \*10 ("[P]rohibiting [defendant] from making af-
firmative misrepresentations to borrowers—in contrast to imposing a duty to disclose—
does no harm to standardization of disclosures for federal student loan programs.")
PHEAA could comply with New York state law, as asserted in the Complaint, while sim-
ultaneously respecting any supposed interest in uniformity. Certainly, the conflict is not
"so direct and positive that the two acts cannot be reconciled or consistently stand to-
gether." *See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d at
102.

    In addition to the presumption against preemption, another principle counsels
against finding implied preemption here: the HEA itself contains numerous express
preemption provisions that appear to capture Congress's intent with respect to state au-
thority to act in this area. *See Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 415 (2d Cir.
2002) ("However, where the federal statute contains a provision explicitly addressing
preemption, and when that provision provides a reliable indicium of congressional intent
with respect to state authority, preemption is restricted to the terms of that provision.")

Accordingly, the Court finds that conflict preemption does not require dismissal of the NYAG's claims.[14]

    E.    <u>Joinder</u>

PHEAA seeks dismissal of the Complaint for failure to join the U.S. Department of Education.  PHEAA contends the DOE is a necessary party for two reasons:  (1) "permitting this action to go forward would 'impair and impede' the Department's ability to protect its unique federal interest in student loans" and (2) "in the Department's absence, PHEAA is subject to a 'substantial risk' of incurring conflicting legal obligations."  (Mot. at 36.)

PHEAA argues the DOE's interests will be "impair[ed] and impede[d]" because the "imposition of liability on Government contractors will directly affect the terms of the Government contracts, at the very least by raising the price of such contracts."  (Mot. at 37 (quoting Preemption Notice, 83 Fed. Reg. at 10621) (internal quotations omitted).)

The Court is thoroughly unconvinced.  PHEAA does not identify any terms of its contract with the DOE that will need to be adjusted if PHEAA is found liable here.  Nor does the Court believe that increased contract costs make the DOE a necessary party.  First, it is entirely speculative that these costs would passed through to the DOE—as the NYAG notes, the DOE's contract with PHEAA does not require that it indemnify PHEAA for damages; that PHEAA may demand higher fees in future contracts is uncertain, but, in any event, the Court is aware of nothing that requires the DOE to contract with PHEAA

---

[14] The parties dispute the weight to give to a Department of Education notice titled "Federal Preemption of State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers," which advocates for a finding of preemption.  *See* 83 Fed. Reg. 10,619 (Mar. 12, 2018). The Court agrees with nearly every other court to have considered the Preemption Notice:  it is entitled to little weight under *Skidmore v. Swift*, 323 U.S. 134 (1944), it "is not persuasive because it is not particularly thorough and it represents a stark, unexplained change in the Department's position."  *Nelson*, 928 F.3d at 651 n.2; Student *Loan Servicing Alliance v. District of Columbia*, 351 F. Supp. 3d 26, 48–49 (D.D.C. 2018). Indeed, the only decision PHEAA cites to as finding the Notice to be "persuasive and due deference under *Skidmore*," *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, No. 17 Civ. 253 (MEW), 2018 WL 5621872, at *3 (N.D. Fla. Sept. 20, 2018), was recently vacated by the Eleventh Circuit considering the decision on appeal, with a note specifically rejecting its deference to the Preemption Notice.  *Lawson-Ross*, 2020 WL 1815966, at *9 n. 13.

specifically.  Second, and more importantly, the Court is unaware of precedent (PHEAA cites none), that the mere potential for increased contract costs would "impair and impede" the interests of the federal government for purposes of the joinder inquiry.  None of the cases PHEAA cites (*see* Mot. at 37; Repl. at 18) concern joinder.  While they recognize that the U.S. might have an interest when it comes to imposing liability on federal contractors, they do not require that the federal government be found a necessary party to any litigation involving its contractors because a finding of liability might increase its costs.  Indeed, such a rule would seem to foreclose most litigation involving a federal contractor not brought by the federal government.[15]  It would leave, for example, no mechanism for state and local authorities to pursue alleged tax and building code violations against contractors, which courts have repeatedly recognized they are entitled to bring.  *See, e.g.*, *United States v. New Mexico*, 455 U.S. 720, 734 (1982) (recognizing that states may tax contractors even where "the tax has an effect on the United States, or the Federal Government shoulders the entire economic burden of the levy.") (citing *Alabama v. King & Boozer*, 314 U.S. 1, 8 (1941)), *GEO Grp., Inc. v. City of Tacoma*, No. 3:18 Civ. 05233 (RBL), 2019 WL 5963112, at *5 (W.D. Wash. Nov. 13, 2019) (permitting application of building code to federal contractor); *Washington v. GEO Grp., Inc.*, No. 3:17 Civ. 05806 (RJB), 2018 WL 6448778, at *4 (W.D. Wash. Dec. 10, 2018) (permitting application of minimum wage law to federal contractor).  Further, other mechanisms exist to protect the interests of the federal government in this instance, including those discussed in the cases PHEAA cites.  *See, e.g.*, *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 830 (4th Cir. 2010) (considering preemption); *In re ("Agent Orange") Prod. Liab. Litig.*, 304 F. Supp. 2d 404, 442 (E.D.N.Y. 2004), aff'd

---

[15] PHEAA dismisses this concern, stating simply that the potential to increase contractual costs for the federal government is "one factor among several to be considered."  (Repl. at 18 n. 13.)  But PHEAA does not explain how consideration of this one factor would not swallow the entire analysis.

sub nom. *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76 (2d Cir. 2008) (considering the government contractor defense).

PHEAA also argues that "any disposition in the Department's absence threatens PHEAA with multiple or inconsistent obligations." (Mot. at 37.)  PHEAA worries that "[i]n the event that this Court were to enter an order requiring certain new or different disclosures as a matter of injunctive relief, for instance, the Department might nonetheless seek to compel PHEAA, through its enforcement mechanisms, to not make such disclosures, consistent with its current servicing requirements." (*Id.* at 37-38.) PHEAA does not, however, point to a single instance of conflicting obligations. While it notes the DOE's belief, expressed in the Preemption Notice, that "State-law requirements may conflict with legal, regulatory, and contractual requirements," it does not identify any actual conflict.  The Court is not willing to find the DOE a necessary party on the speculation that, in the future, the DOE might require that PHEAA make certain disclosures that are found in this litigation to be misleading.  Without now deciding their scope, other doctrines exist to protect PHEAA from liability where it is simply following the DOE's directives.  *See, e.g.*, *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. at 673 (Under *Yearsley* "'there is no liability on the part of the contractor' who simply performed as the Government directed") (quoting *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20-21 (1940)).

Because the Court does not find the DOE to be a necessary party, it does not consider PHEAA's argument that the DOE is an indispensable party.[16]  *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000) ("If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal

---

[16] PHEAA also argues that this case concerns the "availability of federal loan forgiveness, which directly affects the federal Treasury." (Mot. at 36.)  PHEAA does not appear to argue that this litigation would be "impair and impede" that interest, but the Court nonetheless notes, as NYAG does (Opp. at 46 n. 54) that this action does not challenge any DOE policy or the regulations concerning borrower eligibility for PSLF.

under Rule 19(b).") (citing *Associated Dry Goods Corp. v. Towers Fin. Corp.*, 920 F.2d 1121, 1123 (2d Cir. 1990).

   F.   Civil Penalties Under Dodd-Frank

   PHEAA asserts that the NYAG's request for relief in the form of "a civil penalty of $1,000,000 per day in which PHEAA engaged in conduct that violated 12 U.S.C. § 5031 *et seq.*" is improper because the Consumer Financial Protection Act ("CFPA") does not authorize the NYAG to pursue this remedy.  (Mot. at 40.)  According to PHEAA, no civil penalty may be assessed under the relevant statutory section unless the Consumer Financial Protection Bureau is a party to the action, and, because it is not here, the NYAG is not entitled to pursue civil penalties.  (Mot. at 40-41.)  The NYAG disagrees, arguing that the relevant statutory text "in favor of the Bureau" "encompass suits by state attorneys general proceeding in the shoes of the Bureau under Dodd-Frank."  (Opp. at 50.)  The NYAG argues that two cases support its view, *New Mexico ex. rel. Balderas v. Real Estate Law Center, P.C.*, 403 F. Supp. 3 1233 (D.N.M 2019), which considered the issue in the context of a discovery dispute, and *Office of the Attorney General v. Berger Law Group, P.A.*, No. 8:14 Civ. 1925 (JSM), 2015 WL 5922933), which considered the issue in awarding default judgment to the state attorney general, and that no court has found that the state attorneys general lack this authority.

   The Court finds that it premature to decide this issue now.  As the NYAG notes, "a motion to dismiss is addressed to a 'claim'—not to a form of damages."  *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 301, 318 (S.D.N.Y. 2010) (quoting *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 536 (S.D.N.Y. 2013)) (internal quotations omitted); *Denton v. McKee*, 332 F. Supp. 2d 659, 667 (S.D.N.Y. 2004).

## IV.   CONCLUSION

   For the foregoing reasons, PHEAA's motion to dismiss is GRANTED with respect to the NYAG's claims that PHEAA "steer[ed] borrowers into less-favorable repayment options such as forbearance."  (*See* Compl. ¶¶ 350(c), 355(c), 359(c).)  These

claims are preempted by the HEA.  The remainder of PHEAA's motion to dismiss is DENIED.

The parties are directed to appear telephonically at a status conference on May 13, 2020 at 10:00 A.M. (Tel:  877-411-9748; Access Code:  3029857) to discuss PHEAA's request that the Court authorize limited discovery to determine PHEAA's entitlement to *Yearsley* immunity.  (*See* Mot. at 20; Repl. at 8.)  The parties may wish to submit short letters, not exceeding three pages in length, detailing their positions on the matter no later than three days before the conference.

The Clerk of the Court is respectfully directed to terminate the motion at Dkt. No. 40.

It is SO ORDERED.

Dated:   May 1, 2020
         New York, New York

_____
              EDGARDO RAMOS, U.S.D.J.